**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In Re:

W.B. CARE CENTER, LLC                    Case No.: 09-26196-BKC-JKO
                                          Chapter 7 Proceeding

_____Debtor._____/

**<u>NOTICE OF FILING NOTICE OF REMOVAL</u>**

ECC, P.L. d/b/a/ Ehrenstein Charbonneau Calderin ("**ECC**"), a Florida corporation, gives

notice that it filed a Notice of Removal, pursuant to 28 U.S.C. § 1452 and Rule 9027 of the

Federal Rules of Bankruptcy Procedure pursuant, in the matter of *Reardon v. Lake Worth*

*Enterprises, LLC et. al.* commenced in the Florida Southern District Court, Miami Division (the

"**District Court**"), Case 1:12-cv-20829-JAL (the "**Action**"), requesting that the Action be

removed to the United States Bankruptcy Court for the Southern District of Florida, Fort

Lauderdale Division (the "**Bankruptcy Court**"), where the Chapter 7 bankruptcy case of WB

Care Center, LLC (the "**Debtor**") is pending. The Notice of Removal is annexed hereto as

**Exhibit "A"**. A copy of all process, pleadings, and orders served upon ECC in the Action are

attached hereto as **Composite Exhibit "B".**

*[Signature Page Follows]*

**I HEREBY CERTIFY** *that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with additional qualifications to practice as set forth in Local Rule 2090-1(A).*

Respectfully submitted,

EHRENSTEIN CHARBONNEAU CALDERIN

501 Brickell Key Drive, Suite 300

Miami, FL 33131

T. (305) 722-2002     F. (305) 722-2001

By:   /s/ *Robert P Charbonneau*

Robert P. Charbonneau

Florida Bar No: 968234

rcharbonneau@ecclegal.com

Exhibit "A"
(Notice of Removal)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
www.flsd.uscourts.gov

TIMOTHY PATRICK REARDON,

     Plaintiff,

vs.                                   Case No.: 1:12-cv-20829-JAL

LAKE WORTH ENTERPRISES, LLC, _et. al._,

     Defendants.                       /

## **NOTICE OF REMOVAL**

ECC, P.L. d/b/a/ Ehrenstein Charbonneau Calderin ("**ECC**"), a Florida corporation, ("**ECC**"), pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure, requests that the matter of _Reardon v. Lake Worth Enterprises, LLC et. al._ commenced in the Florida Southern District Court, Miami Division (the "**District Court**"), Case 1:12-cv-20829-JAL (the "**Action**"), be removed to the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "**Bankruptcy Court**"), where the Chapter 7 bankruptcy estate of WB Care Center, LLC (the "**Debtor**") is being administered, Case No. 09-26196-JKO (the "**Bankruptcy Case**"), and as grounds therefore, states:

     1.     The Action contains eight (8) enumerated counts, followed by a plethora of what appear to be additional, unnumbered counts.

     2.     The Action primarily involves events related to the operation and sale of a nursing home facility (the "**Facility**") that was previously owned by the Debtor, and the actions of various parties involved with the sale or operation of the Facility at some point in time.

     3.     The Plaintiff, Timothy Patrick Reardon, was the former Administrator of the Facility.

4.     The sale (the "**Sale**") of the Facility was approved by the Bankruptcy Court during the pendency of the Debtor's Chapter 11 case, prior to conversion to Chapter 7. [*See* ECF # 358 in Bankruptcy Case]

5.     Accordingly, the Bankruptcy Court has familiarity with the Debtor, the Facility, and the Sale that the Action arises from, and is related to.

6.     Accordingly, the Bankruptcy Court has original jurisdiction over this Action under 28 U.S.C. § 1334, as the Action relates to the Bankruptcy Case.

7.     Upon removal to the Bankruptcy Court, the Action is a non-core proceeding.

8.     ECC consents to the Bankruptcy Court's entry of final order or judgment in the Action.

Respectfully Submitted,

EHRENSTEIN CHARBONNEAU CALDERIN
501 Brickell Key Drive, Suite 300
Miami, FL 33131
T. (305) 722-2002     F. (305) 722-2001

By: _____
Robert P. Charbonneau
Florida Bar No: 968234
rcharbonneau@ecclegal.com

Exhibit "B"
(Process, Pleadings, and Orders)

JJO,REF_PTRL

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:12-cv-20829-JAL

Reardon v. Lake Worth Enterprises, LLC et al
Assigned to: Judge Joan A. Lenard
Referred to: Magistrate Judge John J. O'Sullivan
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 02/28/2012
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt
Organization
Jurisdiction: Federal Question

**Plaintiff**

**Timothy Patrick Reardon**

represented by **Timothy Patrick Reardon**
226 N.E. 1st Ave
Miami, FL 33132
Email: treardon12@aol.com
PRO SE

V.

**Defendant**

**Lake Worth Enterprises, LLC**
*doing business as*
Oasis Health and Rehabilitation Center

**Defendant**

**LWRE,LLC**

**Defendant**

**1201, LLC**

**Defendant**

**Tri-State Health Investors,LLC**
*doing business as*
L.W.M.

**Defendant**

**Gilda Anderson**

**Defendant**

**W.B. Care Center, LLC**
*doing business as*
West Broward Care Center

**Defendant**

**Millennium Management, LLC**

*formerly known as*
Elite Healthcare Managment, LLC

### Defendant

**Millenium Healthcare Management,
LLC**
*doing business as*
Millennium Management

### Defendant

**West Broward Group, LLC**

### Defendant

**Sterns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.**

### Defendant

**DIP Capital Lending, Inc.**

### Defendant

**Michael I Bernstein, P.A.**

### Defendant

**Moore Stephens Lovelace, P.A.**

### Defendant

**ECC,P.I.**
*doing business as*
Ehrenstein Charbonneau Calderin

### Defendant

**Thomas L Abrams, P.A.**                 represented by  **Thomas Louis Abrams**
                                                            Gamberg & Abrams
                                                            1776 N. Pine Island Road
                                                            Suite 309
                                                            Plantation, FL 33322
                                                            954-523-0900
                                                            Fax: 954-915-9016
                                                            Email: tabrams@tabramslaw.com
                                                            *ATTORNEY TO BE NOTICED*

### Defendant

**Ruben McClosky**
*P.A.*

### Defendant

**Joseph D. Mitchell**
*P.A.*

**Defendant**

**Law Offices of Peter A. Lewis, P.L.**

**Defendant**

**Payton and Associates, LLC**

**Defendant**

**Broad and Cassel, P.A.**

**Defendant**

**Goldsmith and Grout, P.A.**

**Defendant**

**Wilk Auslander, LLP**

**Defendant**

**Joshua D Manaster**
*P.A.*

**Defendant**

**Norhern Jacksonville Enterprise, LLC**
*doing business as*
Lanier Manor

**Defendant**

**Hialeah Enterprise, LLC**
*doing business as*
Hialeah Nursing and Rehabilitation Center

**Defendant**

**West Dixie Care, LLC**
*doing business as*
Watercrest Care Center

represented by **Michael Ira Bernstein**
The Bernstein Law Firm
1688 Meridian Avenue
Suite #418
Miami Beach, FL 33139
305-672-9544
Fax: 305-672-4572
Email: michael@miblawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Coral Gables Holdings, LLC**
*doing business as*
Coral Gables Nursing and Rehabilitation Center

**Defendant**

**Avon Park Royal Holdings, LLC**
*doing business as*
Royal Care of Avon Park

**Defendant**

**Boca Group, LLC**
*doing business as*
Menorah House

**Defendant**

**Delray Group, LLC**
*doing business as*
Lake View Care Center At Delray

**Defendant**

**Bradenton Enterprise,LLC**

**Defendant**

**CDBR Enterprise,LLC**                    represented by **Michael Ira Bernstein**
*doing business as*                                        (See above for address)
Braden River Care Center                                   *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Soloman and Clara Heisler Family**
**Foundation**

**Defendant**

**Weingarten Family Foundation**

**Defendant**

**Schon Family Foundation**

**Defendant**

**Educational Support Foundation,**
**Inc.**
*formerly known as*
The Leoan and Irene Scharf Foundation

**Defendant**

**Emes Foundation, Inc**

**Defendant**

**Chesed Global Foundation**

**Defendant**

**Zichron Foundation for Special**

**Needs**

**Defendant**

**The Ridge Park Foundation**

**Defendant**

**Institutional Leasing 1, LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/28/2012 | 1 | COMPLAINT against 1201, LLC, Gilda Anderson, LWRE,LLC, Lake Worth Enterprises, LLC, Tri-State Health Investors,LLC. Filing fee $ 350.00. IFP Filed, filed by Timothy Patrick Reardon. (Attachments: # 1 Civil Cover Sheet) (cqs) (Entered: 02/29/2012) |
| 02/28/2012 | 2 | Judge Assignment to Judge Joan A. Lenard (cqs)Date Modified on 2/29/2012 (cqs). (Entered: 02/29/2012) |
| 02/28/2012 | 3 | MOTION for Leave to Proceed in forma pauperis by Timothy Patrick Reardon. (cqs) (Entered: 02/29/2012) |
| 05/30/2012 | 4 | ORDER REFERRING CASE to Magistrate Judge John J. O'Sullivan for a ruling on all pre-trial, non-dispositive matters and for a Report and Recommendation on any dispositive matters. This entry constitutes the ENDORSED ORDER in its entirety. Signed by Judge Joan A. Lenard on 5/30/2012. (atl) (Entered: 05/30/2012) |
| 05/30/2012 | 5 | ORDER granting 3 Motion for Leave to Proceed in forma pauperis. Signed by Magistrate Judge John J. O'Sullivan on 5/30/2012. (mkr) (Entered: 05/30/2012) |
| 05/30/2012 | 6 | ORDER requiring the plaintiff to file a notice of compliance with 5 Order on Motion for Leave to Proceed in forma pauperis. Signed by Magistrate Judge John J. O'Sullivan on 5/30/2012. (mkr) (Entered: 05/30/2012) |
| 06/12/2012 | 7 | MOTION for Extension of Time To Serve Defendants by Timothy Patrick Reardon. Responses due by 6/29/2012 (cqs) (Entered: 06/12/2012) |
| 06/18/2012 | 8 | ORDER granting 7 Motion for Extension of Time to deliver documents to the US Marshals Service. Signed by Magistrate Judge John J. O'Sullivan on 6/18/2012. (mkr) (Entered: 06/18/2012) |
| 06/19/2012 | | Set/Reset Deadlines/Hearings as per DE 8 : Miscellaneous (Summonses and attachments) Deadline 6/29/2012. (lk) (Entered: 06/19/2012) |
| 07/09/2012 | 9 | ORDER TO SHOW CAUSE, Show Cause Response due by 7/23/2012. Signed by Magistrate Judge John J. O'Sullivan on 7/9/2012. (mkr) (Entered: 07/09/2012) |
| 07/24/2012 | 10 | NOTICE of Change of Address by Timothy Patrick Reardon (System Updated) (cqs) (Entered: 07/24/2012) |
| 07/24/2012 | 11 | MEMORANDUM of Law re 9 Order to Show Cause by Timothy Patrick Reardon. (cqs) (Entered: 07/24/2012) |

| 07/24/2012 | 12 | MOTION To Be Served Notices Of Filings Via Email by Timothy Patrick Reardon. (cqs) (Entered: 07/24/2012) |
|---|---|---|
| 07/24/2012 | 13 | ORDER granting 12 Motion to be Served Notices of Filings via email. Signed by Magistrate Judge John J. O'Sullivan on 7/24/2012. (mkr) (Entered: 07/24/2012) |
| 07/24/2012 | 14 | ORDER granting 11 motion for extension of time to deliver documents filed by Timothy Patrick Reardon and vacating 9 Order to Show Cause. Signed by Magistrate Judge John J. O'Sullivan on 7/24/2012. (mkr) (Entered: 07/24/2012) |
| 07/30/2012 | 15 | FIRST AMENDED VERIFIED COMPLAINT against All Defendants, filed by Timothy Patrick Reardon.(cqs) (Entered: 07/31/2012) |
| 07/31/2012 | 16 | Summons Issued as to Thomas L Abrams, Avon Park Royal Holdings, LLC, Boca Group, LLC, Bradenton Enterprise,LLC, Broad and Cassel, P.A., CDBR Enterprise,LLC, Chesed Global Foundation, Coral Gables Holdings, LLC, DIP Capital Lending, Inc., Delray Group, LLC, ECC,P.I., Educational Support Foundation, Inc., Emes Foundation, Inc, Goldsmith and Grout, P.A., Hialeah Enterprise, LLC, Lake Worth Enterprises, LLC, Law Offices of Peter A. Lewis, P.L., Joshua D Manaster, Ruben McClosky, Michael I Bernstein, P.A., Millenium Healthcare Management, LLC, Millennium Management, LLC, Joseph D. Mitchell, Moore Stephens Lovelace, P.A., Norhern Jacksonville Enterprise, LLC, Payton and Associates, LLC, Schon Family Foundation, Soloman and Clara Heisler Family Foundation, Sterns Weaver Miller Weissler Alhadeff & Sitterson, P.A., The Ridge Park Foundation, Weingarten Family Foundation, West Broward Group, LLC, West Dixie Care, LLC, Wilk Auslander, LLP, Zichron Foundation for Special Needs. (cqs) (Entered: 07/31/2012) |
| 08/10/2012 | 17 | MOTION For Permission To File A RICO Civil Case Statement by Timothy Patrick Reardon. (cqs) (Entered: 08/13/2012) |
| 08/17/2012 | 18 | ORDER granting 17 Motion for Permission to File a RICO Case Statement. Signed by Magistrate Judge John J. O'Sullivan on 8/17/2012. (mkr) (Entered: 08/17/2012) |
| 08/20/2012 | | Set/Reset Deadlines/Hearings as per DE 18 : Miscellaneous (Rico Statement) Deadline 8/31/2012. (lk) (Entered: 08/20/2012) |
| 08/20/2012 | 19 | EMERGENCY MOTION For Order Directing U.S. Marshals To Serve Defendants, RE: Subpoena To Produce Documents In A Civil Action. by Timothy Patrick Reardon. (Attachments: # 1 Motion cont'd)(cqs) (Entered: 08/20/2012) |
| 08/21/2012 | 20 | ORDER denying 19 Emergency Motion for Order Directing U.S. Marshals to Serve Defendants. Signed by Magistrate Judge John J. O'Sullivan on 8/21/2012. (mkr) (Entered: 08/21/2012) |
| 08/21/2012 | 21 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint West Dixie Care, LLC served on 8/16/2012, answer due 9/6/2012. (cqs) (Entered: 08/22/2012) |
| 08/21/2012 | 22 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint |

| | | |
|---|---|---|
| | | Thomas L Abrams served on 8/16/2012, answer due 9/6/2012. (cqs) (Entered: 08/22/2012) |
| 08/21/2012 | 23 | NOTICE of Filing Letter To Judge John O'Sullivan. by Timothy Patrick Reardon (cqs) (Entered: 08/22/2012) |
| 08/21/2012 | 24 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint CDBR Enterprise,LLC served on 8/16/2012, answer due 9/6/2012. (cqs) (Entered: 08/22/2012) |
| 08/30/2012 | 25 | MOTION TO DISMISS 15 Amended Complaint FOR FAILURE TO STATE A CLAIM by Thomas L Abrams, P.A.. Responses due by 9/17/2012 (Attachments: # 1 Exhibit (Exhibits A and B))(Abrams, Thomas) (Entered: 08/30/2012) |
| 08/30/2012 | 26 | NOTICE of Filing Letter To Judge O'Sullivan by Timothy Patrick Reardon (cqs) (Entered: 08/30/2012) |
| 09/04/2012 | 27 | Summons (Affidavit) Returned Unexecuted as to Chesed Global Foundation. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 28 | Summons (Affidavit) Returned Unexecuted as to Educational Support Foundation, Inc.. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 29 | Summons (Affidavit) Returned Unexecuted as to Emes Foundation, Inc. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 30 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Wilk Auslander, LLP served on 8/23/2012, answer due 9/13/2012. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 31 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Sterns Weaver Miller Weissler Alhadeff & Sitterson, P.A. served on 8/21/2012, answer due 9/11/2012. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 32 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Millennium Management, LLC served on 8/21/2012, answer due 9/11/2012. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 33 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 34 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Payton and Associates, LLC served on 8/21/2012, answer due 9/11/2012. (cqs) (Entered: 09/04/2012) |
| 09/04/2012 | 35 | RESPONSE in Opposition re 25 MOTION TO DISMISS 15 Amended Complaint FOR FAILURE TO STATE A CLAIM With Memorandum Of Law In Support and Request For Oral Argument filed by Timothy Patrick Reardon. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(cqs) (Entered: 09/05/2012) |
| 09/04/2012 | 36 | MOTION For Oral Argument (for image see De#35) by Timothy Patrick Reardon. (cqs) (Entered: 09/05/2012) |
| 09/05/2012 | 38 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Moore |

| | | |
|---|---|---|
| | | Stephens Lovelace, P.A. served on 8/23/2012, answer due 9/13/2012. (cqs) (Entered: 09/06/2012) |
| 09/05/2012 | 39 | ACKNOWLEDGMENT OF SERVICE Executed as to B & C Corporate Services on 8/23/2012. (cqs) (Entered: 09/06/2012) |
| 09/05/2012 | 40 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Law Offices of Peter A. Lewis, P.L. served on 8/22/2012, answer due 9/12/2012. (cqs) (Entered: 09/06/2012) |
| 09/06/2012 | 37 | ORDER denying 36 Motion for Oral Argument. Signed by Magistrate Judge John J. O'Sullivan on 9/6/2012. (mkr) (Entered: 09/06/2012) |
| 09/06/2012 | 41 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint as ot Peter Lewis (cqs) (Entered: 09/06/2012) |
| 09/06/2012 | 42 | SUMMONS (Affidavit) Returned Executed on 15 Amended Complaint Joseph D. Mitchell served on 8/21/2012, answer due 9/11/2012. (cqs) (Entered: 09/06/2012) |
| 09/06/2012 | 43 | NOTICE of Attorney Appearance by Michael Ira Bernstein on behalf of CDBR Enterprise,LLC, West Dixie Care, LLC (Bernstein, Michael) (Entered: 09/06/2012) |
| 09/06/2012 | 44 | MOTION for Extension of Time to File Response/Reply as to 15 Amended Complaint by CDBR Enterprise,LLC, West Dixie Care, LLC. (Bernstein, Michael) (Entered: 09/06/2012) |
| 09/07/2012 | 45 | Summons Issued as to Chesed Global Foundation, Educational Support Foundation, Inc., Emes Foundation, Inc. (lbc) (Entered: 09/07/2012) |
| 09/07/2012 | 46 | EXHIBITS by Timothy Patrick Reardon. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 27)(lbc) (Entered: 09/07/2012) |
| 09/07/2012 | 47 | NOTICE by ECC,P.I. re 15 Amended Complaint *Notice of Removal* (Charbonneau, Robert) (Entered: 09/07/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/07/2012 17:13:22 | | |
| **PACER Login:** | ec1644 | **Client Code:** | TEMP291 |
| **Description:** | Docket Report | **Search Criteria:** | 1:12-cv-20829-JAL |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

FILED by _Ass_ D.C.

FEB 2 8 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

TIMOTHY PATRICK REARDON, an Individual;

## 12-CV-20829-LENARD/O'SULLIVAN

Case No.: _____

Plaintiff,

vs.

**DEMAND FOR JURY TRIAL**

LAKE WORTH ENTERPRISES, LLC d/b/a OASIS HEALTH AND REHABILITATION CENTER; LWRE, LLC; 1201, LLC; TRI-STATE HEALTH INVESTORS, LLC d/b/a L.W.M.; and GILDA ANDERSON;

Defendants.

_____/

## COMPLAINT

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES………………………………………………… 9

NATURE OF ACTION……………………………………………… 13

STATEMENT OF JURISDICATION…………………………………….. 13

BACKGROUND…………………………………………………… 14

INTRODUCTION…………………………………………………… 14

PARTIES AND RELEVANT PARTIES

    Plaintiff………………………………………………………… 15

        Timothy Patrick Reardon


    RICO Defendants………………………………………………… 16

    1) LAKE WORTH ENTERPRISES, LLC d/b/a OASIS HEALTH AND

       REHABILITATION CENTER;

    2) LWRE, LLC;

    3) 1201, LLC;

    4) TRI-STATE HEALTH INVESTORS, LLC d/b/a L.W.M.;

    5) GILDA ANDERSON;


FACTUAL BASIS FOR CLAIMS………………………………………… 19

A. Medicaid Provider Fraud…………………………………………….. 19

   1. False Licensure Applications……………………………………… 19

      a) Fake Change of Ownership (C.H.O.W.) - Brookwood

         i. Sandpiper Cove Limited Partnership
        ii. Blue Heron, LLC
       iii. Paragon Investments, Inc.

iv.  Palm Bay, LLC
v.  Brookcourt, LLC

   b)  Fake Change of Ownership (C.H.O.W.) – Signature Healthcare

i.  Elizabeth Fago on HQM
ii.  Joseph Steier on HQM and Signature
iii.  Paul Walczak on HQM and Signature
iv.  Paul Walczak is Elizabeth Fago's son
v.  Same address for both companies

2.  False Cost Report Expenses…………………………………………… 23

   a)  "compiling" cost reports  (Brookwood)…..…………………………….. 25

   b)  Fake Management fees……………………………………………… 25

i.  Res-Care
ii.  Graceville Area Convalescent Center, Inc.
iii.  Walton County Convalescent Center, Inc.

   c)  Fake Lease Payments - Brookwood…………………………………… 27

i.  Walton County Convalescent Center Operations, LLC
ii.  Waterford Convalescent Center Operations, LLC
iii.  Jackson County Convalescent Center Operations, LLC
iv.  Brookwood Gardens Convalescent Center Operations, LLC
v.  Washington County Convalescent Center Operations, LLC
vi.  Courtyard Millpond Operations, LLC

   d)  Fake Lease Payments – Home Quality Management

i. Elizabeth Fago of HQM negotiates with Gummels for sale
ii. HQM has Health Care Reit buy them and lease to HQM
iii. Not an "arms length" transaction

   e)  Fake Expense - Brookwood…………………………………………… 28

i.  Auto Payments for Administrators automobile
ii.  Capital expenses billed as "expenses"

   f)  Fake Expense – Signature Healthcare

i.  Payments to Ken Gummels

B.  Tax Fraud…………………………………………………………………… 30

1. Fake Expenses lowering profits

      a) Fake lease payments
      b) Fake increased Administrators salary
      c) Fake capital expenses
      d) Fake management fees
      e) Fake lease expenses

C. Perjury
   1. Kenneth Gummels Deposition……………………………………………….. 30

D. Antitrust
   1. Health Care Reit, Inc………………………………………………………..

PROHIBITED ACTIVITIES – PREDICATE ACTS

A. Mail Fraud………………………………………………………………… 31

   1. tax returns

   2. cost reports

   3. licensure applications

   4. kickback checks

B. Wire Fraud………………………………………………………………… 31

   1. Medicaid billings

D. Bank Fraud………………………………………………………………… 31

   2. transferred stolen money

E. Money Laundering…………………………………………………………… 32

PATTERN OF RACKETEERING…………………………………………………… 32

ENTERPRISE…………………………………………………………………… 32

STRUCTURE OF THE ENTERPRISE………………………………………………… 33

ENTERPRISE ENGAGED IN INTERSTATE COMMERCE…………………………… 35

CLAIMS FOR RELIEF…………………………………………………………… 35

FIRST CLAIM FOR RELIEF
    (Violation of RICO – 18 U.S.C. § 1962I)
    (Conduct or Participate In An Enterprise)

SECOND CLAIM FOR RELIEF
    (Violation of RICO 18 U.S.C. § 1962(d))
    (Conspiracy to Violate Section 1962I)


PRAYER FOR RELIEF……………………………………………………………………… 36

## TABLE OF AUTHORITIES

**Federal Regulations**

42 C.F.R. § 413.17  Expenses paid to related organizations

42 C.F.R. § 413.17(b)(3) Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or polices of an organization or institution

42 C.F.R. § 413.9  Costs must be related to patient care

42 C.F.R. § 413.20(d) Provider must furnish such information to the intermediary as may be necessary to assure proper payment by the program

**Florida State Statutes**

<u>Florida Statute 409.920(2) (a) (6)</u>    "Knowingly submit false or misleading information or statements to the Medicaid program for the purpose of being accepted as a Medicaid provider."

<u>Florida Statute  409.920(2)(a)(4):</u>   Knowingly make or in any way cause to be made any false statement or false representation of a material fact, by commission or omission, in any document containing items of income and expense that is or may be used by the agency to determine a general or specific rate of payment for an item or service provided by a provider

**Federal Statutes**
18 U.S.C. § 1961(1)(1)

18 U.S.C. § 1961(d)

18 U.S.C. § 1961(4)

18 U.S.C. § 1962(b)


**Case Law – Related Party Rule  -  11th Circuit**

United States vs. Mehendra Pratap GUPTA, Cardinal Care, Inc. Marshal Medical Services, Inc., Atlantic Health Care Services, Inc., West Coast Healthcare Services, Inc., and Treasure Coast Health Care Services,  11th Circuit Court of Appeals

United States of America, ex rel James  ALDERSON vs. HCA – The Healthcare Company; et al. 11th Circuit Court of Appeals

United States of America, ex rel John SCHILLING vs. HCA – The Healthcare Company; et al., 11th Circuit Court of Appeals

United States of America v. John E. CALHOON, 11th Circuit Court of Appeals

**Case Law – Racketeer Influence Corrupt Organization – 11th Circuit**

United States v. Alonso, 740 F.2d 862, 870 (11th Cir. 1984)

United States v. Cagnina, 697 F.2d 915, 922 (11th Cir. 1983).

United States v. Hewes, 729 F. 2d 1302, 1310-11(11th Cir. 1984).

Williams v. Mohawk Indus. Inc., 465 F.3d 1277, 1283-86 (11th Cir. 2006),

In United States v. Hewes, 729 F. 2d 1302, 1310 (11th Cir. 1984),

United States v. Cagnina, 697 F. 2d 915, 921-22 (11th Cir.)

**Government Reports**

Civil RICO:  18 U.S.C. §§ 1961-1968  A Manual for Federal Attorneys
Prepared by the Staff of the Organized Crime and Racketeering Section
United States Department of Justice, Washington, DC    October 2007

Criminal RICO:  18 U.S.C. §§ 1961-1968  A Manual for Federal Prosecutors
Prepared by the Staff of the Organized Crime and Racketeering Section
United States Department of Justice, Washington, DC    October 2009

State of Florida Auditor General Operational Audit
Agency for Health Care Administration –
Medicaid Program Fraud Prevention and Detection-Policies and Procedures –
Facility Cost Reports   November 2011

Lewis Morris, Health and Human Services, Office of the Inspector General
"In the Hands of Strangers"

11th Circuit Jury Instructions – RICO
11th Circuit Jury Instructions – Anti-Trust
Federal Criminal Sentencing Guidelines – Money Laundering

Plaintiff TIMOTHY PATRICK REARDON, (REARDON), hereby alleges the following against Defendants LAKE WORTH ENTERPRISES, LLC d/b/a OASIS HEALTH AND REHABILITATION CENTER; LWRE, LLC; 1201, LLC; TRI-STATE HEALTH NVESTORS, LLC d/b/a L.W.M.; GILDA ANDERSON;

## NATURE OF ACTION

Plaintiff brings this action for racketeering under Section 1962(a), Section 1962(b) Section 1962(c) and Section 1962(d) against Defendants.  Defendants have participated in a scheme to defraud the Federal Government thru Medicaid Fraud and Tax Fraud.   In order to succeed, Defendants have engaged in bank fraud, money laundering, obstruction of justice and mail/wire fraud.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the subject matter of the causes of action in this Complaint by virtue of:

Federal question jurisdiction pursuant to 18 U.S.C. Section 1331, involving an action pursuant to 18 U.S.C. Sections 1964(a), (b) and (c), the Federal Racketeer Influenced and Corrupt Organization Act ("RICO);

This Court has jurisdiction over the persons of the Defendants because:

1. Each Defendant either resides or transacts business within this judicial district; and

2. Each Defendant is amenable to service of process within the meaning of Federal Rule of Civil Procedure 4(e), 4(f) and 18 U.S.C. Section 1965(b).

Venue is proper in this district pursuant to 18 U.S.C. Section 1965 and 28 U.S.C. Section 1391 because Defendants either reside or transact business in this district or, alternatively, this district is where a substantial part of the events or omissions giving rise to the claim occurred.

## BACKGROUND

RICO stands for Racketeer Influenced and Corrupt Organizations. In the nursing home industry RICO should stand for Related Interests and Controlling Organizations. Medicare and Medicaid pays nursing homes based on cost reports submitted on a yearly basis.

In reality, Medicare and Medicaid is based on a "free market" concept. It is assumed that nursing homes will contract with vendors that offer the best service at the best price. If, on the other hand, a nursing home contracts with a vendor on which it has a relationship, either based on family or business, then the vendor can only charge for actual costs.

Although the nursing home industry has convinced the government and the general population that they need to create multiple layers of corporations to protect themselves from unscrupulous plaintiff attorneys, it is actually all about concealing related parties.

Thru the use of fake management companies, fake lease payments, or straw buyers, the nursing home owners have been able to create layers of "profit" taken from the Medicaid system.

## INTRODUCTION

Plaintiff REARDON was a nursing home administrator employed by Defendants for three years. During this time REARDON signed numerous cost reports and directed the billings to Medicaid and Medicare for nursing home care.

9

It has recently been discovered that although REARDON was informed that the Medicare and Medicaid cost reports were "audited" by a C.P.A. firm, the cost reports were actually "compiled" with information provided by the nursing home owners.

Plaintiff W. B. Care Center, LLC is a nursing home leasing company that is unable to compete with Defendants due to the fact that it cannot offer the same agreements Defendant can unless they agreed to commit Medicare and Medicaid fraud. Additionally, Q.I.S. Management, LLC is a nursing home management company that is also unable to compete with Defendants due to the fact that it cannot offer the same agreements Defendant can unless they agreed to commit Medicare and Medicaid fraud.

## PARTIES AND RELEVANT PARTIES

**PLAINTIFFS:**

Plaintiff TIMOTHY PATRICK REARDON is an individual and Licensed Nursing Home Administrator located in the State of Florida.

**DEFENDANTS:**

MANUAL SCHARF;

BLRE, LLC;

2010 LLC;

MORDECHAI SHALSON;

BRADENTON ENTERPRISE, LLC d/b/a BRADEN RIVER CARE CENTER;

SHARAN BODEK, a/k/a SHARON BODEK;

AYS HOLDINGS, LLC;

PLATINUM GROUP, LLC;

MELISSA WARLOW;

CDBR ENTERPRISE, LLC d/b/a BRADEN RIVER CARE CENTER;

CHRISTOPHER GRELLA;

RANDALL KRUGER;

TRI-STATE HEALTH INVESTORS, LLC d/b/a  B.R.C.C.;

## FACTUAL BASIS FOR CLAIMS

## MEDICAID PROVIDED FRAUD – FALSE LICENSURE APPLICATIONS

**Florida Statute 409.920(2) (a) (6)**     **"Knowingly submit false or misleading information or statements to the Medicaid program for the purpose of being accepted as a Medicaid provider."**

Skilled Nursing Facilities (S.N.F.'s) must submit a yearly licensure application disclosing certain information in order to keep receiving Medicaid funds.  In the United States of America v. Mahendra Pratap Gupta, 11th Circuit Court of Appeals, the Court stated:

"Moreover, Medicare regulations eliminate the potential for ambiguity by providing definitions for a "related organization."  See 42 C.F.R. § 413.17(b)(1).  "Related to the provider, "common ownership." And "control are likewise defined."

"The meaning of agency publication in the Federal Register and Code of Federal Regulations…is well within the "conventional experience of judges."  Medicare regulations even provide examples of organizations that would be related.  See 42 C.F.R. § 413.17I.

"Here, we are dealing with the concept of control over organizations.  The purpose of the related party rule is not susceptible to any other interpretation.

*"First, the related party rule is well defined and there is case law discussing its application.  Although control is broadly defined, it is not ambiguous…*

## Fake Change of Ownership (C.H.O.W.) - BROOKWOOD

After nursing home owners drain a facility of cash, the Medicaid system penalizes them by lowering their Medicaid rate. The only way to increase the Medicaid rate is to do a Change of Ownership (C.H.O.W.) with a non-related party.

Defendants achieved this increased Medicaid rate by doing a fake Change of Ownership (C.H.O.W.). This was accomplished by doing the following:

1. Each of the facilities was set up with a new corporation, known as an Operating Company.

2. As an example, a new LLC was created known as Walton County Convalescent Operations, LLC d/b/a Walton County Convalescent Center.

3. The members of the Walton County Convalescent Operations, LLC are:

   a. Theodore E. Mack, Esq. (Ken Gummels personal attorney).

   b. Jerry W. Hinson, N.H.A. (Ken Gummels employee)

   c. Annette B. Jansenius, N.H.A. (Ken Gummels Employee)

   d. DeFuniak RE, LLC

4. The members of the DeFuniak RE, LLC are:

   a. Theodore E. Mack, Esq. (Ken Gummels personal attorney)

   b. Jerry W. Hinson, N.H.A. (Ken Gummels Employee)

   c. Annette B. Jansenius, N.H.A. (Ken Gummels Employee)

   d. Brookcourt, LLC

5. The members of Brookcourt, LLC.

   a. Theodore E. Mack, Esq. (Ken Gummels personal attorney)

   b. Jerry W. Hinson, N.H.A. (Ken Gummels Employee)

   c. Annette B. Jansenius, N.H.A. (Ken Gummels Employee)

   d. Palm Bay, LLC.

 6. The members of Palm Bay, LLC.

   a. Theodore E. Mack, Esq. (Ken Gummels personal attorney)

   b. Jerry W. Hinson, N.H.A. (Ken Gummels Employee)

   c. Annette B. Jansenius, N.H.A. (Ken Gummels Employee)

After the Change of Ownership went thru, Paragon Investments, Inc. deleted all of the officers for these companies and replaced itself as the Manager for all of the companies controlling the six nursing homes.

According to Ken Gummels' deposition:

> *"...I formed Paragon Investments in 1974 or 1975 and continued as its president in the same industry"*

Additionally, when Ken Gummels sold the six nursing homes, the Settlement Agreement and Mutual Releases stated:

> *"Brookwood Investments, Ltd. (collectively with the Sellers, the "Brookwood Parties"), Kenneth G. Gummels and Marilyn R. Gummels (the "Gummels) and Jerry Hinson (Hinson).*
>
> *The HQM Parties, the Brookwood Parties, Signature, the Gummels and Hinson may each be referred to herein as a "Party" and are collectively referred to herein as the "Parties."*

Kenneth Gummels then signed for each nursing home as Manager for Blue Heron, LLC.

Lastly, Marilyn Gummels and Jerry Hinson each signed.

Ken Gummels knows that this is Medicaid fraud. As stated in his deposition:

> *A. It's significant to me because on a change of ownership, such as what occurred, there's also a change in the reimbursement rate on the property costs.*
>
> *The reimbursement rate is set by the owner at the time, which was beneficial to me.*

> *And the state will recast the rate on a change of ownership if the owner, beneficially me, is no longer involved, ok?*

Q. *So, it's your position that HQM did not notify the State of Florida about the change in ownership.*

A. *That's not my position. I'm asking did HQM notice the Medicaid reimbursement office that I was not any longer involved in ownership, management, control of any kind or nature since August 1, 2006, so that the property cost reimbursement could be recalculated by the Medicaid office.*

Q. *Assume for a moment that HQM did not do that.*

A. *It's Medicaid fraud.*

Q. *How does that affect you?*

A. *I'm not going to be a part of that. If, I'm still – Remember, the Board of Directors, 402(g), it was anticipated that I would be on the Board of Directors.*

Q. *But you are not.*

A. *I'm not. I never have been. If I were on the Board of Directors, the rate wouldn't change. But I'm not on the Board of Directors. The rate should have changed. I want to know whether the been notified because I am not going to be a party to Medicaid fraud.*

*If they have not notified Medicaid, then they have been receiving from August the 1ˢᵗ though today a reimbursement rate that they should not be receiving, which is probably well in excess of a million dollars.*

Q. *Again, assuming that there was no notice given to the State of Florida and assuming that there was no rate change, how does that affect your – how does that affect Brookwood, LLC's liability under this agreement?*

A. *You are getting into legal questions. I can't answer that. But if the reimbursement – if the money has been paid, then it's owed back with interest and penalties.*

14

Lastly, Gummels also admits that he kept control over the six facilities during his deposition regarding payments for one of the nursing homes for construction. Gummels stated:

> Mr. Diaz: **In good faith Ken decided to pay that amount anyway, or not ken but the entity decided to pay that amount out of their own pocket to prevent Acousti from placing a lien on the property.**
>
> **So, Acousti has been satisfied completely, and we have a satisfaction from them. But that's been assigned to, I believe, Brookwood Investments for the purpose of getting that money repaid.**
>
> Q. **Well, let me try to clarify as best I can. The Escrow Agreement is signed by Brookwood Extended Care Center of Homestead, LLC.**
>
> **Which entity paid Acousti, the LLC or Brookwood Investments?**
>
> A. **If you will recess for about three minutes, I can make a phone call and answer that question for you.**

### Fake Change of Ownership (C.H.O.W.) - BROOKWOOD

Home Quality Management (H.Q.M.) was owned and controlled by Elizabeth Fago, her son Paul Walczak and Joseph Steier. According to the deposition of Paul Walczak, H.Q.M. sold to Signature Healthcare. The only difference is that his mother, Elizabeth Fago, is no longer involved.

## MEDICAID PROVIDER FRAUD – FALSE MEDICAID COST REPORTS

**Florida Statute 409.920(2)(a)(4):** **Knowingly make or in any way cause to be made any false statement or false representation of a material fact, by commission or omission, in any document containing items of income and expense that is or may be used by the agency to determine a general or specific rate of payment for an item or service provided by a provider.**

The Florida Auditor General conducted an Operational Audit for the Agency for Health Care Administration regarding the Medicaid Program Fraud Prevention and Detection – Policies and Procedures regarding Facility Cost Reports in November of 2011. In the report, the Auditor General explains:

The Agency for Health Care Administration (AHCA) is the chief health policy and planning entity for the State of Florida, and State law designates the Agency as the State government entity responsible for administering the Medicaid program. Consistent with this authority, State law also authorizes the Agency to compensate Medicaid providers for services rendered to Medicaid recipients, in accordance with State and Federal law.

Medicaid Program compensation paid to providers such as nursing homes is based upon per diem reimbursement rates calculated by AHCA using data included in cost reports submitted annually.

AHCA disbursed to nursing homes $3,557,020,050 (billion) in the 2009-2010 fiscal year. This represented approximately 17% of the State of Florida's total Medicaid disbursement of $18 billion in Medicaid payments made during that period.

> **"Medicaid cost reporting, the primary source of information relied upon to calculate and make billions of dollars in Medicaid payments, is susceptible to fraud."**
>
> **"...examples of fraud involve provider misrepresentations, such as the inclusion of unallowable costs, inflating the costs claimed, inflating counts of medical residents, and artificially inflating cost-to-charge rations."**

In the case of the UNITED STATES vs. John E. Calhoon, the United States Court of Appeals, Eleventh Circuit, affirmed the conviction of John E. Calhoon of signing or causing to be signed a Medicaid cost report claiming amounts he knew not to be reimbursable.

Mr. Calhoon was the Chief Financial Officer (C.F.O.) of Charter Medical Corporation, which ran a national chain of psychiatric hospitals under the Charter Hospital name.

Calhoon filed cost reports in which he claimed various types of advertising expenses under the label "outreach." The government maintains that Calhoon intentionally disguised advertising costs as outreach in order to mislead the intermediaries and to obstruct their audits.

Certain advertising costs are nonreimbursable and obligates a provider seeking reimbursement to identify the costs as "advertising" and to reveal the nature of the advertising. As an example, advertising the services of a nursing home is not reimbursable. Advertising the causes of diabetes, as a public service, would be reimbursable.

> 42 C.F.R. § 413.20(d) states that "the provider must furnish such information to the intermediary as may be necessary to ....assure proper payment by the program.." Under the guidelines in the Manual, certain advertising costs are reimbursable and others are not.

The Court clarified this:

> *"Nothing less is required if the Medicaid reimbursement system is not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government."*

## Compiling Medicaid Cost Reports

Moore Stephens C.P.A. claims to audit the Medicare and Medicaid Cost Reports. In reality, they only "compile" the information given to them by the owner. The Administrator, however, is told that they are signing a cost report that has been "audited" by an experienced C.P.A. firm.

Additionally, the nursing home bills Medicaid over $8,000.00 for this service, when in reality, compiling cost reports involves little to any work.

## Fake Management Fees – Res Care

In *United States of America, ex rel James ALDERSON vs. HCA – The Healthcare Company; et al. 11th Circuit Court of Appeals* Columbia Hospital paid over one billion dollars in a qui tam lawsuit.

In 1993, Columbia's Southwest Florida Regional Medical Center, located in Fort Myers, Florida purchased a home health agency from Res-Care and retained Res-Care to manage the agency. When Southwest bought Able Care Home Health Agency in late 1993, Columbia had Able Care take over Res-Care's responsibilities. Columbia bought out Res-Care's management contract by continuing to pay Res-Care's monthly management fees for minimal work, and improperly included those fees on Southwest's cost reports.

In the case at hand, Brookwood Extended Care Center of Homestead and Brookwood Extended Care Center of Hialeah Gardens contracted with Res-Care Health Services, Inc. to manage both facilities. Since both nursing homes did not have any money, they signed a note with Res-Care to provide the operating cash.

This was memorialized in the management agreements with each facility. It is repeated in the second mortgage between each facility and Res-Care dated July 1, 1986.

As stated in each second mortgage:

> **"The said Mortgageor is indebted to Mortgagee, in the principal amount of Four Hundred Fifty Thousand Dollars ($450,000), as a result of amounts borrowed by Mortgagor pursuant to certain Management Agreement dated July 1, 1986."**

As Ken Gummels stated in his deposition:

> **"The partnerships – for instance Washington, Victoria, Madison, Waterford, Brookwood Gardens – the partnerships were the licensed operators of those buildings. They simply had a management agreement with a third-party management company.**
>
> **And then Brookwood commenced management of those buildings starting in 1990".**

Just as Columbia Hospital did with Res-Care, after Brookwood took over management of Brookwood Gardens and Waterford Convalescent, Ken Gummels authorized a fake management fee to be paid from the facilities to Res-Care to pay off the monies owed to Res-Care.

This was done because management fees are reimbursable under Medicaid but the payment of loans would not be. Just as with Columbian Hospital, Res-Care would visit Brookwood Gardens and Waterford Convalescent on a quarterly basis. Res-Care would spend four hours at each facility, for a total of eight hours total in one day.

Res-Care was then paid 4% of the monthly revenue for each facility.

Additionally, neither Brookwood Gardens or Waterford Convalescent listed the Res-Care management fees on the cost reports as being paid to a "related organization." Based on the notes and mortgages, Res-Care was a related party to Brookwood Gardens and Waterford Convalescent. If Res-Care had been listed as a related party, then the management fees would have been reduced to "cost." Since Res-Care's cost was little to anything, just as with Columbia Hospital, these were costs that would not be reimbursable.

Res-Care was paid these fake management fees from 1990 until the mortgages were paid off on April 14, 2006, sixteen years after Brookwood took back management from them.

### Fake Management Fees – County Nursing Homes

Brookwood-Walton County Convalescent Center, LP continued to pay management fees to Walton County Convalescent Center, Inc., which is owned by the county, for years after it was purchased by Brookwood.

Brookwood-Jackson County Convalescent Center, LP continued to pay Graceville Area Convalescent Center, Inc., which is owned by the county, for years after it was purchased by Brookwood.

### Fake Lease Payments - Brookwood

After creating these new entities, Kenneth Gummels then formed a new LLC for each nursing home.  As an example:

1. Brookwood-Extended Care Center of Hialeah Gardens was formed and the Manager was listed as Sandpiper Cove Limited Partnership.

2. In 2004, Sandpiper Cove Limited Partnership changed to Blue Heron, LLC at all six of the nursing facilities.

As Kenneth Gummels stated in his deposition:

> *Q.  What is the official name of that?*
>
> *A.  Sandpiper Cove Limited Partnership.*
>
> *Q.  Is that a trust that you have created, Gummels?*
>
> *A.  Yes*
>
> *Q.  So, the Sandpiper Cove Limited Partnership, Blue Heron, LLC is the manager of that partnership?*
>
> *A.  Correct.*

Medicaid only pays for actual expenses.  As the owner of the properties, Medicaid would only reimburse Gummels for his mortgage, interest, depreciation, etc.  All of the lease payments made to Gummels were considered payments by a related party and the lease should have actually been listed as an ownership.

As stated in *United States of America v. John E. CALHOON, 11th Circuit Court of Appeals,*

> **"An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner.**

**...money was simply being moved from one pocket to another, making the fee nonreimbursable because it was not an actual expense" 42 C.F.R. § 413.17**

### Fake Lease Payments – H.Q.M. and Signature

Elizabeth Fago of Home Quality Management negotiated the sale of the six Brookwood homes with Ken Gummels (according to Gummels deposition). H.Q.M. did all the due diligence with Brookwood.

Upon purchase, however, the homes are listed on Property Appraisor as being owned by Health Care Reit. H.Q.M.'s numerous LLC's then lease the homes from Health Care Reit. This was obviously not an "arm's length" transaction.

In the Federal Guidelines it states:

> *Lease Purchase Agreements – Rental Charges – Where a lease agreement has been determined to be a virtual purchase, the rental charge is includable in allowable cost only to the extent that it does not exceed the amount which the provider would have included in allowable costs if it had legal title to the asset.*

Additionally, in UNITED STATES v CALHOON, UNITED STATES COURT OF APPEALS, 111TH CIRCUIT, the court stated:

**"An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner"**

In this case, it is unrealistic to believe that Health Care Reit actually put the H.Q.M. homes on the "open market" to see the best leasing price that they could receive. There was clearly a "back office" deal.

When H.Q.M. went to Health Care Reit, they simply agreed to the following:

1. H.Q.M. would allow Health Care Reit to purchase the Brookwood homes.

2. Health Care Reit would agree to lease them back to H.Q.M.

3. Health Care Reit would get the benefit of "rent" as opposed to ownership "costs."

4. H.Q.M. would get the benefit of not putting any monies out of their pocket.

5. H.Q.M. would get the benefit that Medicaid would reimburse them for either "costs" if they bought the Brookwood homes or "rent" if they leased them from Health Care Reit.

6. In the end, the only people who lost were the residents of the State of Florida who are paying 50% of this increased Medicaid expense and the entire United States, because the Federal government is paying the other 50% of this increased Medicaid expense.

### Fake Expenses – Auto Payments

Kenneth Gummels would tell each administrator that they would get a company car. In reality, Gummels was getting Medicaid to pay for an automobile for himself.

Gummels would purchase an automobile under one of his many companies names. He would get a short payment plan, such as two years. He would then tell each administrator that they were allowed to drive the car for two years.

Gummels would then increase the administrator's salary and make the administrator pay for the automobile out of their own salary. This was done because the automobile was not an approved Medicaid expense, but the administrator's salary was reimbursable 100%.

At the end of two years Ken Gummels would then take the automobile to his home or else give it to one of his sons. In fact, one administrator, Carmen Telot, thought the Ford Explorer she was paying for was her own car. When she traded the Explorer in for a new

Explorer, Ken Gummels drove to the Ford dealership and explained that she was not the owner of the truck, that he was in fact the owner. Ford returned the truck to Mr. Gummels.

### Fake Expenses – Capital Expenses

Medicaid demands that all expenses over $500 are "capitalized." This means that the expense is depreciated over a period of ten or twenty years.

Medicaid, on the other hand, reimburses all expenses under $500 immediately. Gummels, therefore, demanded that each administrator tell the vendor to "break up" any item over $500 into multiple invokes so that it could be "expensed."

As an example, a new bed would be invoiced under multiple invoices such as: headboards, motor, frame, mattress, etc. As long as each individual invoice was below $500, Mr. Gummels was happy.

### TAX FRAUD

Each item listed above that was a fake expense artificially lowered the expenses of the facility. This has the beneficial aspect of lowering the before tax profits and therefore lowering the amount of taxes that should have been paid.

### PERJURY

Ken Gummels commits perjury when he states that Blue Heron, LLC had no connection with any of the Brookwood entities. In fact, Gummels recently renewed every single LLC he has ever created with these entities and hired a new Registered Agent.

Gummels also lied when he stated that he couldn't remember that his personal attorney and two of his twenty year employees were officers in the new companies he created for the fake Change of Ownership.

> **Q.** **I'm sorry. I asked you earlier about Blue heron. I thought you told me it had no connection with any of these Brookwood entities, right?**
>
> **A.** **Blue Heron, that's right. Blue Heron, you asked me and I said none.**
>
> **Q.** **You signed on behalf of these various Brookwood entities as Ken Gummels, as manager of Blue Heron, LLC in its capacity as manager.**
>
> **A.** **Correct.**
>
> **Q.** **So, what does that mean?**
>
> **A.** **It manages – it's the manager of the family limited partnership.**
>
> **Q.** **I think I asked you before in any one of these LLC's who were the shareholders, and you don't remember that.**
>
> **A.** **Specifically, I don't.**

**MAIL FRAUD**

Between 2001 and 2011 the enterprise has mailed fraudulent tax returns on a yearly basis for each of the six nursing homes. This is a total of thirty seventy two instances of furthering the enterprise thru the use of the U.S. Mail.

Between 2001 and 2011 the enterprise has mailed fraudulent Medicaid cost reports on a yearly basis for each of the six nursing homes. This is a total of seventy two instances of furthering the enterprise thru the use of the mails.

## WIRE FRAUD

Between 2001 and 2011 the enterprise has wired false Medicaid billings on a monthly basis for each of the six nursing homes. This is a total of seven hundred twenty instances of furthering the enterprise thru the use of wire.

## BANK FRAUD

Defendants used the banking system to transfer Medicare and Medicaid monies from the nursing facilities that had been acquired thru the use of false cost reports and tax returns.

## MONEY LAUNDERING

Defendants engaged in numerous financial transactions and transfers which were then concealed thru false creating straw buyers, false cost reporting and false tax returns.

## PATTERN OF RACKETEERING ACTITIY

Defendants have executed numerous predicate acts of racketeering activity, which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. Section 1961(1)(B), as more specifically alleged below.

As described throughout this Complaint, the Defendants engaged in a pattern of related and continuous predicate acts over a substantial period of time.

The predicate acts demonstrated a variety of unlawful activities, each conducted in furtherance of the Enterprise and the common purpose to defraud Medicare, Medicaid and the Internal Revenue Service. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts are related and are not isolated events.

## ENTERPRISE

The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has squarely held that the term "enterprise" encompasses both legitimate and illegitimate enterprises. See United States v. Turkette, 452 U.S. 576 (1981).

Courts have given a broad reading to the term "enterprise." Noting that Congress mandated a liberal construction of the RICO statute in order to effectuate its remedial purposes and pointing to the expansive use of the word "includes" in the statutory definition of the term, courts have held that the list of enumerated entities in Section 1961(4) is not exhaustive but merely illustrative. (United States v. Turkette, 452 U.S. 576, 580 (1981) ("[t]here is no restriction upon the associations embraced by the definition [of enterprise]").

The term enterprise includes courts and judicial offices. United States v. Grubb, 11 F.3d 426, 438 (4th Cir. 1993) (**Office of the 7th Judicial Circuit**); United States v. Conn, 769 F.2d

420, 424-425 (7th Cir. 1985) (**Cook County Circuit Court**): <u>United States v. Blackwood</u>, 768 F.

2d 131, 137-38 (7th Cir.) (**Cook County Circuit Court**), <u>United States v. Angelilli</u>, 660 F. 2d 23,

30-34 (2d Cir. 1981) (**New York City Civil Court**), <u>cert denied</u>, 455 U.S. 945 (1982); <u>United

States v. Stratton</u>, 649 F.2d 1066, 1074-75 (5th Cir. 1981) (**judicial circuit**); <u>United States v.

Bacheler</u>, 611 F.2d 443, 450 (3d Cir. 1979) (**Philadelphia Traffic Court**); <u>United States v.

Claville</u>, 2008 WL 686977 (W.D. La. March 12, 2008) (**the Judicial Branch of Louisiana

government**); and <u>United States v. Alonso</u>, 740 F.2d 862, 870 (11th Cir. 1984) (**Dade County

Public Safety Department, Homicide Section**), cert. denied, 469 U.S. 1166 (1985).

<u>CONTINUITY</u>

STRUCTURE OF THE ENTERPRISE

It is not necessary to prove that "every member of the enterprise participated in or knew

about all its activities." <u>United States v. Cagnina</u>, 697 F.2d 915, 922 (11th Cir. 1983). <u>Accord

United States v. Hewes</u>, 729 F. 2d 1302, 1310-11(11th Cir. 1984).

In <u>Williams v. Mohawk Indus. Inc.</u>, 465 F.3d 1277, 1283-86 (11th Cir. 2006), the court

held that the civil RICO complaint adequately alleged an association-in-fact enterprise

comprised of Mohawk Industries, Inc., and various independent agents the corporate defendant

hired to recruit, hire and harbor illegal alien workers. The court explained that members of the

enterprise shared a common purpose of obtaining illegal workers for Mohawk, and that there is

no "requirement that the 'common purpose' of the enterprise be the sole purpose of each and

every member of the enterprise." <u>Id</u> at 1285-86. The Court also noted it was particularly

significant to the determination of the existence of an enterprise that the alleged association of

individuals furnished a vehicle for the commission of the alleged racketeering acts. <u>Id</u>. At 1285.

In <u>United States v. Hewes</u>, 729 F. 2d 1302, 1310 (11th Cir. 1984), cert. denied, 469 U.S. 1110 (1985). The court held that the evidence was sufficient to establish an association-in-fact enterprise even thought the enterprise consisted of a "group of persons who had committed a variety of unrelated offenses with no agreement as to the particular crime." But who were "associated for the purpose of making money from the repeated criminal activity."

In the <u>United States v. Cagnina</u>, 697 F. 2d 915, 921-22 (11th Cir.), cert. denied, 464 U.S. 856 (1983), The court held that Turkette "did not suggest that the enterprise must have a distinct, formalized structure" and that "[a]lthough both an enterprise and a pattern of racketeering activity must be shown,....the proof used to establish the two elements may in particular cases coalesce." The court also rejected the Eighth Circuit's requirement that Government must prove an enterprise distinct from evidence showing a pattern of racketeering, and found that the enterprise was adequately established where evidence showed an informal association with a common purpose, i.e. making money from repeated criminal activity.


## ENTERPRISE ENGAGED IN INTERSTATE OR FOREIGN COMMERCE

The enterprise is involved in billing both Medicaid and Medicare monies. Although Medicaid is a State program, the Federal Government contributes approximately 50% of all Medicaid monies. Thus, Medicaid fraud is considered an Interstate Commerce since each claim cannot be split and therefore each Medicaid claim is paid partly thru Washington D.C.


## RICO INJURY "BY REASON OF" THE DEFENDANT'S RICO ENTERPRISE

While employed as an Administrator from 1997 until 2000, REARDON has now learned that he signed Medicaid cost reports that were not "audited" per regulation and in fact were only "compiled."

Not only is this a violation of Medicaid fraud, because Defendants ultimately billed Medicaid for the cost of audited financial, but REARDON now believes that he signed cost reports that contained non-reimbursable expenses.

## COUNT I

### FEDERAL RICO VIOLATIONS
(against all Defendants)

Count I seeks relief from the DEFENDANTS for violation of 18 U.S.C. Section 1962(c).

Each Defendant is a "person within the meaning of 18 U.S.C. Section 1961(3).

Commencing in and around 2001 and continuing thru the present day, the Defendants violated 18 U.S.C. Section 1962(c).

18. U.S.C. § 1962 (c) makes it unlawful to "conduct or participate in an enterprise." All Defendants have participated in the conduct of the enterprise's affairs.

## COUNT II

### CONSPIRACY TO VIOLATE RICO
(against all Defendants)

Count II seeks relief against from the DEFENDANTS for violation of 18 U.S.C. Section 1962(d).

In violation of 18 U.S.C. Section 1962(d), Defendants and others known and unknown conspired with each other to violate 18 U.S.C. Section 1962(a)-(c).

The objects of the conspiracy included, without limitation, the theft of Medicare and Medicaid funds by means of a scheme to defraud. Additionally, Defendants did not pay taxes on these funds by fraudulently representing to the Internal Revenue Service that they were providing charity services when in fact they were being reimbursed 100% for all services by either Medicaid or Medicare funds.

Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff REARDON prays for trial by jury and request that this Court:

    A. Enter judgment in favor of Plaintiff REARDON against all Defendants, jointly and severally.

    B. Award Plaintiff REARDON treble damages for all injuries deemed at trial to have resulted from Defendants racketeering activities, pursuant to 18 U.S.C. § 1964 (c).

    C. Award Plaintiff REARDON compensatory damages in an amount to be determined at trial;

    D. Award Plaintiff REARDON punitive damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct;

    E. Award Plaintiff REARDON its costs, interest, and reasonable attorney's fees incurred in prosecuting this action pursuant to 18 U.S.C. § 1964; and

F.  Such other and further relief as this Court may deem just and proper.

Dated February 21, 2012                    Respectfully submitted,


Timothy Patrick Reardon
(appearing Pro Se)
50 Biscayne Blvd, Suite # 3703
Miami, FL  33132
305-302-0601

Tim Reardon

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

FILED by _AJS_ D.C.

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. - MIAMI

## I. (a) PLAINTIFFS

Timothy Patrick Reardon

**DEFENDANTS**

Lake Worth Enterprises, LLC et. al

**(b)** County of Residence of First Listed Plaintiff  Miami Dade
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Miami Dade
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

305
3020601

Pro Se,  50 Biscayne Blvd, # 3703, Miami FL  33132

Attorneys *(If Known)*

Venue Miami

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Med. Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☒ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C 1962

Brief description of cause:
RICO - Racketeer Influenced and Corrupt Organizations Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                    DOCKET NUMBER

DATE
02/28/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP  Yes  JUDGE_____  MAG. JUDGE_____



AO 240  (Rev. 07/10) Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form)

# UNITED STATES DISTRICT COURT
### for the

<table>
<tr><td>Timothy Patrick Reardon</td><td>)</td><td></td></tr>
<tr><td><em>Plaintiff/Petitioner</em></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td>Lake Worth Enterprises, LLC  et. al</td><td>)</td><td><strong>12-CV-20829-LENARD/O'SULLIVAN</strong></td></tr>
<tr><td><em>Defendant/Respondent</em></td><td>)</td><td></td></tr>
</table>

FILED by ___ D.C.

FEB 2 8 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## APPLICATION TO PROCEED IN DISTRICT COURT WITHOUT PREPAYING FEES OR COSTS
### (Short Form)

I am a plaintiff or petitioner in this case and declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief requested.

In support of this application, I answer the following questions under penalty of perjury:

1. *If incarcerated.* I am being held at: _____ .
If employed there, or have an account in the institution, I have attached to this document a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months for any institutional account in my name.  I am also submitting a similar statement from any other institution where I was incarcerated during the last six months.

2. *If not incarcerated.*  If I am employed, my employer's name and address are:

My gross pay or wages are:  $ _____ 0.00 , and my take-home pay or wages are:  $ _____ 0.00 per

*(specify pay period)* _____ .

3. *Other Income.* In the past 12 months, I have received income from the following sources *(check all that apply)*:

| | | |
|---|---|---|
| (a) Business, profession, or other self-employment | ❏ Yes | ☑ No |
| (b) Rent payments, interest, or dividends | ❏ Yes | ☑ No |
| (c) Pension, annuity, or life insurance payments | ❏ Yes | ☑ No |
| (d) Disability, or worker's compensation payments | ❏ Yes | ☑ No |
| (e) Gifts, or inheritances | ❏ Yes | ❏ No |
| (f) Any other sources | ☑ Yes | ❏ No |

*If you answered "Yes" to any question above, describe below or on separate pages each source of money and state the amount that you received and what you expect to receive in the future.*

Unemployment of $550 every two weeks from Unemployment beginning in December of 2010.

My last payment of $550 is today, February 28th, 2012

AO 240  (Rev. 07/10) Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form)

4.  Amount of money that I have in cash or in a checking or savings account:  $ _____ 0.00 _____ .

5.  Any automobile, real estate, stock, bond, security, trust, jewelry, art work, or other financial instrument or thing of value that I own, including any item of value held in someone else's name *(describe the property and its approximate value)*:

    none

6.  Any housing, transportation, utilities, or loan payments, or other regular monthly expenses *(describe and provide the amount of the monthly expense)*:

rent   $600 a month

electric  $35 a month

bus pass  $100 a month

7.  Names (or, if under 18, initials only) of all persons who are dependent on me for support, my relationship with each person, and how much I contribute to their support:

    none

8.  Any debts or financial obligations *(describe the amounts owed and to whom they are payable)*:

$2,500,000 judgement against me personally by Institutional Leasing 1, LLC
$1,200,000 foreclosure by Regions Mortgage for 520 West Ave, Apt. 1904, Miami Beach
                ($950,000 mortgage and $250,000 home equity)
 $ 360,000  student loans
  $ 18,000  credit card

*Declaration:*  I declare under penalty of perjury that the above information is true and understand that a false statement may result in a dismissal of my claims.

Date: _____ 02/28/2012 _____

_____
*Applicant's signature*

_____
Tim Reardon
*Printed name*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
        Plaintiff,

vs.

LAKE WORTH ENTERPRISES, LLC, et. al.
        Defendants.
_____/

## ORDER

THIS MATTER came before the Court on the plaintiff's Application to Proceed in

District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12). Having

reviewed the applicable filings and the law, it is

ORDERED AND ADJUDGED that the plaintiff's Application to Proceed in District

Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12) is **GRANTED**.

Based on the Application to Proceed in District Court Without Prepaying Fees or Costs

(Short Form) (DE # 3, 2/29/12) filed with the Court, the plaintiff is unable to pay the costs

associated with this lawsuit. The plaintiff shall deliver a copy of this Order, the summonses

and attachments to the Untied States Marshals Service, 400 N. Miami Avenue, 6th Floor,

Miami, Florida 33128 on or before **Wednesday, June 13, 2012**. The United States Marshal

shall serve the summonses and attachments on the defendants without cost to the plaintiff.

**DONE AND ORDERED** in Chambers at Miami, Florida this **30th** day of

May, 2012.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
U.S. District Judge Lenard

Mailed by Chambers to:
Timothy Patrick Reardon
50 Biscayne Blvd. #3703
Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,

     Plaintiff,

vs.

LAKE WORTH ENTERPRISES, LLC, et. al.

     Defendants.

_____/

## ORDER

THIS MATTER came before the Court sua sponte following a review of the record. On May 30, 2012, the Court issued an Order granting the plaintiff's Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12). See Order (DE# 5, 5/30/12). The Order (DE# 5) requires the plaintiff to "deliver a copy of this Order [DE# 5], the summonses and attachments to the Untied States Marshals Service, 400 N. Miami Avenue, 6th Floor, Miami, Florida 33128 on or before **Wednesday, June 13, 2012**." Id. Accordingly, it is

ORDERED AND ADJUDGED that the plaintiff shall file a notice with the Court following delivery of these documents to the Untied States Marshals Service.

**DONE AND ORDERED** in Chambers at Miami, Florida this **30th** day of May, 2012.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
U.S. District Judge Lenard

Mailed by Chambers to:
Timothy Patrick Reardon
50 Biscayne Blvd. #3703
Miami, FL 33132

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN



FILED by _CHL_ D.C.

JUN 1 2 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

TIMOTHY PATRICK REARDON,
        Plaintiff,

vs.

LAKE WORTH ENTERPRISES,, LLC, et al.,
        Defendants.

_____/

## <u>MOTION FOR EXTENSION OF TIME</u>

On May 30, 2012, this Honorable Court ordered that Plaintiff shall deliver a copy of the Order (Attached), the summonses and attachments to the United States Marshals Service on or before Wednesday, June 13, 2012.

TIMOTHY PATRICK REARDON (REARDON), appearing Pro Se, respectfully requests that this Honorable Court grant an extension until June 29th, 2012 to serve the Defendants with a copy of the summons and complaint.

REARDON is in the process of amending the complaint and needs until June 29th, 2012 to file and serve a copy of the summons and the amended complaint.

Respectfully submitted this 12th day of June, 2012.

Timothy Patrick Reardon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
      Plaintiff,

vs.

LAKE WORTH ENTERPRISES, LLC, et. al.
      Defendants.
_____/

## ORDER

THIS MATTER came before the Court on the plaintiff's Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12). Having reviewed the applicable filings and the law, it is

ORDERED AND ADJUDGED that the plaintiff's Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12) is **GRANTED**. Based on the Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12) filed with the Court, the plaintiff is unable to pay the costs associated with this lawsuit. The plaintiff shall deliver a copy of this Order, the summonses and attachments to the Untied States Marshals Service, 400 N. Miami Avenue, 6th Floor, Miami, Florida 33128 on or before **Wednesday, June 13, 2012**. The United States Marshal shall serve the summonses and attachments on the defendants without cost to the plaintiff.

**DONE AND ORDERED** in Chambers at Miami, Florida this **30th** day of May, 2012.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
U.S. District Judge Lenard

Mailed by Chambers to:
Timothy Patrick Reardon
50 Biscayne Blvd. #3703
Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,

     Plaintiff,

vs.

LAKE WORTH ENTERPRISES, LLC, et. al.

     Defendants.

_____/

## ORDER

THIS MATTER is before the Court on the Motion for Extension of Time (DE# 7, 6/12/12) filed by the plaintiff. On May 30, 2012, the Court granted the plaintiff's Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form) (DE # 3, 2/29/12) and ordered that the plaintiff "deliver a copy of this Order [DE# 5], the summonses and attachments to the Untied States Marshals Service, 400 N. Miami Avenue, 6th Floor, Miami, Florida 33128 on or before **Wednesday, June 13, 2012**." See Order (DE# 5, 5/30/12). The plaintiff now seeks an extension of time until June 29, 2012 to deliver the documents to the United States Marshals Service.[1] Having reviewed the applicable filings and the law, it is

ORDERED AND ADJUDGED that the Motion for Extension of Time (DE# 7, 6/12/12) is **GRANTED**. The plaintiff shall deliver a copy of May 30, 2012 Order [DE# 5],

_____

[1] The plaintiff states in his motion that he is seeking an extension of time to serve the defendants. However, pursuant to the May 30, 2012 Order, the plaintiff is required to deliver copy of this Order [DE# 5], the summonses and attachments to the Untied States Marshals Service and the United States Marshals Service will effectuate service on behalf of the plaintiff. See Order (DE# 5, 5/30/12).

the summonses and attachments to the Untied States Marshals Service, 400 N. Miami Avenue, 6th Floor, Miami, Florida 33128 on or before **Friday, June 29, 2012**. It is further,

ORDERED AND ADJUDGED that the plaintiff shall file a notice with the Court following delivery of these documents to the Untied States Marshals Service.

**DONE AND ORDERED** in Chambers at Miami, Florida this **18th** day of June, 2012.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
U.S. District Judge Lenard

Mailed by Chambers to:
Timothy Patrick Reardon
50 Biscayne Blvd. #3703
Miami, FL 33132

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
     Plaintiff,
v.
LAKE WORTH ENTERPRISES, LLC, et. al.
     Defendants.
_____/

## ORDER TO SHOW CAUSE

THIS MATTER is before the Court sua sponte. On June 18, 2012, the Court issued an

Order (DE# 8) granting the plaintiff Timothy Patrick Reardon's Motion for Extension of Time to

Deliver Documents to the U.S. Marshals Service (DE# 8, 6/18/2012). The Order (DE# 8)

required Mr. Reardon to deliver the subject documents on or before June 29, 2012. The

undersigned's Chambers has contacted the U.S. Marshals Service and has been advised that

the plaintiff has failed to deliver the required documents pursuant to the Court's Order (DE# 8).

Accordingly, it is

ORDERED AND ADJUDGED that on or before **Monday, July 23, 2012**, the plaintiff

shall file a memorandum addressing why the undersigned should not issue a Report and

Recommendation recommending that the instant action be dismissed for failure to comply with

an Order of this Court (DE# 8) and for failure to serve process within 120 days of the filing of

the complaint as required by FED.R.CIV.P. 4(m).

DONE AND ORDERED in Chambers, at Miami, Florida, this **9th** day of July, 2012.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable Judge Lenard
All Counsel of Record

Copies mailed by Chambers to:
Timothy Patrick Reardon
50 Biscayne Blvd. #3703
Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON
     Plaintiff,

v.

LAKE WORTH ENTERPRISES, LLC, et. al.
     Defendants

FILED by ___AOS___ D.C.

JUL 2 4 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## **CHANGE OF ADDRESS**

Timothy Patrick Reardon (REARDON), appearing Pro Se, files this CHANGE OF ADDRESS.

Plaintiff's new address:       Timothy Patrick Reardon
                                  226 N.E. 1st Ave
                                  Miami, FL 33132

                                  305-302-0601

Respectfully submitted this 23[th] of July, 2012.

Timothy Patrick Reardon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON
     Plaintiff,

v.

LAKE WORTH ENTERPRISES, LLC, et. al.
     Defendants

FILED by **AJS** D.C.

JUL 2 4 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## <u>MEMORANDUM OF LAW</u>

On July 9, 2012 this Honorable Court ordered that Plaintiff shall file a memorandum addressing why this Court should not issue a Report and Recommendation recommending that the instant action be dismissed for failure to comply with an Order of this Court (DE# 8) and for failure to serve process within 120 days of filing of the complaint as required by Fed. R. Civ. P . 4(m).

> Fed.R.Civ.P. 4(m) states: "If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."

Timothy Patrick Reardon (REARDON), appearing Pro Se, previously asked for a one week extension of time that his Court granted.

Plaintiff is filing a case under the Racketeer Influenced and Corrupt Organization Act (RICO) and needs more time to ensure compliance with all elements necessary.

Plaintiff would seek a second, Final Extension until Monday, July 30th, 2012 to serve the U.S. Marshalls Service copies of subject documents.

Respectfully submitted this 23th of July, 2012.

_____

Timothy Patrick Reardon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON
     Plaintiff,

v.

LAKE WORTH ENTERPRISES, LLC, et. al.
     Defendants



## **MOTION TO BE SERVED NOTICES OF FILINGS {NEF} VIA EMAIL**

Timothy Patrick Reardon (REARDON), appearing Pro Se, files this MOTION TO BE SERVED VIA EMAIL.

Tthe Honorable Alan S. Gold – Pro Se Instructions state:

"Pro se litigants may file a motion with the Court requesting they receive the notices of electronic filings {NEF} by providing the Court with a valid e-mail address.

Plaintiff's email address is the following:   treardon12@aol.com

Respectfully submitted this 23th of July, 2012.

Timothy Patrick Reardon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
     Plaintiff,
v.
LAKE WORTH ENTERPRISES, LLC, et. al.
     Defendants.
_____/

## ORDER

THIS MATTER is before the Court on the Motion to Be Served Notices of Filings {Nef} via Email (DE# 12, 7/24/12). Having reviewed the applicable filings and the law, it is

ORDERED AND ADJUDGED that the Motion to Be Served Notices of Filings {Nef} via Email (DE# 12, 7/24/12) is **GRANTED**. The Clerk of the Court is directed to add the plaintiff's email address (treardon12@aol.com) to receive notices of electronic filings in this case.

DONE AND ORDERED in Chambers, at Miami, Florida, this **24th** day of July, 2012.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable Judge Lenard
All Counsel of Record

Copies mailed by Chambers to:
Timothy Patrick Reardon
226 N.E. 1St Ave
Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
        Plaintiff,
v.
LAKE WORTH ENTERPRISES, LLC, et. al.
        Defendants.
_____/

**ORDER**

THIS MATTER is before the Court on the Memorandum of Law (DE# 11, 7/24/12) filed by the plaintiff. The plaintiff requests an extension of time until Monday, July 30, 2012 to deliver a copy of the Court's prior Order (DE# 5), the summonses and attachments to the United States Marshals Service, 400 N. Miami Avenue, 6th Floor, Miami, Florida 33128. The undersigned will construe the plaintiff's memorandum as a motion for extension of time. Accordingly, it is

ORDERED AND ADJUDGED that the Order to Show Cause (DE# 9, 7/9/12) is **VACATED** and that the Motion for Extension of Time (DE# 11, 7/24/12) to deliver documents to the United States Marshals Service is **GRANTED**. The plaintiff shall deliver the documents to the United States Marshals Service on or before **Monday, July 30, 2012**. If the plaintiff does not deliver the documents by this date, the undersigned will issue a Report and Recommendation recommending that the instant action be dismissed for failure to serve process within 120 days of the filing of the complaint as required by FED.R.CIV.P. 4(m).

DONE AND ORDERED in Chambers, at Miami, Florida, this **24th** day of July, 2012.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
The Honorable Judge Lenard
All Counsel of Record
All pro se parties

FILED by ___ D.C.

JUL 3 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
    Plaintiff,

vs.

**DEMAND FOR JURY TRIAL**

W.B. CARE CENTER, LLC d/b/a WEST
BROWARD CARE CENTER; MILLENNIUM
MANAGEMENT, LLC; f/k/a ELITE
HEALTHCARE MANAGEMENT, LLC;
MILLENIUM HEALTHCARE MANAGEMENT,
LLC d/b/a MILLENNIUM MANAGEMENT;
INSTITUTIONAL LEASING 1, LLC; WEST
BROWARD GROUP, LLC; STEARNS
WEAVER MILLER WEISSLER ALHADEFF &
SITTERSON, P.A.; DIP CAPITAL LENDING,
INC.; MICHAEL I. BERNSTEIN, P.A.; MOORE
STEPHENS LOVELACE, P.A.; ECC, P.I. d/b/a
EHRENSTEIN CHARBONNEAU CALDERIN;
THOMAS L. ABRAMS, P.A.; RUDEN
MCCLOSKY, P.A.; JOSEPH D. MITCHELL,
P.A.; LAW OFFICES OF PETER A. LEWIS,
P.L.; PAYTON & ASSOCIATES, LLC; BROAD
AND CASSEL, P.A.; GOLDSMITH & GROUT,
P.A.; WILK AUSLANDER, LLP; JOSHUA D.
MANASTER, P.A.; NORTHERN
JACKSONVILLE ENTERPRISE, LLC d/b/a
LANIER MANOR; LAKE WORTH
ENTERPRISE, LLC d/b/a OASIS HEALTH
AND REHABILITATION CENTER; HIALEAH
ENTERPRISE, LLC d/b/a HIALEAH NURSING
AND REHABILITATION CENTER; WEST
DIXIE CARE, LLC d/b/a WATERCREST CARE
CENTER; CORAL GABLES HOLDINGS, LLC
d/b/a CORAL GABLES NURSING AND
REHABILITATION CENTER; AVON PARK
ROYAL HOLDINGS, LLC d/b/a ROYAL CARE
OF AVON PARK; BOCA GROUP, LLC d/b/a
MENORAH HOUSE; DELRAY GROUP, LLC
d/b/a LAKE VIEW CARE CENTER AT
DELRAY; BRADENTON ENTERPRISE, LLC;

1

CDBR ENTERPRISE, LLC d/b/a BRADEN
RIVER CARE CENTER; SOLOMON AND
CLARA HEISLER FAMILY FOUNDATION;
WEINGARTEN FAMILY FOUNDATION;
SCHON FAMILY FOUNDATION;
EDUCATIONAL SUPPORT FOUNDATION
INC. f/k/a THE LEON AND IRENE SCHARF
FOUNDATION; EMES FOUNDATION, INC.;
CHESED GLOBAL FOUNDATION; ZICHRON
FOUNDATION FOR SPECIAL NEEDS; THE
RIDGE PARK FOUNDATION;
     Defendants.
_____/

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff, TIMOTHY PATRICK REARDON ("Reardon"), hereby alleges the
following against Defendants W.B. CARE CENTER, LLC d/b/a WEST BROWARD
CARE CENTER ("WEST BROWARD"), MILLENNIUM MANAGEMENT, LLC; f/k/a
ELITE HEALTHCARE MANAGEMENT, LLC ("MILLENNIUM"), MILLENIUM
HEALTHCARE MANAGEMENT, LLC d/b/a MILLENNIUM MANAGEMENT
("MILLENIUM), INSTITUTIONAL LEASING 1, LLC ("INSTITUTIONAL"), WEST
BROWARD GROUP, LLC ("WEST BROWARD GROUP"), STEARNS WEAVER
MILLER WEISSLER ALHADEFF & SITTERSON, P.A. ("STEARNS"), DIP CAPITAL
LENDING, INC.("DIP"), MICHAEL I. BERNSTEIN, P.A. ("BERNSTEIN"), MOORE
STEPHENS LOVELACE, P.A. ("MOORE STEPHENS"), ECC, P.I. d/b/a EHRENSTEIN
CHARBONNEAU CALDERIN ("CHARBONNEAU"), THOMAS L. ABRAMS, P.A.
("ABRAMS"), WILK AUSLANDER LLP ("WILK"); NORTHERN JACKSONVILLE
ENTERPRISE, LLC d/b/a LANIER MANOR ("LANIER"), LAKE WORTH ENTERPRISE,

LLC d/b/a OASIS HEALTH AND REHABILITATION CENTER ("LAKE WORTH"),
HIALEAH ENTERPRISE, LLC d/b/a HIALEAH NURSING AND REHABILITATION
CENTER ("HIALEAH"), WEST DIXIE CARE, LLC d/b/a WATERCREST CARE
CENTER ("WATERCREST"), CORAL GABLES HOLDINGS, LLC d/b/a CORAL
GABLES NURSING AND REHABILITATION CENTER ("CORAL GABLES"), AVON
PARK ROYAL HOLDINGS, LLC d/b/a ROYAL CARE OF AVON PARK ("AVON"),
BOCA GROUP, LLC d/b/a MENORAH HOUSE ("MENORAH"), DELRAY GROUP, LLC
d/b/a LAKE VIEW CARE CENTER AT DELRAY ("LAKE VIEW"), BRADENTON
ENTERPRISE, LLC ("BRADENTON"; CDBR ENTERPRISE, LLC d/b/a BRADEN
RIVER CARE CENTER ("CDBR"), ZICHRON FOUNDATION FOR SPECIAL NEEDS,
INC. (ZICHRON), PAYTON & ASSOCIATES, LLC ("PAYTON"), RUDEN MCCLOSKY,
P.A. ("RUDEN"), JOSEPH D. MITCHELL, P.A. ("MITCHELL"), LAW OFFICES OF
PETER A. LEWIS, P.L. ("LEWIS"), BROAD AND CASSEL, P.A. ("BROAD"),
GOLDSMITH & GROUT, P.A. ("GOLDSMITH"), JOSHUA D. MANASTER, P.A.
("MANASTER"), SOLOMON AND CLARA HEISLER FAMILY FOUNDATION
("SOLOMON"); WEINGARTEN FAMILY FOUNDATION ("WEINGARTEN"); SCHON
FAMILY FOUNDATION ("SCHON"); EDUCATIONAL SUPPORT FOUNDATION INC.
f/k/a THE LEON AND IRENE SCHARF FOUNDATION ("LEON"); EMES
FOUNDATION, INC. ("EMES"); CHESED GLOBAL FOUNDATION ("CHESED");
ZICHRON FOUNDATION FOR SPECIAL NEEDS ("ZICHRON"); THE RIDGE PARK
FOUNDATION ("RIDGE PARK");

## Nature of the Action

1. Plaintiff brings this action for racketeering and other wrongs committed by Defendants who conspired with each and with others to perpetrate an enormous fraud and money laundering scheme through which the Defendants have stolen, and continue to steal, millions of dollars from both the Medicaid and Medicare payment systems. What appears to be legitimate purchases and leases of skilled nursing facilities (nursing homes) is in actuality an extensive fraudulent enterprise through which Defendants steal millions of dollars through a pattern of racketeering involved criminal acts of Racketeering (Fraud under Title 11), collection of an illegal debt, wire fraud, mail fraud, money laundering, bank fraud, conspiracy and more. This scheme is made possible through the active involvement of law firms and accounting firms who play a crucial and pivotal role.

2. Defendants purchase or lease skilled nursing facilities and siphon off monies thru parties with "related parties." While required to disclose these relationships on both licensure applications and Medicare and Medicaid cost reports, Defendants instead either intentionally leave off these related parties or list them and do not reduce the dollar amounts to the true "costs."

3. Defendants use a system of shell corporations which usually have intentionally misspelled names or are intentionally similar to confuse those responsible for auditing said licensure applications of cost reports. None of this would be possible without the cooperation of accountants and attorneys who know that true relationships.

4

## Jurisdiction and Venue

4.  This Court has jurisdiction over the subject matter of the causes of action in this

Complaint by virtue of:

- o  Federal question jurisdiction pursuant to 28 U.S.C. Section 1331, involving an action pursuant to 18 U.S.C. Section 1964 (a), and (c), the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO");

- o  Diversity jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1), involving an action between citizens of diverse states with an amount in controversy in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs;

- o  Supplemental jurisdiction pursuant to 28 U.S.C. Section 1367(a), involving claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution; and

5.  This Court has jurisdiction over the persons of the Defendants because;

- •  Each Defendant either resides or transacts business within this judicial district; and
- •  Each Defendant is amenable to service of process within the meaning of Federal Rule of Civil Procedure 4(e), 4(f) and 18 U.S.C. Section 1965(b).

6.  Venue is proper in this district pursuant to 18 U.S.C. Section 1965 and 28 U.S.C.

Section 1391 because Defendants either reside or transact business in this district or,

alternatively, this district is where a substantial part of the evens or omissions giving rise

to the claim occurred.

## Parties

7.  Plaintiff Timothy Patrick Reardon is a citizen of the State of Florida.

Reardon has been a Licensed Florida Nursing Home Administrator. Reardon has a

Bachelors degree and a Masters Degree in Health Services Administration. Reardon

graduated from the University of Miami School of Law, Evening Division, where he was

the President of the Health and Law Society. Additionally, while attending law school,

Reardon was taught Bankruptcy 101 by the Honorable A. Jay Cristol, the only sitting Federal Bankruptcy Judge to teach a full semester class on Bankruptcy Law.

8.     Plaintiff Reardon is also the 100% owner of W.B. Care Center, LLC d/b/a West Broward Care Center, a skilled nursing facility (S.N.F.0, located in Plantation Florida.  West Broward previously had a five year lease on the property located at 7751 Broward Blvd. with Defendant Institutional Leasing 1, LLC.  The lease gave W.B. Care Center the ability to bill Medicare and Medicaid for providing services to 120 nursing home residents.  Additionally, W.B. Care Center contracted with Millennium Management, LLC to provide "Back Office" support including (1) accounts payables, (2) accounts payables, and (3) Medicare and Medicaid cost report preparation.

9.     After placing W.B. Care Center into Chapter 11 Bankruptcy, Reardon lost control of the entity.  W.B. Care Center soon began (1) filing false Medicare and Medicaid cost reports, (2) denying payment to vendors that Medicaid had previously reimbursed W.B. Broward Care Center, (3) making partial payments to vendors that Medicaid had previously reimbursed W.B. Care Center for, (4) denying payment of vacation and sick payments to employees that Medicaid had previously reimbursed W.B. Care Center for, and (5) failing to care for residents that Medicare and Medicaid was reimbursing W.B. Care Center for.  W.B. Care Center, LLC is both a Defendant and a victim of the Enterprise.

10.     Plaintiff Reardon is also the 100% owner of Q.I.S. Management, LLC, a consulting company that provided management services to skilled nursing facilities and was contracted with Defendants W.B. Care Center, Hialeah, Watercrest, Lanier, Menorah, Bradenton, Coral Gables, Oasis, Lake View, and Avon Park.  At each nursing

facility, Q.I.S. Management, LLC was contracted to provide management consulting such as (1) nursing, (2) dietary, (3) marketing, (4) activities, (5), maintenance, etc. Q.I.S. Management, LLC had a five year contract with W.B. Care Center, LLC and a two year contract with the nine other Defendant facilities.

11.    Defendant Millennium Management, LLC f/k/a Elite Healthcare Management is a Florida corporation owned by Abraham Shaulson. W.B. Care Center, LLC contracted with Millennium Management for five years for "Back Office" support. Although each of Millennium Management's agreements with over seventy eight nursing facilities state that it is contracting with a "non-related" third party lessee, in fact, each of these nursing homes is considered a "related party" to Abraham Shaulson.

12.    Defendant Millenium Healthcare Management, LLC d/b/a Millennium Management is a Florida corporation owned by Avi Klein. (Millenium is intentionally spelled with one "N" in Mille"n"ium Healthcare Management, LLC and two "N's" in the fictitious name, Millennium Management. This was done to intentionally the following:

15. Millennium Management, LLC

16. Millennium Management owned by Millenium Healthcare Management.

13.    The purpose of creating two identical "Millennium Managements" with the only difference being that one has an "LLC" at the end is to confuse both Medicare and Medicaid as to the "relationship" to the nursing facilities. [1] In either case, Abraham Shaulson and Avi Klein have been, and continue to be, business partners since 1999 and therefore are considered a "related party" under both Federal and State guidelines.

14.    Defendant Institutional Leasing 1, LLC is a Florida corporation owning a skilled nursing facility located at 7751 Broward Blvd., in Plantation Florida.

---

[1] This will be explained in much further detail under "Medicaid Fraud"

15.     Defendant West Broward Group is a Florida corporation owned by Eli Strohli, brother-in-law to Abraham Shaulson.  West Broward Group leased the skilled nursing facility from 2005 until 2008.

16.     Defendant Oasis Health is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Lake Worth, Florida.  Oasis contracted with Q.I.S. for two years, beginning in September of 2008.

17.     Defendant Hialeah Nursing is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Hialeah, Florida.  Hialeah contracted with Q.I.S. for two years, beginning in September of 2008.

18.     Defendant Braden River Care Center is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Bradenton Florida.  Bradenton contracted with Q.I.S. in September of 2008.

19.     Defendant CDBR is a Florida corporation owned by Chris Grella and Randy that leases a nursing home in Bradenton Florida.  CDBR contracted with Q.I.S. for two years in September 2008.

20.     Lanier Manor is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Jacksonville Florida.  Lanier contracted with Q.I.S. for two years in September of 2008.

21.     Defendant Coral Gables Nursing Center is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Coral Gables Florida.  Coral Gables contracted with Q.I.S. for two years in September of 2008.

8

22.     Defendant Royal Care is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Avon Park Florida.  Royal Care contracted with Q.I.S. for two years in September of 2008.

23.     Defendant Menorah House is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Boca Raton Florida.  Menorah contracted with Q.I.S. for two years in September of 2008.

24.     Defendant Lake View Care Center is a Florida corporation owned by Eli Strohli and the owner of a nursing home in Delray Beach Florida.  Lake View contracted with Q.I.S. for two years in September of 2008.

25.     Defendant West Dixie Care is a Florida corporation owned by Barry Shisgal and the owner of a nursing home in North Miami Florida.  West Dixie contracted with Q.I.S. for two years in September of 2008.

26.     Defendant DIP Capital Lending is a Florida corporation owned by Abraham Shaulson which loaned monies to W.B. Care Center, LLC during Chapter 11 and charge interest against Medicaid regulations.

27.     Defendant Michael Bernstein, P.A. is a Florida corporation owned by Michael Bernstein, Esq.  Bernstein is the defacto corporate counsel to all entities owned and operated by Abraham Shaulson, Avi Klein and Eli Strohli.

28.     Defendant Moore Stephens Lovelace, P.A. is a Florida corporation that provides C.P.A. services to nursing homes regarding Medicare and Medicaid nursing facilities.  Of the 650 nursing homes in the state of Florida, Moore Stephens files is the accounting firm for over 350 of those nursing homes.

29.     Defendant Goldsmith & Grout, P.A. is a Florida corporation and a law firm specializing in representing nursing homes in Licensure matters.    Additionally, Goldsmith and Grout represent the Florida Health Care Association, a trade association whose members include almost all of the 650 nursing homes in the State of Florida.

30.     Defendant Peter Lewis, P.L. is a Florida corporation and law firm specializing in representing nursing homes in Licensure disputes.

31.     Defendant Joshua D. Manaster, P.A. is a Florida corporation and law firm representing almost every nursing home owned by Abraham Shaulson and Avi Klein in the State of Florida.

32.     Wilk Auslander, LLP is a New York corporation and law firm representing Abraham Shaulson and Avi Klein's nursing homes in regards to Lease Agreements and Assignments of Rent.

33.     Defendant Thomas L. Abrams, P.A is a Florida corporation and law firm that represented W.B. Care Center, LLC in Chapter 11.

34.     Defendant Ehrenstein Charbonneau Calderin is a Florida corporation and law firm that represented W.B. Care Center, LLC in Chapter 11.

35.     Defendant Stearns Weaver is a Florida corporation and law firm that represented Millennium Management, LLC f/k/a Elite Healthcare Management in two Chapter 11 cases, Safe Harbor and W.B. Care Center, LLC.

36.     Defendant Payton & Associates is a Florida corporation and law firm that represented Millennium Management, LLC f/k/a Elite Healthcare Management and Corum Healthcare Management in Safe Harbor Chapter 11.

37.     Defendant Ruden McClosky, P.A. is a Florida corporation and law firm that represented Institutional Leasing 1, LLC in the W.B. Care Center Chapter 11 and also other Abraham Shaulson and Avi Klein entities.

38.     Defendant Broad and Cassel, P.A. is a Florida Corporation and law firm that represented Leader Healthcare, a company owned by Abraham Shaulson and Avi Klein.

39.     Defendant Joseph Mitchell, P.A. is a Florida corporation and accounting firm specializing in Medicare and Medicaid cost reports.  Additionally, Joseph Mitchell was a court appointed accountant in Safe Harbor Chapter 11 and ended up leasing said nursing home.

40.     Defendant Zichron Foundation is a Florida non-profit corporation owned by Avi Klein.

41.     The Ridge Park Foundation is a New York non-profit corporation owned by Abraham Shaulson.

42.     Solomon and Clara Heisler Family Foundation is a New York non-profit corporation owned by Solomon and Clara Heisler.

43.     Weingarten Family Foundation is a New York non-profit corporation providing loans to Abraham Shaulson and Avi Klein nursing home purchases.

44.     Schon Family Foundation is a New York non-profit corporation providing loans to Abraham Shaulson and Avi Klein nursing home purchases.

45.     Educational Support Foundation f/k/a The Leon and Irene Scharf Foundation is a New York non-profit corporation providing loans to Abraham Shaulson and Avi Klein nursing home purchases.

46.     Emes Foundation is a New York non-profit corporation providing loans to Abraham Shaulson and Avi Klein nursing home purchases.

47.     Chesed Global Foundation is a New York non-profit corporation providing loans to Abraham Shaulson and Avi Klein nursing home purchases.

## BACKGROUND – NURSING HOME REIMBURSEMENT

48.     Nursing homes, also known as Skilled Nursing Facilities (SNF) receive almost 100% of their funding from the government, either thru Medicare or Medicaid.

49.     Medicare is a Federal program that pays for short term (less than 100 days) for a patient to receive physical, occupational or speech therapy after a minimum of a three day hospital stay.

50.     Medicaid is a State run program that pays for long term stays (permanent) after the patient, also known as a resident, has spent almost all of their assets.  Most states, including Florida, allow the person to keep their house if they intend to return home.  Upon death, the house becomes property of the State.

51.     The Federal Government actually administers both Medicare and Medicaid.  The States pay approximately 50% with the Federal government paying the other 50%.  This amount varies slightly from State to State and the Federal government started paying almost 60% due to the recent economic downturn.

52.     Since most nursing homes receive approximately 25% of their monthly funding from Medicare and the other 75% from Medicaid, this means that each nursing home is actually receiving more than half of their funding from the Federal government.

## Nursing Homes are reimbursed on a "cost based" system

53.    Nursing homes are reimbursed differently compared to almost any other health care provider.  For the most part, physicians, outpatient centers, etc. are reimbursed on a "fee for service" model where every provider is paid the same amount for each "service" they provide.  In other words, each doctor is paid the same amount, whether his office is in a luxury building or an old decrepit store front.

54.    Nursing homes bill Medicaid for a daily "all inclusive" rate which includes food, nursing, medications, housekeeping, etc.  Unlike other providers, however, nursing homes are paid based on the actual costs.  In fact, since the daily rates are calculated to the penny, of the 650 nursing homes in Florida, there are 650 different rates, no two homes have the same rate.  The range is from approximately $170 up to $235.

55.    The rate each nursing home is paid is calculated by submitting a Medicaid Cost Report at the end of the year in which every expense is listed.  The total cost is divided by the amount of patient days that the nursing home provided, and a "daily rate" is determined.

56.    As an example, an average nursing hoe is 120 beds.  Based on a thirty day month, the total "patient days" billed to Medicaid would be 3,600 (120 residents x 30 days)   On a yearly basis this would be a maximum billing of 43,800 days (365 x 120 residents).

57.    The Medicaid cost report then takes the total yearly cost of the nursing home, including mortgage, staffing, food, etc. (approximately $8,640,000 for a typical 120 bed nursing home) and divides by the number of actual patient days and gets a

13

daily rate of $200 per day (in this example) which is then used to "forecast" for the next year.

58.    What makes this system unique is that every nursing home in the country has a unique rate.  A nursing home on one side of the street can have  a daily rate of $220 a day and the nursing home on the other side of the street can have a rate of $140 per day.

59.    The reason for this disparity is that contrary to the popular belief (from the nursing home industry trade associations), nursing homes are actually spending less money that the government allows for them to provide nursing care.

60.    Medicaid actually breaks up the daily rate into separate components.  The four components are:

> A.    Direct Care (nurses and nursing assistants)
>
> B.    Indirect Care (Nursing Administration or management)
>
> C.    Operating (Administration, Housekeeping, Laundry, etc.)
>
> D.    Property (rent, mortgage, depreciation, etc.)

61.    The reason that these components are important is because Medicaid has limits on the Indirect, Operating and Property components.  On the other hand, there is no real "limit" to the amount nursing homes can spend on Direct nursing care.

**Nursing Home Fraud**

62.    The reason why there is such a discrepancy in Medicaid rates is that unscrupulous owners set up separate companies, which they control, and charge exorbitant rental and management fees to these companies.

63.     This process drains the facilities of much needed cash, which forces the nursing homes to cut back on staff, in particular, nurses and nursing assistants.

64.     As an example, if a nursing home is billing Medicaid $800,000 per month, they are allowed to spend only $35,000 on rent. If they spend over that amount, then Medicaid does not reimburse them at the end of the year for those additional monies.

65.     In the short run, this means that they must cut back on nurses and nursing assistants, which are variable costs, so that they can meet the monthly rental payment. What the nursing home owners do not tell anyone, especially the staff or Medicaid, is that they are actually renting the nursing home from a company that they own.

66.     The way the system is supposed to punish these owners is that at the end of the year, when the cost report is filed, the government realizes that the nursing home spent less than the amount that was allocated for nursing on last years cost report.

67.     Thus, when they divide actual costs by patient days, the new daily rate is less than the last year's daily rate that they have been getting for the last twelve months.

68.     This creates an "overpayment" where the nursing home was actually paid more for nursing staff than they provided. Medicaid "solves" this problem by lowering the "cap" that the nursing home will be allowed to spend on nurses the next year. This process is called "ratcheting down" the Medicaid rate because once Medicaid lowers the "cap" it can never be raised again, until the home is sold to a new nursing home owner. Thus, it is "ratcheted down" because a ratchet can only go in one direction.

69.     Of course, the new owner has to really be a "new" owner, not someone or some company related to the old owner. This is called a non-related party change.

15

**Re-Basing the Medicaid Rate**

70.     When the nursing home is sold, the new owner files a Change of Ownership, or C.H.O.W.

71.     The new owner must also provide a Proof of Financial Ability to Operate a nursing home (P.F.A.) that demonstrates that the new owner has at least one month's financial reserves to cover all nursing home costs ($800,000 in our previous example).

72.     The P.F.A. also requires that the new owner provide a detailed financial statement created by a C.P.A. firm specializing in Medicaid cost reports that lists all asset and liabilities that have been assigned to the new entity, including the source of the one month "reserve."

73.     Last, but most important, the P.F.A. supplies a detailed one year budget that not only demonstrate that the new nursing home will be self supporting, but the budget is also used to "set" the new nursing home rate.

74.     Of course, every P.F.A. submitted is based on a budget showing that the new nursing home owner will be spending the full amount allowed, in order to set the new rate as high as possible.

75.     In Florida, the Agency for Health Care Administration (A.H.C.A.) issues the new owner a license and has C.P.A.'s on staff who review the P.F.A. and are required to guarantee that it makes fiscal sense and also to determine if the new owner is related to the old owner by family or by "contract."

76.     Once the new P.F.A. is approved, the new owner must still operate for six months under the previous owner's rate.

77.     After six months, the new owner then files a "Six Month Medicaid Cost Report" prepared by the C.P.A., which demonstrates that the actual costs spent are the same as were budgeted.

78.     If the new cost report proves that the new owner is spending the same as the budget that was approved, the new rate if formally approved and a "retro" or "true up" payment is issued to make up for the six months when the old rate had been paid.

79.     This "retro" payment is significant because if the old owner had drained the facility of cash over the last few years, the difference between the old rate and the new rate could be as much as $60 per day.

80.     Based on the previous example, $60/day times six month of patient days (21,600 x $60) would equal a lump sum of $1,296,000.

81.     Of course, if the new owner does not continue to spend at the new, higher rate, when the next cost report is filed it will be discovered and will create an "overpayment" again, which will required the new rate to go down and most likely a large settlement amount that Medicaid will simply deduct from the next Medicaid check.

### Scam # 1 --   "Re-Basing" thru the fake Change of Ownership (C.H.O.W.)

82.     Just as every industry has scams, the oldest scam in the nursing home industry is for a nursing home owner to drain all of the cash out of the facility and then sell the nursing home to a related party, usually a brother-in-law (different last name than owner).

83.     The "old" owner then waits for the new rate to be set six months later, receive the "true up" settlement, and then buy back the facility (or in the case of Florida,

17

leasing the building is considered the same as a sale) and then the old owner then gets back the building at the new rate with cash in pocket.

84.     This means, of course, that the brother-in-law (and the accountants and lawyers who file the P.F.A. and licensure application) must all lie and state that there is no relationship between the old owner and the new owner.

85.     As a point of clarification, there is nothing illegal about an owner selling a nursing home to their brother-in-law.   In that case, however, the rate stays the same, in the ratcheted down position, and there is no re-basing of the rate.

86.     In the "fake" Change of Ownership scenario, the landlord actually has an incentive to get rid of the new owner as soon as the change is approved by the State. There is no "minimum" requirement to how long the new owner must be in place, other than the wait for the six month cost report.  After the six months, the old owner, if unscrupulous, wants to take back the nursing home as soon as possible.

87.     In the lease agreement, the old owner is actually the landlord and is "leasing" the building to the new owner.  So taking back the nursing home is a lot easier than an actual sale.

88.     When Medicaid finally realizes that a huge overpayment has been created by the Fake Change of Ownership, the brother-in-law (who had no assets except the lease to the nursing home) is gone and the LLC is a shell.

89.     In order to see examples of multiple fake Changes of Ownership, resulting in "Re-basing," one must only look at the history of West Broward Care Center:

18

A.    **December 1999 – 1st Change of Ownership**

Nationwide Senior Healthcare, Inc., owned by Abraham

Shaulson, purchases the property located at 7751 Broward

Blvd from Integrated Health Services (I.H.S.) of Melissa for

$3,000,000.  (This is verified by the lawsuit "Integrated Health

Services of Melissa vs. Nationwide Senior Healthcare, Inc.

Nationwide Senior is represented by Joshua Manaster, Esq.

B.    Institutional Leasing, LLC, owned by Leon Scharf and David

Scharf registers itself as the owner of the property, for the

same $3,000,000.  Institutional Leasing then leases the

property to Nationwide Senior, owned by Abraham Shaulson.

C.    **February 2001 – 2nd Change of Ownership**

Nationwide Senior Healthcare, LLC d/b/a West Broward Care

Center changes to Southeast Senior Healthcare, LLC d/b/a

West Broward Care Center.  On the Articles of Incorporation,

the owner is listed as "none."  The address is listed as the

same address as the law office of Joshua Manaster.  Based

on the lawsuit by Medistat Pharmacy, Abraham Shaulson

signs as the owner of Southeast Senior Healthcare, Inc.

D. **October 2002 – 3rd Change of Ownership**

West Broward Group, LLC d/b/a West Broward Care Center

(owned by Eli Strohli, brother-in-law to Abraham Shaulson)

registers Articles of Incorporation

E. **March 2005 – 4th Change of Ownership**

Institutional Leasing, LLC, owned by Leon Scharf and David

Scharf, sells the property for $3,100,000 to Institutional

Leasing 1, LLC, owned by Abraham Shaulson.  In reality,

Abraham Shaulson only paid $100,000 and $1,500,000 was

financed by Educational Support Foundation, Inc., a non-profit

owned by Leon Scharf, and the other $1,500,000 was

financed by Chesed Global Foundation Inc., a non-profit

owned by Ester and Charles Scharf.  So, in reality, Institutional

Leasing, LLC, owned by the Scharf family sold itself to

Institutional Leasing 1, LLC, owned by the Scharf family.

## Scam # 2 – The Fake "Lease"

90.     Medicaid only pays for actual costs.  As an example, if the owner of the

nursing home license also owns the property, then the only costs of "property" that they

can get reimbursement for would be the actual costs of ownership such as mortgage,

interest, depreciation, property insurance, etc.

20

91.     If, on the other hand, the owner of the license is leasing the property from a non-related party (not a brother-in-law), then Medicaid reimburses the owner for the actual cost of leasing the building, such as the lease payments.

92.     The Agency for Healthcare Administration is supposed to verify that the lease is not actually a "purchase" from a related party, to ensure that the owner of the property is not reimbursed at the higher rental rates.

93.     Unscrupulous nursing home owners are always trying to figure out ways to submit fake "costs" since this is a cost-based reimbursement system.

94.     Honest nursing home owners are happy with the fact that they are guaranteed to always pay their bills because it is a cost based reimbursement system, which means that there is no way to lose money.  Additionally, after twenty or thirty years, Medicaid has paid off the mortgage in full and the building is owner "free and clear."

95.     In order to see examples of the "fake lease" one only has to look at the history of West Broward Care Center:

> A.     **"Lease" from Institutional Leasing to Nationwide Senior**
>
> As previously stated in "B" above, although the property was purchased by Nationwide Senior Healthcare, LLC, owned by Abraham Shaulson in December of 1999 for $3,000,000, it was registered by Institutional Leasing, LLC, owned by the Scharf family, in the same month.  (The purchase agreement states that the escrow monies were kept with the law firm of Defendant Goldsmith & Grout, P.A.).  Then, a lease

agreement was filed that shows the property being leased

from Institutional Leasing, LLC to Nationwide Senior

Healthcare, LLC. There is not mention of any sale from

Nationwide to Institutional Leasing. In the end, however,

Medicaid is now paying Nationwide Senior Healthcare for

lease payments, instead of just the cost of ownership.

B.     **Lease from Institutional Leasing 1 to West Broward Group**

In 2005, when Institutional Leasing, LLC sells the property to

Institutional Leasing 1, LLC, the property is then leased to

West Broward Group, LLC, owned by Eli Strohli.   Since Eli

Strohli is the brother-in-law of Abraham Shaulson, and

brother-in-laws are considered a "related party" under Federal

Medicaid guidelines, the payments to Institutional Leasing 1,

LLC should only be for actual costs of ownership, not the

rental payments Eli Strohli is charging Medicaid.


### Scam #3  - The Fake "Sub-Lease"

96.     The next way to add fraudulent layers of "cost" is to create a fake "sub-lease." When most people think of a sub-lease (or at least the way Plaintiff thought of a sub-lease) would be the typical apartment setting in a crowded city such as New York City.

97.     The tenant needs to move, for whatever reason, and they are lucky enough to find a suitable tenant, who is acceptable to the landlord, to "sub-lease" the

apartment. In this scenario, the original tenant would be ecstatic to get the new tenant to pay the same amount of rent, of course, because there are other apartments available to rent. In some situations, the original tenant may not be able to get a sub-tenant that will pay the whole rent, and in that case, the original tenant might have to give up their security deposit or make some financial payment because they are the ones on the original lease.

98. In the case of the nursing home "fake" sub-lease, it is simply used as a way to create a layer of fraud. The landlord leases the building to a tenant and the tenant then "sub-leases" the building to another tenant, at a higher rent!

99. The reason that the tenant is able to lease the building at a higher rent is because the landlord, the tenant and the "sub-tenant" are all companies owned by the same person, or group of people.

100. Again, in order to see an example of the fake "sub-lease" one must only look at the history of West Broward Care Center:

> A. **Fake Sub Lease from 7751 Leasing to Southeast Senior**
>
> In December of 2000, Institutional Leasing, LLC is leasing the building to Nationwide Senior Healthcare, LLC, d/b/a West Broward Care Center, owned by Abraham Shaulson. Abraham Shaulson then creates 7751 Leasing, LLC (this is based on the address of the nursing home, 7751 Broward Blvd.). Abraham Shaulson then creates Southeast Senior Healthcare, LLC d/b/a West Broward Care Center. 7751 Leasing LLC then "sub-leases" the building to Southeast

23

Senior Healthcare.  This is why Joshua Manaster Esq. lists the owner of Southeast Senior as "none" on the articles of incorporation.

**B.**     **Fake Sub-Lease -- Nationwide Sr to West Broward Group**

In October 2002, West Broward Group, LLC owned by Abraham Shaulson's brother-in-law, Eli Strohli, not only files a change of ownership, but also files a lease with Broward County Clerk for a lease between Nationwide Senior Healthcare and West Broward Group.  Again, the landlord is Institutional Leasing, owned by the Scharf's, who lease to Abraham Shaulson, who then sub-leases to his brother-in-law.

**C.**     **Fake Sub-Lease Institutional to West Broward Group**

In October 2005, When Institutional Leasing sells to Institutional Leasing 1, it is not really a change of ownership because the Scharf family financed $300,000 of the $3,100,000 purchase price, or 97%.  Under Federal Guidelines, a Change of Ownership must be a minimum of 41%.  So, in reality, the Scharf family is still leasing the building to Abraham Shaulson who is then sub-leasing to Eli Strohli.

**Scam # 4 – The Fake "Back Office" Support Agreement**

101.    The next way unscrupulous owners create "fake costs" is by creating the fake "Back Office" support agreement.  Again, in reality, this is a good idea practices in

24

many areas, but when the government is reimbursing based on costs, nursing home owners have figured out another way to drain the facility of monies and at the same time make themselves "judgment proof" against lawsuits by residents, vendors, and employees.

102.    Many companies contract with companies for "back office" support.  On a small scale, the example would be a solo attorney who hires a company to do billing, pay his payroll taxes for himself and his assistant, pay his monthly bills, etc.

103.    On a larger scale, many companies that own operations spread out across far distances, such as the owner of many gas stations, stores, etc., would create their own "back office" support as an "economies of scale" model.  In this situation, rather than put a bookkeeper at every gas station, each gas station would pay a monthly fee to a central office to do the work for them.  It could either be a corporate owned "corporate office" or, in our attorney scenario, it could be an "out-sourced" company that provides the services.  In either case, there is nothing "nefarious" about it.

104.    In the hands of the nursing home owner, they use the situation to create an extra layer of costs.  The way that they do this is really simple.  They pay the "back office" support company a monthly fee based on receivables, and they "forget" to mention to Medicaid that it is a company that is either owner and/or controlled by the owner of the nursing home.

105.    Since it is a universal procedure that every nursing home has a "home office" that takes care of these back office duties, each annual licensure application and each annual Medicare and Medicaid cost report asks specifically "who is the Management Company" and "are they a related party?"

106. The Cost reports also have a separate section to list "all related parties" but since the Management company, or "home office" is so universal, there is a separate question specific to these two items.

107. Unscrupulous nursing home owners simply used do the following:

      A.    write N/A (not applicable) on the question "List Management Company,

      B.    answer "no" to the question "is management company a related party

      C.    Create two different "management" companies. One of the companies is the "outside" management company that provides clinical, marketing, etc. and is listed as the actual management company and the owners "admit" that this is a related company, and as such, they only list the actual costs of the employees in the "outside" management company. Then, they create a second "back office" support company, which they charge based on a percentage of revenue (as opposed to actual costs) and they simply do not list this "back office" company as on any licensure application or cost report.

108. Once again, in order to see example of this fake "back office" support, one must only look at the history of Licensure Applications and Medicare and Medicaid cost reports filed by West Broward Care Center.

      A.    September 2000 Licensure Application for Nationwide Senior Healthcare d/b/a West Broward Health Care asks for the name of the Management Company and Abraham Shaulson asks "name of chain" and Shaulson leaves blank, although

26

Elite Healthcare Management is the Chain for five of Shaulsons nursing homes.

B.    The 2004 Medicaid cost report lists the Management Company as Millennium Enterprise. The form asks "Management Company a related party?" Eli Strohli and Michael Greenwald mark "no." Actually, Eli Strohli owns Millennium Enterprise.

109.   The added benefit that nursing home owners have realized by creating two different management companies, and calling one a "back office" support, is that whenever they are sued by nursing home residents, vendors, or employees, they claim that all the monies are with the "back office" but that they "back office" has no influence over the nursing home. The first claim, that the back office keeps all the monies, is true. The second claim, that the back office has not control over the nursing home, is not true.

110.   in order to see examples of nursing home owners hiding behind the "back office" agreement, one must only look toward the lawsuits involving West Broward Care Center and the other nursing homes owned by Abraham Shaulson and the Scharf Family.

A.    Affidavit filed by Sandy Swindling, C.P.A. for the accounting firm of Moore Stephens states that Millennium Management is "just a back office support" function. Moore Stephens, and Sandy Swindling in particular, are the registered agent for said nursing homes, so he knows that the homes and the management company are both owned by Abraham Shaulson.

### Scam # 5 – Not paying vendors

111.   Since Medicaid is a cost based system, the next way to steal from Medicaid is to submit bills to Medicaid, get reimburse, but then not pay the vendors. Similar to the Internal Revenue Service, vendor invoices can be included as "costs"

even if they have not been paid. However, after one year, these bills either need to be paid or the monies given back to Medicaid.

112. In order to accomplish this, the Chief Financial Officer, (C.F.O.) must create false financials that show the bills being paid.

113. To see examples of vendors not being paid, and the "second set of books" that needs to be created, one must only look at the history of West Broward Care Center and the other Scharf/Shaulson owned homes:

> A. Lawsuit by Omnicare Pharmacy against West Broward Group for over $800,000. The financial statements on the Accounts Payables shows that West Broward has not paid the pharmacy for over five years, however, the Medicaid cost report and the monthly balance sheet do not show this balance.

## PLAINTIFF FALLS VICTIM TO DEFENDANTS' SCHEME

114. In October of 2005, Plaintiff had been the Executive Director of St. Anne's Nursing Center and Residence, a two-hundred forty (240) bed skilled nursing facility and sixty (60) bed assisted living center owned by the Archdiocese of Miami for over five years.

115. Reardon had been on a formal "career ladder" to become President of Catholic Health Services, a management company run by the Archdiocese that oversaw the three nursing homes, two rehabilitation hospitals, HUD housing, cemeteries and schools owned by the Archdiocese of Miami.

116. In October 2005 Reardon was contacted by the accounting firm of Moore Stephens and told that a nursing home corporation named Millennium Management

28

was interest in hiring Reardon to run their two hundred seventy six (276) bed nursing home in Hialeah Florida. After Reardon stated that he was not interested because of his career ladder, Reardon soon began receiving phone calls from Abraham Shaulson, the owner of Millennium Management.

117. Reardon was hired by Millenium Management and by February 2008 he was the Vice President of Operation – Florida, for the ten nursing homes Millennium Management owned in Florida.

118. In May of 2008, Abraham Shaulson approached Reardon with a business proposition. Shaulson wanted Reardon to create two corporations. The first company would be an "outside" management company that would oversee all ten of the Millennium homes and focus on patient care, marketing, budget, expenses, and quality assurance. This company would bill each nursing home based on a percentage of revenue and would have a two year contract with each nursing home. Millennium Management would handle "back office" duties such as payroll, payables and receivables.

119. The second company would be a nursing home leasing company that would start leasing the Millenium Management nursing homes. Reardon would become the "operator" and Shaulson stated that he just wanted to be the landlord and have Millennium Management charge for the "back office" duties.

120. Reardon would start with one nursing home, West Broward Care Center, located at 7751 Broward Blvd., in Plantation Florida.

121. In June of 2008, Reardon created two limited liability corporations using Shaulson's corporate counsel, Michael Bernstein, Esq. W.B. Care Center, LLC d/b/a

West Broward Care Center was created to lease West Broward Care Center. Bernstein also created Q.I.S. Management, LLC, which would do all the "outside management" for the ten nursing homes.

122.    Since W.B. Care Center, LLC had a five year lease, Q.I.S. Management had a five year lease with W.B. Care Center. Additionally, although the contracts with the nine other nursing homes was based on a percentage of revenue, the five year contract between Q.I.S. Management and W.B. Care Center, LLC was based on a flat monthly fee of $38,500 per month, due to the extra services Reardon and his management staff was providing to West Broward.

123.    Reardon then resigned as the Vice President of Operations – Florida, for Millennium Management.

124.    In July of 2008, Reardon, thru W.B. Care Center, contracted with Millennium Management, to do the "back office" support with a five year contract. Also, Millennium Management was contracted to handle the Change of Ownership.

125.    In order to qualify as a nursing home owner, a very detailed process is involved requiring the services of certified public accountants specializing in Medicare and Medicaid cost reports for nursing homes. For this purpose, W.B. Care Center, LLC paid the accounting firm of Moore Stephens.

126.    One of the requirements to become the licensed operator of a nursing home in the State of Florida is obtaining a line of credit equal to one month's expenses for the individual nursing home. In the case of West Broward, it was necessary to prove that it had a line of credit of $878,000. To accomplish this, West Broward Care Center

signed a one year note with Abraham Shaulson, personally, to loan W.B. Care Center $878,000.

127.    The budget that was submitted to the Florida Agency for Health Care Administration listed the rent of W.B. Care Center to Institutional Leasing 1, LLC, owned by Abraham Shaulson, was $125,000 per month.  This is $50,000 more per month than the $75,000 previous licensee, West Broward Group LLC, owned by Eli Strohli, and was paying to Institutional Leasing 1.

128.    Although AHCA approved this increased rent, because they though Reardon was a "non-related" party, the increased reimbursement would not come for another six months.  The new, increased rent, however, started immediately.

129.    When Reardon tried to use the $878,000 of funds to help with this increased rent of $50,000 per month, he found that Millennium Management had transferred the monies out of the W.B. Care Center account within two months of AHCA approving the application.

130.    This forced Reardon to use his own monies to meet payroll obligations. Between June 2008 and January 2009, Reardon deposited over $130,000 of his own monies into the W.B. bank account, each time asking Shaulson to transfer the monies back, to no avail.

131.    In December of 2008, Millennium took $196,000 out of the W.B. bank account for monies that it claimed it was owed.  After proving that the monies were owed to W.B., Millennium wrote a check to W.B. that soon bounced due to insufficient funds.

132. Finally, after two months, Millennium Management finally transferred the $196,000 into the W.B. accounts. During this time, Reardon was again forced to use his own monies to fund payroll.

133. In February of 2009, Reardon was informed by AHCA that the change of ownership had been approved at the rate had increased from $180 per day to $220 per day, or $1,752,000 per year, based on a census of 120 patients.

134. This increased rate also generated a "retro" or "true up" of $440,000 of "re-basing" monies to pay W.B. Care Center, and Reardon, for the monies that had been expended due to the increased rent.

135. At this time, Millennium Management was being paid by W.B. to create all monthly financial statements and to pay all bills, including transferring $125,000 per month from the W.B. accounts to the Institutional Leasing 1 bank account.

136. In February of 2009, Reardon noticed a transfer of $75,000 out of the W.B. bank account. Not recognizing this amount, Reardon sent an email to Michael Greenwald, C.P.A. and C.F.O. for Millennium Management asking what this withdrawal was for.

137. Michael Greenwald then sent an email back informing Reardon that he had only transferred $75,000 of the $125,000 rent as a 'favor' to Reardon. He said that the remaining $50,000 would be taken when the "re-basing" monies came in at the end of February. A "cash flow" analysis also noted the $50,000 as "rent paid short until retro" and also confirmed that there was, in fact, enough monies to cover the full rent, if needed. [2]

---

[2] Also, Reardon had been depositing his own monies into the account. If necessary, Reardon could have paid the extra $50,000, except it was not needed. The cash flow confirms there was enough money to pay the full rent.

## The Fake Lawsuit

138. Two weeks later, W.B. Care Center, Q.I.S. Management, LLC and Reardon, personally, was served a lawsuit by Michael Bernstein, Esq., on behalf of Institutional Leasing 1, LLC. On the same day as the lawsuit, Bernstein resigned as the Registered agent of W.B. Care Center, LLC and Q.I.S. Management, LLC. Since the regulation regarding Registered agents states that a Registered agent must remain as the Registered agent for 31 days after resigning, Bernstein actually served Reardon personally for the W.B. Care Center and Q.I.S. Management lawsuit, since Bernstein couldn't serve himself.

139. The lawsuit for $10,000,000, based on the following:

    A.     $50,000 for paying rent "short"

    B.     $5,000 for 10% of the $5,000 "short" payment

    C.     $7,500,000 for "accelerated rent" for the remaining 54 months of the 60 month lease.

    D.     $2,500,000 for a "promissory note" between Institutional Leasing 1 and W.B. Care Center, and personally guaranteed by Reardon.

    E.     Additionally, the lawsuit stated that Q.I.S. Management had been taking fees from W.B. Care Center that it was not legally allowed to do.

140. Reardon was surprised by three things:

    A.     Institutional Leasing 1 LLC, the landlord and Millennium Management, the "back office" support are both owned by

Abraham Shaulson. Obviously, Institutional Leasing 1 knew that Millennium Management made the decision to pay rent short.

B.   Although the $2,500,000 note between Institutional Leasing 1 and W.B. Care Center, personally guaranteed by Reardon, had Reardon's signature, Reardon had never seen it before. Additionally, Institutional Leasing 1 had certainly never transferred $2,500,000 into the W.B. accounts. Lastly, since Millennium Management, LLC had been doing the monthly financials, certainly the $2,500,000 would have been listed under the "liabilities section" on the W.B. monthly balance sheet. And this information was certainly required to be on the P.F.A., and the six month Medicaid cost report.

C.   Institutional Leasing 1 was accusing Q.I.S. Management of taking more monies than was allowed in the Management Contract. Since Millennium Management had sent the Q.I.S. Management contract to AHCA as part of the initial P.F.A., certainly Abraham Shaulson at Millennium Management could have told Abraham Shaulson at Institutional Leasing 1 that this was not true. And since Michael Bernstein is the attorney for over 200 companies owned by Abraham Shaulson, he certainly knew this too.

141.     Reardon first contacted Shaulson and demand that he accept the $50,000 rent payment, since by now the $440,000 "re-basing" monies had also come in.

142.     Instead, Institutional Leasing 1 filed for Eviction for the full payment of $10,000,000.

143.     Reardon, having been a nursing home administrator for almost twenty years explained to Shaulson that he knew that he was trying to take the nursing home back in order to keep the new "rebased" monthly Medicaid rate of $220 per day. Shaulson stated that he didn't care and said he was going to have a trustee appointed.

144.     Reardon, having learned bankruptcy directly from sitting Bankruptcy Judge A. Jay Cristol, knew that putting W.B. Care Center, LLC into Chapter 11 would stay the eviction notice and give him time to prove that the $2,500,000 note was unfunded.

145.     Additionally, Reardon could show any Judge that Millennium Management had completed all the licensure documents and had sent the Q.I.S. Management agreement with W.B. Care Center to AHCA for the proper amount. Q.I.S. Management, in fact, had been taking less than the AHCA allowed $38,500 per month because Reardon was already putting his own monies into the nursing home awaiting on the rebasing rate.

146.     Most importantly, Medicaid was still wiring the Medicaid monies into the "old" W.B. Care Center bank accounts until the "retro" rate was approved.  Each month, Michael Greenwald would transfer the monies from the "old" account into the "new" accounts.  At the time of the fake lawsuit, Millennium Management was holding

$196,000 of Medicaid monies paid to W.B. Care Center and needed to meet the next payroll of $210,000.

## RACKETEERING – FRAUD IN A CASE UNDER TITLE 11

### Count 1

**(Institutional Leasing 1, LLC; Millennium Management, LLC; Ruden McClosky, P.A.; P.A., Merryl Lynch, Thomas L. Abrams, P.A.)**

147.    On the first day of the Chapter 11, Institutional Leasing 1, LLC and Millennium Management, LLC appeared thru the law firm of Ruden McClosky and intentionally misrepresented to the court that Judge John K. Olson had represented previously represented Millennium Management, formally known as Elite Healthcare Management, LLC  for "one or two days."....

Transcript of the February 26, 2009 hearing in the first Bankruptcy case reads:

MR. GORDICH:    And Judge, before we get rolling, just this is something that I spoke with my colleague, and they mentioned that I should bring it to your Honor's attention, some years ago Mr. Abraham Shaulson was referred to a very good attorney in Tampa by the name of Olson and he represented that gentleman in an attempt to purchase a nursing home and I understand it was a day or two, or something like that and we wanted to bring it to your Honor's attention.  We don't believe it's any conflict or otherwise but I just got retained

yesterday. I just found out. I just told my colleagues this morning, and I wanted to give them an opportunity to stew on that a little bit.

THE COURT:    Thank you for mentioning it. Had you not, I would have.

MR. GORDICH:    Thank you, Judge.

THE COURT:    Mr. Abrams, your call.

MR. ABRAMS:    As long as you don't personally feel a conflict, we don't have a problem with it.

THE COURT:    Okay. It's been a while, and I think that the representation was sufficiently attenuated that if everybody is comfortable with it, let's proceed.

MR. ABRAMS:    All right.

THE COURT:    I've obviously read the motions and—

147.    In reality, Judge Olson represented Abraham Shaulson and the following corporations and individuals for over three years in a similar Chapter 11 in In Re: Safe Harbour Florida Health Care Properties, Inc., Case No.: 8:03-bk-3356 and three related adversary proceedings. The corporations and individuals represented by John K. Olson Esq. and Stearns Weaver are:

    A.    Elite Healthcare Management, LLC, a nursing home management company that later changed its name to Millennium Management, LLC.

    B.    Leader Healthcare Management, Inc.

    C.    Corum Healthcare Management, Inc.

    D.    Menorah House

E.    Avi Klein

F.    Michael Greenwald

G.    Aaron Davis

H.    The Weingarten Family Foundation

I.    Henry Schon

J.    David Shine

K.    Miri Rosner

148.    Larry Gordich Esq., attorney for Ruden McClosky, knew of the past representation based on the following:

A.    Steven Siegal, Esq., corporate counsel for Millennium Management, LLC f/k/a Elite Healthcare Management worked with Larry Gordich at Ruden McClosky and referred the case of Millennium Management to him.

B.    Larry Gordich and Steven Siegal both left Ruden McClosky on the same day.

C.    Larry Gordich and Ruden McClosky represented Defendant Henry Schon on previous cases.

D.    Ruden McClosky had represented numerous Millennium Management nursing homes in the past.

149.    Thomas Abrams, P.A. worked with Judge John K. Olson in Miami Bankruptcy Court before becoming Judge and should have refused to allow Judge Olson to oversee an identical Chapter 11 case in front of former client, Abraham Shaulson.

150.    Additionally, other parties that were involved in In Re: Safe Harbour that were also related to West Broward Care Center are:

A.    Moore Stephens Lovelace

38

B.    E.T.E. Systems

C.    Bayonne Bridge

D.    MDI Technologies

## Count II

**(Stearns Weaver, P.A.; Broad and Cassel, Payton & Associates, Joseph Mitchell, P.A., Moore Stephens, Millennium Management, LLC f/k/a Elite Healthcare Management, LLC)**

149. In numerous court filings, and documented in numerous court transcripts, Defendants accused Don Larder, owner of Safe Harbour Florida Health Care Properties, owner of Meadowview Nursing Home, of stealing funds from the Nursing Home, and thus the estate.

150. As proof of the theft, Defendants relied on fact that Don Larder filled out a "change of address" with the Agency for Health Care Administration to have Medicaid funds sent to a different address.

151. Defendant accountants, Joseph Mitchell, P.A. and Moore Stephens are experienced Medicaid Cost Report accountants responsible for filing over 65% of all Medicaid cost report for the State of Florida's 650 nursing homes.   Defendants had a duty to inform the Bankruptcy judge that Larder had every right to fill out a change of address since he was the owner of the nursing home license.

152. Joseph Mitchell, in particular, benefited by appearing in court as a Court appointed accountant and keeping silent because Joseph Mitchell negotiated with the landlord, Omega Investors, to become the new Lessee, after Don Larder had been discredited as a "thief" by John K. Olson, Esq. in numerous court documents and appearances.

39

**Count III**

**(Stearns Weaver, Ehrenstein Charbonneau, Calderin)**

153. On August of 2009, W.B. Care Center filed Chapter 11 for a second time in six months, in Case No.: 09-26196-JKO and Patricia Redmond, Esq., representing Institutional Leasing 1, LLC and Millennium Management, LLC f/k/a Elite Healthcare Management, LLC appeared in court and explained that she would have the case transferred from Judge Ray to Judge Olson. Both Stearns Weaver and Ehrenstein Charbonneau Calderin had a duty to inform the Court, and W.B. Care Center, LLC, that Judge Olson and Patricia Redmond had represented Abraham Shaulson and Millennium Management from 2003 until 2006, when Judge Olson became the "Honorable John K. Olson," Federal Bankruptcy Judge.

154. Also, Patricia Redmond stated in court, and accompanying legal filings, said that W.B. Care Center had a "trustee appointed" in a State Court Action by Institutional Leasing 1, LLC and that West Broward was "forum shopping."

155. In reality, Institutional Leasing 1 intentionally served W.B Care Center with the wrong court date, and when no one representing W.B. Care showed up in Court, the State Court Judge appointed a Court receiver.

**Count IV**

**(Institutional Leasing 1, LLC; Stearns Weaver, Marcum LLP, Ehrenstein)**

156. On October 27, 2009, Patricia Redmond, Esq. informed the Court that W.B. Care Center had begun Chapter 11 two months prior with over $600,000 in the bank and currently had only $75,000 in the bank. Stearns Weaver then demanded that an

Examiner be appointed or else Institutional Leasing 1 would refuse to allow W.B. Care Center to use any of its "cash collateral."

157. Based on this, Judge Olson appointed an Examiner.

158. Patricia Redmond and Robert Charbonneau of Ehrenstein then put John Heller, C.P.A. with Marcum LLP on the witness stand and questioned him. Robert Charbonneau and John Heller both knew, based on the August and September D.I.P. reports that W.B. Care Center actually entered Chapter 11 with less than $75,000 in the bank.

159. Instead, John Heller accused Reardon and W.B. Care Center of not turning over the October bank statements. Since the date was October 27, Regions bank (or any other bank) does not send out monthly bank statement until after the end of the month.

160. Although Reardon had explained that he did not want to turn over the Regions Bank "pin #" because it was linked to his personal account, Judge Olson ordered that he turn over the pin # and appointed an Examiner.

### Count V

### (Ehrenstein Charbonneau Calderin)

161. On November 5, 2009, Robert Charbonneau, Esq. filed an "Emergency Order to Resign as Counsel to W.B. Care Center, LLC." Charbonneau stated Irreconcilable differences.

162. In fact, Ehrenstein resigned because Judge Olson ruled that W.B. Care Center could reject the previous settlement agreement and W.B. Care Center wanted

41

Ehrenstein to prosecute the two adversary proceedings against Institutional Leasing 1 and West Broward Group, LLC.

163. Because this would have led to W.B. Care Center discovering that Judge Olson had lied about his previous representation of Abraham Shaulson and Millennium Management, Charbonneau resigned.

164. On November 12, 2009, Ehrenstein Charbonneau Calderin filed a "Motion to Withdrawal of Expedited Motion to Withdraw" because Charbonneau had negotiated with Institutional Leasing 1 to pay all of their "previous and future" legal bills.

165. This agreement by Institutional Leasing 1 occurred during the settlement agreement negotiations when Ehrenstein was supposed to be representing W.B. Care Center.

<u>Count VI</u>

**(Stearns Weaver, Ehrenstein Charbonneau Calderin)**

166. On December 14, 2009, Patricia Redmond, Esq. stated to the Court that Institutional Leasing 1 were not able to work out terms of the previously negotiated settlement agreement.

167. In reality, after the settlement agreement had been negotiated over a period of twelve hours, at a cost to the Estate of over $40,000, Institutional Leasing 1 demanded that Reardon sign a new settlement agreement in which Reardon refused to "cooperate with any Federal investigation" regarding Millennium Management, LLC.

168. Reardon's personal bankruptcy attorney, Joel Tabas, Esq., had informed Patricia Redmond and Robert Charbonneau from November 22 until the morning of December 14th that he could not allow his client (Reardon) to sign this new release.

169. Then, Patricia Redmond accused Reardon of "attempting" to transfer $50,000 out of the Region account, more than two months after she demanded Reardon give John Heller his personal bank Pin #.

170. Redmond then explained that Institutional Leasing 1 wanted to create a "new settlement" that did not pay Reardon any compensation.

### Count VII

### (Stearns Weaver, Ehrenstein Charbonneau Calderin)

171. On December 30, 2009, Institutional Leasing 1 had re-negotiated a new settlement agreement with W.B. Care Center and John Heller, C.P.A. the "Unicorn Trustee."

172. Robert Charbonneau, Esq. stated to Judge Olson that the Estate was benefiting from the new settlement agreement because the $500,000 settlement payment to Reardon was "so much money coming from the Estate."

173. In fact, the $500,000 was coming from Institutional Leasing 1, LLC, and the landlord. Not one penny of the $500,000 was coming from the Estate.

174. Charbonneau also stated that the Estate was benefiting $10,000 because of the new settlement.

175. In fact, the old settlement agreement that Reardon negotiated, had Institutional Leasing 1 "providing DIP financing."

176. The new settlement agreement, signed by the Unicorn Trustee, was changed to "provide, or arrange to provide" DIP financing.

177. Also, the $10,000 was earmarked for attorney fees to arrange for the DIP financing. In the end, the Estate actually paid interest on the $250,000 DIP financing,

where the original settlement agreement had Institutional Leasing 1 paying for the DIP financing at their own expense.

## Count VIII

### (Ehrenstein Charbonneau Calderin)

178. The Law Firm of Ehrenstein Charbonneau Calderin submitted legal bills totaling over $300,000 to the Estate of W.B. Care Center, LLC.

179. Robert Charbonneau, Esq. refused to pursue the two adversary claims that were researched, filed, argued and eventually dropped.

180. The combination of the two adversary claims were worth over $3,500,000 to the Estate, based on the following:

A. First Claim was that the $2,500,000 note was either fraudulent, or, at the very least, Institutional Leasing 1 should have to prove that it was in fact funded, or be directed to in fact deposit said $2,500,000 into the bank account.

B. Second claim was that the previous Licensee, West Broward Group, LLC, owned by Eli Strohli, brother-in-law, had intentionally left off a $1,000,000 renovation required by the Agency for Health Care Administration. Reardon had the citation from AHCA that showed the citation was cited before the lease agreement between Institutional Leasing 1 and W.B. Care Center was signed. Also, Institutional Leasing 1 was suing W.B. Care Center to make them pay the $1,000,000. Instead, Charbonneau negotiated with Institutional Leasing 1 to pay all of their "past and future" legal bills.

## 18 U.S.C. § 157 – BANKRUPTCY FRAUD – FALSE CLAIM

### (Institutional Leasing 1, LLC)

181. In February 2009 and August 2009, Institutional Leasing 1, LLC presented a forged, unfunded $2,500,000 Promissory note between Institutional Leasing 1, LLC and W.B. Care Center, LLC that was personally guaranteed by Timothy Patrick Reardon.

182. Evidence that this note was at best, a forgery, and at the very least, unfunded, are based on the following:

A.  Institutional Leasing 1, LLC and Millennium Management, LLC f/k/a Elite Healthcare Management, LLC are both owned by Abraham Shaulson.

B.  W.B. Care Center, LLC leased the property at 7751 Broward Blvd. from Institutional Leasing 1, LLC.

C.  W.B. Care Center, LLC signed a "Back Office Support Agreement" with Millennium Management, LLC, signed by Michael Greenwald, C.P.A. and C.F.O. of Millennium Management.

D.  The back office support agreement provides that Millennium Management will provide all monthly financial statements to W.B. Care Center.

E.  W.B. Care Center, LLC had one bank account with Regions Bank that Michael Greenwald was not only a signer, but his name appeared about Timothy Patrick Reardon on the bank statements.

F.  Michael Greenwald, between July of 2008 and February of 2009 made numerous wire transfers of monies both in and out of the Region account.

G.  Each transfer in and out is listed on the bank statement as 'MG" for Michael Greenwald.

H.  Numerous emails demonstrate that Michael Greenwald, Abraham Shaulson and Millennium Management were involved with the initial licensure application with AHCA and preparation of the Proof of Financial Ability (PFA) to Operate a Nursing Home.

I.  The P.F.A. required a detailed balance sheet.

45

J.     Millennium Management LLC and Michael Greenwald were intimately involved with preparing and filing two subsequent Medicaid cost reports, which include detailed financial statement.

K.     There is no mention on any of these items that $2,500,000 was transferred, wired, or deposited into any W.B. Care Center bank account, although the $878,000 loan to W.B. Care Center by Abraham Shaulson, personally, is listed on each one:

      i. August 2008 until January 2009 Financial Statements or Balance Sheet.

      ii. PFA contained in the initial licensure application.

      iii. Six Month Medicaid Cost Report.

      iv. Revised Six Month Cost Report

      v. August 2008 until January 2009 Region Bank Statements.

      vi. Numerous emails only detail the $878,000 loan and the over $125,000 that Reardon had to personally deposit into the Regions bank account to meet payroll after Millennium Management transferred out the $878,000 ten months before the loan was due.

## BANK FRAUD

### (Millennium Management LLC f/k/a Elite Healthcare Management, LLC)

177.     As previously stated, Millennium Management used Regions Bank

for the following parts of the "scheme:"

A.     After Abraham Shaulson deposited $878,000 into the Regions Bank account of W.B. Care Center in July of 2008, based on a promissory note between W.B. Care Center, LLC and Abraham Shaulson, personally, Millennium Management LLC transferred out $600,000 within ten days of the deposit and the other $278,000 within the following four weeks. This left W.B. Care Center LLC "out of compliance" with the AHCA regulation that all nursing homes have one month of reserve funding and

46

caused Reardon to personally have to deposit his own monies, without even being able to take interest, due to Reardon being a related party to W.B. Care Center, LLC

B.   Millennium Management LLC transferred $75,000 out of the Regions Bank account in February of 2009 and Michael Greenwald, C.P.A., C.F.O. of Millennium Management stated that it was for 'partial rent payment."   Less than two weeks later, Institutional Leasing 1 sued W.B. Care Center for $50,000 for late rent, $5,000 penalty, $7,500,000 in accelerated rent and $2,500,000 for a forged, unfunded note.

## BRIBERY

### (Stearns Weaver, Institutional Leasing 1, LLC)

178.   After the Institutional Leasing 1 agreed to the November 12, 2009 settlement agreement, Stearns Weaver refused to deposit the $500,000 settlement into escrow.  Instead, Patricia Redmond sent a new "release" stating that Reardon would not cooperate in any Federal Investigation.

179.   When Reardon's new Chapter 11 attorney, Joel Tabas, Esq. refuse to allow Reardon to sign it, Redmond sent an email stating that it was "approved" by the Stearns Weaver Health Practice Group.

180.   She then stated that her clients were "running new numbers" to offer a new settlement to get Reardon to sign the new release.

181.   When Reardon refused to sign the new release, Redmond stated in court that they were "unable to come to an agreement" and then accused Reardon of "attempting to take $50,000 out of the Regions Bank account."

182.   This, despite that fact that Reardon had turned over his Pin # to John Heller on October 27th and then resigned from the nursing home on November 12, more then one month before this "attempt to transfer $50,000" occurred.

47

## MONEY LAUNDERING

**(Solomon & Clara Heisler Family Foundation; Weingarten Family Foundation; Schon Family Foundation; Educational Support Foundation Inc., f/k/a The Leon and Irene Scharf Foundation; Emes Foundation, Inc.; Chesed Global Foundation; Zichron Foundation for Special Needs and The Ridge Park Foundation)**

183.    The above foundations owned by the Defendants contain the following current balances:

A.    Solomon & Clara Heisler Family Foundation = $6,205,520

B.    Weingarten Family Foundation = $6,044,096

C.    The Schon Family Foundation = $21,513,343

D.    Emes Foundation = $2,267,003

E.    Chada Foundation = $4,121,578

F.    Education Support f/k/a Leon and Irene Scharf = $20,611,280

G.    Zichron Foundation for Special Needs $1,231,230

H.    The Ridge Park Foundation $219,235

184.    The primary purpose of these non-profits seems to be (1) pay the health insurance of the members (2) loan money back to the member's nursing homes (3) collect interest payments from the members' nursing homes.

185.    This is based on the following:

A.    In Re: Safe Harbor, Henry Schon of the Schon Family Foundation admits that a loan made to Leader Healthcare Management was actually paid out of the nursing home funds, which is clearly illegal. Mr. Schon owns nursing homes in New York with his brother in law, Otto Weingarten and their father and mother in law, Solomon and Clara Heisler.

B.    The Weingarten Family Foundation loans monies, and collects interest payments from "Laconia Realty" which lists their address as the nursing home also owned by Otto Weingarten.

C.   The Schon Family Foundation and the Weingarten Family Foundation list all of their "investment partners" on the I.R.S. Form 990 as "on Form K-1" however Form K-1 is obviously blocked out in order to prevent anyone from seeing that they are loaning monies to "related parties."

D.   The Schon Family Foundation was listed in the Eli Weinstein Ponzi Scheme as a place where Eli Weinstein "hid" $250,000 from investors.   When the investors sued the Schon Family Foundation to get back the $250,000, attorney Michael Bernstein represented the fund and said it was a "donation."  Eli Weinstein claimed that it was for "repayment of a loan."

E.   The Weinstein Foundation and the Schon Foundation were recently sued by Capital Bank for Bank Fraud due to the illegal transfer of monies from nursing homes owned by that were secured and supposed to be in a "lock box" as part of the original $20,000,000 loan.

F.   The Zichron Foundation for Special Needs claims to be for the benefit of children with autism but a review of the "donations" include donations to a "for profit" enterprise that puts on kids birthday parties.

G.   The Ridge Park Foundation claims to be for the "advance education" but instead lists donation to a professional tennis player.

H.   Education Support Foundation f/k/a the Leon and Irene Scharf Foundation loans monies to Institutional Leasing 1 for West Broward and Menorah House, which are owned by Abraham Shaulson and are therefore a "related party."

I.   The Educational Support Foundation and the Chesed Global Foundation, with combined assets of over $25,000,000 and owned by the Scharf family, both state "unable to determine taxable income due to missing transactions" every year that they file the I.R.S. Form 990.

J.   The Schon Family Foundation invests in MI Property Holdings, LLC, FC Properties IX, LLC, IBHSAR 1, LLC, PA Lackawanna Holdings, LLC; and E & S Management, LLC, all nursing homes owned by Abraham Shaulson and Avi Klein, which should not be charging interest that is billed to Medicaid.

K.      The Zichron Foundation, owned by Avi Klein, lists "donations" from Millenium Healthcare Management and Continium Healthcare Management, both of which are also owned by Avi Klein.

L.      Also, The Zichron Foundation lists a $1,000,000 donation from the EMUNAH Trust, which is also owned by Avi Klein and Abraham Shaulson.

M.      The Zichron Foundation then "loans" monies to ASK Holdings, IBSHAR I, and MI Property Holding, all of which are also owned by Avi Klein.

## MAIL FRAUD & WIRE FRAUD

**(Moore Stephens, Joseph Mitchell, Millennium Management, Lanier Manor, Hialeah Nursing, Watercrest Nursing, Menorah House, Braden River, Coral Gables, Avon Park, Oasis, Lake View, W.B. Care Center, LLC)**

182.    Because RICO does not recognize Health Care Fraud as a Predicate Act, all acts of false licensure applications, false cost reports, and false monthly billings must be listed under Mail Fraud and Wire Fraud.

183.    Almost all acts of Medicaid Fraud, as previously discussed, include submitting bills that either (1) were not paid to the vendor or the employee, (2) were not reduced to actual costs, which in some cases is "zero" or (3) were completely fictitious expenses.

184.    Some examples of the fraud, based on the individual nursing home submitting fraudulent cost reports that do not reveal related parties, submitting fraudulent annual licensure renewals, fraudulent yearly Medicare and Medicaid Cost Reports,  or submitting monthly bills, include:

## BILLS THAT ARE NOT PAID TO VENDORS

**Fake Pharmacy Payment**

Omnicare Pharmacy was not paid for at least fifty-three months. The monthly Accounts Payable Report at Lake Worth dated 8/18/2008 shows a balance to Medistat (now known as Omnicare) with a balance of $719,260.50. It even includes a $200,000 "reserve for settlement" which means the true balance is $819,260.50. As a whole, all of the Millennium homes are billing Medicaid for $500,000 per month, receiving this amount, and then keeping the monies.

All of the Accounts Payables Reports from December 2007 until November 2008 show no balance owed to Omnicare, even though the amount would have been over $1,000,000.00 at the time.

**Fake Workers Compensation Payment**

Wausau Underwriters filed suit against Lake Worth Enterprise and nineteen other Millennium Management homes due to non-payment of $1,000,000.00 for a policy issued on January 2008. Michael Bernstein, Esq. responded for Lake Worth Enterprise and stated that Lake Worth received "no value" for the workers compensation.

**Fake Sub-Lease Agreement**

BLRE, LLC, owned by Manuel Scharf, purchases Braden River Nursing Home for $2,705,000 on August 25, 2003.

BLRE, LLC then leases the property to 1201, LLC, owned by Abraham Shaulson. 1201, LLC then sub-leases the building to Lake Worth Enterprise, LLC, owned by Eli Strohli.

51

This same arrangement is used for the other buildings owned by Scharf and leased to Shaulson/Strohli.

| Nursing Home name and address | Property Owner | Sub-Lease | Lessee-Licensee/Operator |
|---|---|---|---|
| Lake Worth 1201 12th Ave South, Lake Worth | LWRE, LLC owned by Manuel Scharf | 1201, LLC owned By Abraham Shaulson and Manuel Scharf | Lake Worth Enterprise, LLC d/b/a Lake Worth Manor, owned by Eli Strohli |
| Lanier Manor 12740 Lanier Rd, Jacksonville, FL | NJRE, LLC owned by Manuel Scharf | 12740, LLC owned by Abraham Shaulson and Manuel Scharf | Northern Jacksonville Enterprise, LLC d/b/a Lanier Manor, owned by Eli Strohli |
| Braden River Nursing Center, 2010 Manatee Ave, Bradenton FL | BLRE, LLC owned by Manuel Scharf | 2010, LLC owned by Abraham Shaulson and Manuel Scharf | Bradenton Enterprise, LLC d/b/a Braden River Care Center owned by Eli Strohli |
| Hialeah Convalescent 190 west 22 FL | HLRE, LLC owned by Manuel Scharf | 190, LLC owned by Abraham Shaulson and Manuel Scharf | Hialeah Enterprise, LLC d/b/a Hialeah Convalescent Center owned by Eli Strohli |

At a deposition given by Avi Klein, co-owned of Millennium Management explained how a sub-lease works in the nursing home industry. At the time, Avi Klein and Abraham Shaulson owned both Corum, LLC and Leader, LLC:

Q.      Now, if I understand correctly, Corum was the entity that entered into the lease with Omega; is that correct?

A.      Correct.

Q.      And then Corum added a sublease where at least, where it was going to lease the premises to Leader, is that correct?

A.      Correct.

52

Q.     And Corum actually marked up or increased the lease price in the sublease over the price that it had with the landlords; is that correct?

A.     Correct.

Q.     What was the mark up?  What was the difference between the amount that Corum was paying and the amount that Leader was paying?

A.     I believe $25,000.00

Q.     A month?

A.     A month.

Q.     And what did Corum provide to Leader in exchange for that additional $25,000?

A.     A favorable lease.

In the case of Lake Worth, LWRE, LLC is leasing to 1201, LLC, who then sub-leases it to Lake Worth Enterprise, LLC d/b/a Lake Worth Manor.

In a lawsuit against Braden River Nursing Center, the Lease and Sub-Lease agreements were released thru discovery.  The following information was found:

### Purchase of Braden River Care Center

On August 25, 2003, BLRE, LLC purchased Braden River Care Center for $2,705,000.

### Lease Agreement

On August 31, 2003 (the same date all four Scharf entities were leased to Shaulson/Strohli entities) a ten year Lease Agreement was signed between BLRE. LLC and 2010, LLC.   Manuel Scharf signed for BLRE, LLC and Mordechai Shaulson signed for 2010, LLC.   Mordechai Shaulson is the sister of Abraham Shaulson.

Although the lease agreement states "rent schedule attached" there is no rent schedule attached.

## Sub-Lease Agreement

On the same day, August 31, 2003, BLRE, LLC signs" Consent to Subleasing" to Bradenton Enterprise, LLC.

Also on August 31, 2003, 2010, LLC signs a "sub-lease agreement" with Bradenton Enterprise, LLC. The lease is for two years. The amount of the rent is $90,000 per month.

The agreement is signed by Mordechai Shaulson for 2010, LLC and Eli Strohli for Bradenton Enterprise, LLC. Strohli and Shaulson are related because Eli Strohli's sister, Barbi, is married to Mordechai's brother, Abraham.

## Amendment to Sub-Lease

On September , 1, 2005, at the end of the two year lease, 2010, LLC and Bradenton Enterprise, LLC sign an "Amendment to Sub-Lease Agreement" to extend the sub-lease another two years. This time, Manuel Scharf signs for 2010, LLC. He has now signed for BLRE, LLC in the Lease Agreement and 2010, LLC in the Sub-Lease agreement.

Additionally, the sub-lease agreement is increased from $90,000 per month to $125,000 per month. Lastly, it states:

"Tenant shall pay the Landlord in December 2005 Two Hundred Fifty Thousand Dollars ($250,000) as a renewal fee, to enter into the first year of this present Sub-Lease Agreement.

Additionally, Tenant shall subsequently pay the Landlord One Million Dollars ($1,000,000) as a renewal fee to enter into the second year of this present Sub-Lease Amendment.

## Second Amendment to Sub-Lease Agreement

On March 27, 2008, 2010, LLC and Bradenton Enterprise, LLC sign a "Second Amendment to Sub-Lease Agreement between 2010, LLC and Bradenton Enterprise, LLC. Manuel Scharf again signs for 2010, LLC.

This time, it appears that the agreement is for a previous period. Although the agreement is dated March of 2008, it states:

"From September 1, 2005 until December 31, 2005 Tenant will pay Ninety Thousand Dollars ($90,000) every month; then from January 1, 2006 until conclusion of the sub-Lease, August 31, 2007, Tenant will pay One Hundred Twenty Five Thousand Dollars $125,000) every Month.

Additionally, Tenant shall pay the Landlord Two Hundred and Fifty Thousand Dollars ($250,000) as a renewal fee to enter into this present Second Amendment to Sub-Lease Agreement. Said renewal fee is therefore due September 1, 2007 and is to be remitted no later than August 31, 2008."

A review of the financial statements shows the monthly rent was indeed $125,000 until October 2007. There is then an increase from $75,000 to $325,000 for the month of December (the $250,000 "renewal fee") and then the rent returns to the agreed upon $75,000.

This means that Manuel Scharf is the owner of both the property, LWRE, LLC and the lessor, 2010, LLC.  Abraham Shaulson is the owner of 2010, LLC and also Bradenton Enterprise, LLC since he is the brother-in-law to Eli Strohli.

Lastly, Bradenton Enterprise, LLC has paid $1,500,000 in "renewal fees" over the five year lease.

Lease Payments:

| | | |
|---|---|---|
| September 2003 until August 2005 | $90,000 per month = | $2,160,000 |
| September 2005 until December 2005 | $90,000 per month = | $ 360,000 |
| January 2006 until August 2007 | $125,000 per month = | $2,500,000 |
| September 2007 until November 2007 | $125,000 per month = | $ 250,000 |
| December 2007 until August 2008 | $75,000 per month  = | $ 750,000 |
| December 2005 renewal  fee | | $ 250,000 |
| September 2006 renewal fee | | $ 600,000 |
| September 2007 renewal fee | | $ 400,000 |
| August 2008 renewal fee | | $ 250,000 |

Total Lease payment and renewal fees from September 2003 until August 2008 = $ 7,520,000

Original purchase price = $ 2,705,000

In a Deposition given in the same Braden River Care Center lawsuit, Abraham Shauslon explains how he negotiated this sub-lease with his brother-in-law, Eli Strohli:

Q.      Who negotiated the lease between the Braden River Care Center which I guess was actually Bradenton Enterprise, LLC, who negotiated that lease with 2010, who were the persons who negotiated each side of it?

A.    I negotiated and I believe I had counsel on behalf of the 2010, and the operator (Strohli) negotiated and they might have had counsel on their behalf.

A review of the other SCHARF homes show the following  sub-lease "renewal" fees in December, 2007.

Lake Worth   $400,000

Lanier Manor  $420,000

Hialeah Convalescent Home  $600,000

**Fake Mortgage Payments**

BLRE, LLC, the owner of the property, took out two mortgages on August 29, 2003.  One mortgage was for $1,995,250.00 and the other was for $1,301,250.00.  On March 2, 2009 an Extension of Mortgage was filed for each mortgage.  The amounts still owed on the notes were $1,995, 250.00 and $1,301,250.00, respectfully.

This means that BLRE, LLC made "interest only" payments for six years, which would be approximately $300,000 per year, or a total of $1,500,000 for the first five years.  At the same time, they charged Bradenton Enterprise $7,520,000, or a "profit" of $6,000,000.00.

Other SCHARF/SHAULSON homes

| Nursing Home | Mortgage, Assignment Of Leases & Rents | Purchase Price | Mortgage Amounts | "Out Of Pocket $$$ | Maturity Date On Mortgage | Amount Owed On Maturity Date | New Maturity Date |
|---|---|---|---|---|---|---|---|
| Lake Worth | 8/29/2003 | $3,470,000 | $1,995,250 + $1,301,250 = $3,296,500 | $173,500 | 9/1/2008 | $3,296,500 | 9/1/2013 |
| Hialeah | 8/29/2003 | $6,750,000 | $3,881,250 + $2,531,250 = $6,412,500 | $337,500 | 9/1/2008 | $6,412,500 | 9/1/2013 |
| Lanier Manor | 8/29/2003 | $3,075,000 | $1,768,125 + $1,153,125 = $2,921,250 | $153,750 | 9/1/2008 | $2,921,250 | 9/1/2013 |
| Braden River | 8/29/2003 | $2,705,000 | $1,555,375 + $1,014,375 = $2,569,750 | $135,250 | 9/1/2008 | $2,569,750 | 9/1/2013 |
| Totals | | $16,000,000 | $15,200,000 | $800,000 | | $15,200,000 | |

## BILLS NOT REDUCED TO COST

### Office Supplies

Office Supplies are ordered from a company called RLR Supplies, Inc., which is owned by the parents of Eli Strohli.

### Enteral Supplies

Nationwide D.M.E., LLC bills the facility for enteral supplies and it is owned by Eli Strohli.

### Directors Fee

E.S., LLC is billing for directors fees and it is a company owned by Eli Strohli.

### I.T. Management

I.T. Management, LLC is a company owned by Ilan Najman. Ilan Najman is listed on the Millennium Management organizational chart as the Chief Information Officer.

58

**Purchasing Organization**

Adelpo is a purchasing organization that charges a fee to the facilities. Also, all credits for discounts are kept by Adelpo. Adelpo is owned by Ilan Najman, Chief Information Officer for Millennium. The contract was created by Michael Bernstein, Esq., attorney for Abraham Shaulson and Millennium Management. The contract has a guaranteed profit built in.

**Back Office Support**

Millennium Management, LLC has a "back office support" agreement to do billing, payables and payroll for each facility. Millennium charges a percentage of the revenue that each home collects on a monthly basis.

Millennium Management, LLC is owned by Abraham Shaulson, who also is the landlord, the operator, and partners with the property owner. All charges to the nursing homes should be based on the actual "costs" of Millennium Management, not a percentage of revenue.


**RICO COUNT I**

**FEDERAL RICO VIOLATION**
(against all Defendants)

Plaintiff incorporates paragraphs 1 through 184 above by reference.

RICO Count I seeks relief from the Defendants for violation of 18 U.S.C. Section 1962(c).

Each Defendant is a "person" within the meaning of 18 U.S.C. Section 1961(3).

Commencing in or around 1999 and continuing until today, the Defendants violated 18 U.S.C. Section 1962(c).

## The Enterprise

At all times, Defendants associated in fact with each other and with others known and unknown so as to constitute an "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c). At all times relevant to this Complaint, the Enterprise was engaged in, and its activities affected, interstate commerce.

The "association in fact" Enterprise had an ascertainable structure and organization and existed apart from its predicate acts. Defendants associated with the Enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the Enterprise's activities.

The Defendants associated with each other for the common purpose of defrauding Reardon as a (1) straw nursing home owner, (2) a straw "management company and (3) a straw "sub-lessee" for Defendants gain.

In furtherance of the Enterprise, Defendants committed numerous acts, as set forth in Paragraphs 1 through 184 of this Complaint, including violation of Racketeering, bank fraud, mail fraud, wire fraud, bribery and money laundering.

## STUCTURE OF THE ENTERPRISE

The structure of the enterprise can be divided into three distinct units, nursing home owners/operators, attorneys and Certified Public Accountants:

Nursing Home Owners/Operators

The nursing home owners and operators are all from Brooklyn, N.Y. and also have residences/businesses in Miami Beach, FL. They consist of the following twelve families:

     (1)      The Heisler Family
     (2)      The Schon Family
     (3)      The Weingarten Family
     (4)      The Scharf Family
     (5)      The Shaulson Family
     (6)      The Klein Family
     (7)      The Strohli Family

The families take on various roles in the enterprise and have business transactions both within their own families and with the other families. The one common element that each family has is the ownership of one or more non-profit organizations which are used to both loan monies to, and accept donations from, other members of the enterprise.

Additionally, all of the nursing home owners/operators share the same attorneys and Certified Public Accountants.

**Attorneys**

None of the fraud occurring within the enterprise would be possible without the help of attorneys complicit with the twelve families. Some of the actions of the attorneys include:

Filing organizations with false names;

Filing false affidavits;

Filing false interrogatories;

Filing false U.C.C. documents,

Filing frivolous lawsuits

Filing fraudulent template legal "defenses"

Filing fraudulent nursing home licensure applications

Filing fraudulent Chapter 11 documents

**Certified Public Accountants**

In order to perpetuate Medicare/Medicaid Fraud, tax fraud, bank fraud and collections of illegal debts, it would not be possible without Certified Public Accountants. Some of the actions include:

Filing false tax returns;

Filing false Medicare and Medicaid Cost Reports;

Filing false Medicare and Medicaid claims;

Filing false financial statements;

Transferring bank funds without authorizations;

Filing false Chapter 11 claims;

The Non-Profit Organizations

**ROLES OF THE ENTERPRISE**

Lewis Morris, Chief Counsel to the Inspector General, Office of Inspector General Department of Health and Human Services[3] gave testimony to the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, U.S. House of

---

[3] Responsible for payment of over one billion dollars per month of Medicare and Medicaid Nursing Home Payments just to nursing homes.

Representatives on May 15, 2008 entitled "In the Hands of Strangers: Are Nursing

Home Safeguards Working?"

> "Establishing accountability is a challenge, in part, because of the sometimes Byzantine structures that are intentionally constructed around the long-term care facilities.
>
> The Service Employees International Union has reported, and OIG's law enforcement experiences confirm, a growing trend in the corporate restructuring of nursing home chains and other long-term care facilities to obfuscate the ownership and control of nursing homes.
>
> We have seen a variety of methods that have been used to hide the true owners that often involve the following steps:
>
> > (1) creating a holding corporation to own the entire chain of nursing homes;
> >
> > (2) creating limited liability companies (LLCs) to manage the operations of the individual homes;
> >
> > (3) creating LLCs for the real estate holdings (the facility and the grounds), usually referred to as Real Estate Investment Trusts (REITs); and
> >
> > (4) creating an affiliated corporation to lease all of the properties from the REITs and then sublease those properties to the facility-specific entity, usually an LLC, which operates the individual homes.
>
> The entity that acts as the facility operator does not own any assets and is authorized to use the facility under a sublease.
>
> The operating entity usually contracts with a management or administrative services company to perform the day-to-day operations of the facility.

> During ongoing investigations of nursing homes for the provision of substandard care, OIG has encountered nursing facilities that have as many as 17 LLCs that play a role in the operations of the facility."

In addition to the entities mentioned, REARDON would add the following:

    (1)        Money lenders;
    (2)        Money launderers;
    (3)        Attorneys and
    (4)        Accountants;

## PURPOSE OF ENTERPRISE

Although Mr. Lewis describes the purpose of the enterprise is to avoid lawsuits for negligent patient care, this is only one benefit. Once this has been accomplished, however, the actual purpose of the enterprise is to add layers of fake "costs" which can be submitted to Medicaid and Medicare for reimbursement.

Additionally, these fake "costs" are then submitted to the Internal Revenue Service and used to reduce profits to little if any.

The funds generated by the reimbursement from Medicaid and Medicare are then funneled thru non-profit entities that each defendant owns. This is done with "donations" made from the original nursing homes.

The non-profit entities then loan the monies back to the nursing homes and are paid interest which the nursing homes are reimbursed by Medicaid and Medicare.

The Money Lenders, Money Launderers, Fake Management Company, The Landlord, The Sub-lessee, The Operators, corporate Attorneys, Medicare and Medicaid Attorneys, Bankruptcy Attorneys, Corporate Accountants, Non-profit Corporation

Accountants, Bankruptcy Accountants, Medicare and Medicaid Accountants, Trade Associations.

## FUNCTION OF ENTERPRISE

The Fake "re-basing," The Fake Change of Ownership (C.H.O.W.), The Fake Interest Payments, The Fake Lease, The Fake Sub-Lease, The Fake Financial Statements, Fake Tax Returns, The Fake Licensure Application, The Fake Medicare Cost Report, The Fake Medicaid Cost Report, The Fake Lawsuit, The Fake Deposition, The Fake Interrogatories, The Fake Affidavits, The Fake Legal Filings, Fake Management Company, Fake Management Fees to Pay Off Purchase of Nursing Home, The Fake "Back Office Support" Company, The Fake Negotiations, The Fake "compiled" Accounting, The Fake "Disclosure" for Lease or Sale, Fake Non-Profit, The Fake Expenses, The Kick Back, The Fake Corporate Filings, Fake Promissory Notes, Fake Lease Agreements, Fake Lease "Renewal" Fees, Fake Back Office Support "Renewal" Fees, Fake Pharmacy Payments, Fake Therapy Company Payments, Fake Employee Salary Payments, Fake Management Company Employees, Fake Contractor, Payments, Fake Law Firm Payments, Don't Pay Resident Lawsuits, Bill Medicaid for Attorney Payments, Don't Pay EEOC Lawsuits, Don't Pay Taxes for Sales, Pay Off Mortgage on Sale to Avoid Taxes, Don't Pay Taxes for Lease Purchase Agreements, Don't Pay Taxes for Profits, Fake "Direct Care" Employees, Fake "Governing Board." Failure to Care. Leased from a "Non-Related" Third Party.

## RICO Injury

By virtue of Defendants violation of 18 U.S.C. Section 1962(c), Reardon has sustained substantial injury to both its business and its property.

Defendant's violations were the actual cause of Reardon's damages, which would not have occurred without Defendants conduct. In addition, the acts and violations were the direct, natural, and proximate cause of damage to Reardon, including, but not limited to, a $2,500,000 judgment against Reardon personally and also his management company Q.I.S. Management, LLC, the loss of the management contract between W.B. Care Center, LLC and Q.I.S. Management, LLC, loss of profits from the five year lease with W.B. Care Center, LLC, over $125,000 of personal monies Reardon deposited into W.B. Care Center, LLC, over $600,000 worth of improvements W.B. Care Center, LLC spent on the property. Defendants profited from their RICO acts and used some of the proceeds to further their RICO enterprise.

## RICO COUNT II

## **CONSPIRACY TO VIOLATE FEDERAL RICO**

(against all Defendants)

The allegations of paragraphs 1 through 184 are incorporated herein by reference.

Count II seeks relief against all Defendants for violation of 18 U.S.C. Section 1962(d).

In violation of 18 U.S.C. Section 1962(d), Defendants and others known and unknown conspired with each other to violate 18 U.S.C. Section 1962(a)-(c).

66

The objects of the conspiracy included, without limitation, the misappropriation of funds from W.B. Care Center and the use of Reardon as a (1) straw buyer, (2) straw management company and (3) a straw sub-lessee.

Defendants agreed and combined with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Defendants by their own words or actions, objectively manifested agreements to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the Enterprise. Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

Defendant's agreement to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others. Defendant's agreement was manifested by the number and similarity of the racketeering offenses committee by them as discussed throughout this Complaint.

At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

As described above, the conspiratorial agreement was an agreement to participate in an enterprise which engaged in racketeering activity within the meaning of

18 U.S.C. Sections 1961(1) and 1962(a)-(c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sections 1961(5) and 1962(a)-(c). Defendants knew that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

As a result of one or more acts predicate to the conspiracy and Defendants conduct or participation in the conduct of the Enterprise's affairs through a pattern of racketeering activity, Reardon has sustained substantial injury to both his business and property, including the loss of his twenty year reputation as a Nursing Home Administrator.

Defendant's acts and violations were the actual cause of Reardon's damages, which would not have occurred without the Defendants' conduct. In addition, the acts and violations were the direct, natural, and proximate cause of damage to Reardon, as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Timothy Patrick Reardon prays for trial by jury and request this Court:

       A.   Enter judgment in favor of Plaintiff Reardon and against Defendants.

       B.   Award Plaintiff Reardon treble damages for all injuries deemed at trial to have resulted from Defendants racketeering activities, pursuant to 18 U.S.C. § 1964(c);

C.  Impose a constructive trust on Defendants in favor of Plaintiff for the proceeds of Defendants unlawful activity relating to Reardon.

D.  Award Plaintiff Reardon compensatory damages in an amount to be determined at trial;

E.  Award Plaintiff Reardon punitive damages in an amount to be determined at trial appropriate to the severity of the Defendants' conduct;

F.  Such other and further relief as this Court may deem just and proper.

Dated July 30, 2012                Respectfully submitted,

By: _____

Timothy Patrick Reardon

`305-302-0601

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tim Reardon
_____
Plaintiff(s)

v.

W. B. Care Center
_____
Defendant(s)

Civil Action No.

12-20829 CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Joshua Manastr, P.A.
c/o Joshua Manastr
4770 Biscayne Blvd #1400
Miami FL 33137

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 NE 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012**
_____



**SUMMONS**

Steven M. Larimore
Clerk of Court

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

|  |  |
|---|---|
| Tim Kenwik _____ *Plaintiff(s)* v. W. B care Center _____ *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 208 29 civ |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Michael Bernstein, P.A.
c/o Michael Bernstein
1688 Meridian Ave #418
Miami Beach FL 33139

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Kenwik
226 NE 1st Ave
Miami FL 33135

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __JUL 31, 2012__



Steven M. Larimore
Clerk of Court

## SUMMONS

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

)
)
Tin Rundu )
*Plaintiff(s)* )
)
v. )
) Civil Action No.
)
W.B. Care ) 12-20829 CIV
*Defendant(s)* ) Leonard
)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Lake Worth Enterprise, LLC
c/o CT Corporation
1200 South Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tin Rundu
226 N.E 1st Au
Miam FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012**



Steven M. Larimore
Clerk of Court

## SUMMONS

S/Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

|  |  |  |
|---|---|---|
| Tim Rivul | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| W. B. Care | ) | 12-20829 |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
ECC, P.I d/b/a Ehrenstein
Charbonneau, Calderin
ATTN: Jackie Calderin
501 Brickell Key Drive #300
Miami FL 33131

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Rivul
226 NE 1st Av
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012** _____



## SUMMONS

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim _____
_____
Plaintiff(s)

v.

_W. B. Care_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

_12-20829_

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

Brond & Cassel PA
B & C Corp Survis
390 N. Orain Ave #1400
Orlando FL 32801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim _____
_226 NE 1st Av_
_Mam, FL 33137_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012**
_____



**SUMMONS**

s/ Crystal Barnes-Butler
**Deputy Clerk**
**U.S. District Courts**

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tim Reardon

_____
Plaintiff(s)

v.

W. B. Care Center

_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)

Civil Action No.

12 - 20829 - CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

West Dixie Care, LLC
C.T. Corporation System
1200 South Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __JUL 31, 2012__



Steven M. Larimore
Clerk of Court

## SUMMONS

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Tim Reardon

_____
Plaintiff(s)

v.

W. B. Care Center

_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12-20829-civ

Lenard.

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Schon Family Foundation
1534 53rd St
Brookly N.Y 11219

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N. E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



**SUMMONS**

Date: **JUL 31, 2012**
_____

Steven M. Larimore
Clerk of Court

s/ Crystal Barnes-Butler
**Deputy Clerk**
**U.S. District Courts**

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

|                          |       |
|--------------------------|-------|
| _Tim Rud_                | )     |
| Plaintiff(s)             | )     |
| v.                       | )  Civil Action No. |
| _V. B. Law_              | )     |
| Defendant(s)             | )  12-20829 |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Chesed Global Founders
1440 Broadway Suite
# 1766
New York NY 10018

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Rud, E 1st Ave
226 N. E 1st Ave
Miami, FL 33137

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  **JUL 31, 2012**



**SUMMONS**

Steven M. Larimore
Clerk of Court

s/Crystal Barnes-Butler
**Deputy Clerk**
**U.S. District Courts**

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_Tim Reardon_
_____
Plaintiff(s)

v.

_W. B. Cave Center_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

_12-20829-CIV_

_Leonard_

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

_The Ridge Park Foundation_
_1446 59th Street_
_Brooklyn N.Y. 11219_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Reardon_
_226 N.E. 1st Ave_
_Miami FL 33132_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __JUL 31, 2012__



**SUMMONS**

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

| | ) | |
|---|---|---|
| Tim Read | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | 12-20829 |
| W. B Can Cure | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Delray Group LLC
CT Corporate
1200 South Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Read
226 NE 1st Ave
Miam FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012** _____



Steven M. Larimore
Clerk of Court

# SUMMONS

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| Timothy Patrick Reardon | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 12-20829-CIV-O'SULLIVAN |
| | ) | |
| W.B. Care Center, LLC d/b/a | ) | |
| West Broward Care Center, | ) | |
| et al., | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Northern Jacksonville Enterprise, LLC
> c/o  C.T. Corporation System
> 1200 South Pine Island Road
> Plantation FL  33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Timothy Patrick Reardon
> 226 N.E. 1st Ave
> Miami, FL  33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



Date: **JUL 31, 2012**
_____

Steven M. Larimore
Clerk of Court

## SUMMONS

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tim Reurdon
_____
*Plaintiff(s)*

v.

W. B. Care Center
_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12-20829

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Solomon & Clara Heisler Family Foundation
1543 51st Street
Brookly NY 11219

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reurdon
226 N.E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **JUL 31, 2012**
_____



Steven M. Larimore
Clerk of Court

## SUMMONS

s/ Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Reed_
_____
Plaintiff(s)

v.

_W. B Can_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)

Civil Action No.

12 -20829

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Bocin Group LLC
CT Corp
1200 South Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reed
226 N. E 1ˢᵗ Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __**JUL 31, 2012**__



Steven M. Larimore
Clerk of Court

## SUMMONS

s/Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Quimby_
_____
Plaintiff(s)

v.

_W. B. Care_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)

Civil Action No.

_12 - 20829_

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Joseph Mitchell, P.A.
c/o Joseph Mitchell
2851 Remington Green Circle
Suite D
Tallahassee FL 32308

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Quimby
226 N.E. 1st Ave
Miami FL 33122

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



Date: __JUL 31, 2012__
_____

# SUMMONS

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_Tim Rhew_
_____
Plaintiff(s)

v.

_W. B. Law_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)

Civil Action No. 12-20829 CIV

Lenard

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

Emes Foundation, Inc
C/o Eli Robins
1333 Broadway # 730
New York NY 10018

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Rhew
226 N. E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**



_Steven M. Larimore_
_Clerk of Court_

# SUMMONS

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

Timothy Patrick Reardon
)
)
)
)
————————————————
*Plaintiff(s)*
)
)
v.
)     Civil Action No.  12-20829-CIV-O'SULLIVAN
)
W.B. Care Center, LLC d/b/a
)
West Broward Care Center,
)
et al.,
)
)
————————————————
*Defendant(s)*
)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Weingarten Family Foundation
5422 17th Ave
Brooklyn  NY  11204

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Timothy Patrick Reardon
226 N.E. 1st Ave
Miami, FL  33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  __July 31, 2012__



**SUMMONS**

Steven M. Larimore
Clerk of Court

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## for the

|  |  |
|---|---|
| _Tim Rhomd_ | )<br>)<br>) |
| _____ | ) |
| Plaintiff(s) | ) |
| v. | ) Civil Action No. |
| | ) $12-20829$ |
| _W. B. Care_ | ) |
| _____ | ) |
| Defendant(s) | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  
Goldsmith & Grout, PA.  
c/o Jonathan Grout  
4216 Centurgate Lane #203  
Orlando FL 32740

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Rhomd E 1st Av  
226 N. E 1st Av  
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: _____ **July 31, 2012** _____



Steven M. Larimore  
Clerk of Court

**SUMMONS**

s/ Crystal Barnes-Butler  
Deputy Clerk  
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Reed_
_____
Plaintiff(s)

v.

_W. B. Care LLC_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)

Civil Action No. _12-20829_

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

_Leasing 1, LLC_
_Institutional_
_c/o Millennium Margent_
_10800 Bisayn Blvd #600_
_Miami    FL 33161_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Reed_
_226 N. E 1st Ave_
_Miami FL 33132_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



Date: __July 31, 2012__

Steven M. Larimore
Clerk of Court

## SUMMONS

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

|  |  |
|---|---|
| _Tim Read_ | ) |
| Plaintiff(s) | ) |
| v. | ) Civil Action No. $12-208\ 29\ CIV$ |
| _W. B. Care Cart_ | ) Leonard |
| Defendant(s) | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*
Millennium Healthcare Managmt, LLC
c/o Bernstein Law Firm
1688 Meridian Ave # 418
Miami Beach FL 33135

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Read
226 N. E. 1st Ave
Miami FL 33137

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**

Steven M. Larimore
Clerk of Court

## SUMMONS

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

|  |  |  |
|---|---|---|
| _Tim Rennh_ | ) | |
| _____Plaintiff(s)_____ | ) | |
| Plaintiff(s) | ) | Civil Action No. |
| v. | ) | 12-20829-CIV |
| _W.B. Care Center_ | ) | Leonard |
| _____Defendant(s)_____ | ) | |
| Defendant(s) | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Millennium Management, LLC
c/o Millennium Management
10800 Biscayne Blvd #600
Miami FL 33161

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Tim Rennh
226 N.E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  __July 31, 2012__



## SUMMONS

Steven M. Larimore
Clerk of Court

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_Tim Reed_
_____
*Plaintiff(s)*

v.

_W. B. Care_
_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12- 20829

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

CDBR Enterprise, LLC
CT Corp
1200 S. Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reed
226 N.E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __July 31, 2012__



## SUMMONS

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

| | )
|---|---|
| Tim Reardon | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) 12-20829-CIV |
| W. B Car Center | ) Leonard |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    Law office of Peter Lewis, P.L
c/o Peter Lewis
302 3 North Shannon Lakes Dr.
#101
Tallahassee FL 32309

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: _____ **July 31, 2012** _____

Steven M. Larimore
Clerk of Court

**SUMMONS**

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Rhead_

_____

Plaintiff(s)

v.

_W. B. Care_

_____

Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

_12-20829_

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

_Coral Gables Holdings LLC
CT Corp
1200 South Pine Island Rd
Plantation FL 33324_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Rhead NE 1st St
226 Miami FL 33131_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**
_____



Steven M. Larimore
Clerk of Court

# SUMMONS

S/Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Reardon_

_____
Plaintiff(s)

v.

_W. B. Core Centr_

_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12-20829 CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Zichron Foundation for special needs
c/o Bernstein Law Firm
1688 Meridian Ave # 418
Miami Beach FL 33139

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  **July 31, 2012**
_____



Steven M. Larimore
Clerk of Court

## SUMMONS

S/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tom Ricardo
_____
*Plaintiff(s)*

v.

W. B Carr
_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12-20829

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Royal Holdings
Avon Park
CT corp
1200 South Pine Island Rd
Plantation FL 33132

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tom Ricardo
226 NE 1st Av
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

## SUMMONS

**July 31, 2012**
_____
*Signature of Clerk or Deputy Clerk*

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

))))))))))))

*Tim Reardon*

_Plaintiff(s)_

v.

*W. B. Care Center*

_Defendant(s)_

Civil Action No.

12-20829-CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

*Payton & Associates, LLC*
*c/o Attn: Harry Payton*
*2 South Biscayne Blvd #1600*
*Miami FL 33131*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

*Tim Reardon*
*226 N.E. 1st Ave*
*Miami FL 33132*

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**



## SUMMONS

s/Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tin Read_
_____
Plaintiff(s)

v.

_W B Car_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)

Civil Action No.
_12-208 29_

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

_Bradenton Enterprise, LLC_
_Millennium Mortgage_
_10800 Biscayne Blvd #600_
_Miami FL 33161_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Read_
_226 NE 12th_
_Miami FL 3315_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



Date: ___**July 31, 2012**___

**SUMMONS**

s/ Crystal Barnes-Butler
**Deputy Clerk**
**U.S. District Courts**

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_Tim _____
_____
Plaintiff(s)

v.

_W, B Care_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

_12-20829_

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

D I P Capital Lending, Inc
40 Michael Bernstein
1688 Meridian Ave #418
Miami FL 33139

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim _____
226 NE 1st A
Miami, FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: ___**July 31, 2012**___

Steven M. Larimore
Clerk of Court

**SUMMONS**

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tim Reardon
_____
Plaintiff(s)

v.

W. B. Care Center
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  12-20829-civ
Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Thomas L. Abrams, P.A
1776 North Pines Island Rd #309
Plantation FL 33222

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  **July 31, 2012**
_____



## SUMMONS

Steven M. Larimore
Clerk of Court

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tim Reardon_

Plaintiff(s)

v.

_W. B Care Center_

Defendant(s)

Civil Action No. 12-20829 CIU Leonard

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

_West Broward Group, LLC_
_c/o Millennium Management_
_10800 Biscayne Blvd #600_
_Miami FL 33161_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Reardon_
_226 N.E. 1st Ave_
_Miami FL 33132_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __July 31, 2012__



SUMMONS

Steven M. Larimore
Clerk of Court

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_Tim Rush_
_____
Plaintiff(s)
v.

_W. B Cam_
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

_12 -20829_

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

_Educational Support Foundation, Inc_
_890 West End Ave_
_New York NY 10025_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

_Tim Rush_
_226 NE 1st Ave_
_Miami FL 33132_

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**
_____



# SUMMONS

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Tim Reardin
_____
Plaintiff(s)

v.

W. B. Care Center
_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 12-20829-CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Wilk Auslander ~~~~~ LLP.
c/o Jack Wilk
1515 Broadway 43rd Floor
New York NY 10036

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardin
226 N.E 1st Ave
Miami, FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __July 31, 2012__



## SUMMONS

s/Crystal Barnes-Butler
**Deputy Clerk**
U.S. District Courts

Steven M. Larimore
Clerk of Court

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

|  |  |  |
|---|---|---|
| <u>Tim Reardon</u> | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| <u>W B Core Centr</u> | ) | 12-20829-CIV |
| *Defendant(s)* | ) | Leonard |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Miller Weissler
A/hg deff
&
Stearns Weaver
Sitterson, PA
c/o Eugene Stearns
150 West Flagler #220
Miami FL 33130

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __July 31, 2012__



Steven M. Larimore
Clerk of Court

SUMMONS

s/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

| | ) |
|---|---|
| Tim Reardon | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| | ) |
| W. B. Care Center | ) |
| _Defendant(s)_ | ) |

Civil Action No.

12-20829 CIV

Leonard

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

Ruden McClosky, P.A.
c/o Joseph Luzinski
200 South Bisayne #1818
Miami FL 33131

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Reardon
226 N.E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**



Steven M. Larimore
Clerk of Court

# SUMMONS

S/Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_Tin Rendn_

_Plaintiff(s)_

v.

Civil Action No. 12-20829 CIV

_W. B. Core Center_

_Defendant(s)_

Leonard

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

Moore Stephens Loveluce, P.A.
c/o B & L Corporate Services
390 North Orange Ave # 1400
Orlando FL 32801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tin Rendn
226 N.E 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: **July 31, 2012**



Steven M. Larimore
Clerk of Court

## SUMMONS

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Tim Rhens

_____
Plaintiff(s)

v.

W. B. Cann

_____
Defendant(s)

)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

12-20829

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Hinlenh Enterprise, LLC
CT Corporation System
1200 South Pine Island Rd
Plantation FL 33324

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Tim Rhens
226 N. E. 1st Ave
Miami FL 33132

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date: __July 31, 2012__

**SUMMONS**

s/ Crystal Barnes-Butler
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

TIMOTHY PATRICK REARDON,
     Plaintiff,
vs.
W.B. CARE CENTER, LLC d.b.a
WEST BROWARD CARE CENTER;
et. al.
     Defendants.

_____/



FILED by _____ D.C.

AUG 1 0 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## PLAINTIFF'S MOTION FOR PERMISSION TO FILE A
## RICO CIVIL CASE STATEMENT

     Timothy Patrick Reardon, appearing Pro Se, files this Motion for Permission to

File a RICO Case Statement.   Plaintiff had been planning to file a RICO Case

Statement within thirty (30) days from serving Complaint on Defendants.

     Plaintiff recently discovered by reading the Local Rules of the United States

District Court for the Southern District of Florida that the rule regarding the RICO Case

Statement has been discontinued.

     Plaintiff believes that the filing of the RICO Case Statement would help a Pro Se

litigant fight the impending "Motions to Dismiss for Failure to State a Cause of Action"

that are almost certainly to come, especially since many of the Defendants are

themselves, law firms.

     Dated August 10, 2012,

Respectfully submitted,

By: _____

Timothy Patrick Reardon

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 12-20829-CIV-LENARD/O'SULLIVAN

FILED by _____ D.C.

AUG 2 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

TIMOTHY PATRICK REARDON,
     Plaintiff,
vs.
W.B. CARE CENTER, LLC d.b.a
WEST BROWARD CARE CENTER;
et. al.
     Defendants.
_____/

## EMERGENCY MOTION

### PLAINTIFF'S EMERGENCY MOTION
### FOR ORDER DIRECTING U.S. MARSHALS TO SERVE DEFENDANTS

### (1) INSTITUTIONAL LEASING 1, LLC;
### (2) MILLENNIUM MANAGEMENT, LLC;
### (3) MOORE STEPHENS LOVELACE, P.A.;

### PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS IN A CIVIL ACTION

### Reason for Emergency

On the 24th of July, 2012, this Honorable Court issued Order [DE #14] ordering Plaintiff to deliver documents to the U.S. Marshals Service on or before Monday, July 30th, 2012. Plaintiff completed this order.

### Limiting Court Expense

U.S. Marshals have not served any Defendants as of Friday, August 17, 2012, and Plaintiff was told it could take until as late as September 15, 2012. Therefore, Plaintiff has a "window of opportunity" to get Notice for Production served at the same time as Plaintiff's Complaint.

Since Plaintiff is informa pauper is, this would be another expense that this court must decide upon.

### Justification for Spending Money to Serve Notice of Production

All Exhibits and arguments in this Emergency Motion are based on the idea that this Court must determine the "merits" of Plaintiffs request to have the U.S. Marshal Service serve the three defendants.

If, on the other hand, this Court does not need to analyze the merits at this point, then Plaintiff is informing the Court that all arguments and Exhibits in this Motion are also included in Plaintiffs RICO Case Statement, which will be filed by August 30, 2012, per previous order.

## Background

Plaintiff Timothy Patrick Reardon, (REARDON), appearing Pro Se, is basing his RICO case on both racketeering (fraud in a Title 11 case) and also collection of an illegal debt ($2,500,000 unfunded loan) against Plaintiff personally and also Plaintiff's nursing home management company and nursing home leasing company.

## Introduction

Plaintiff is not trying to argue its RICO case in an emergency motion. All documents included as exhibits are only entered in regards to the issue of a loan of two-and-one-half million ($2,500,000) between Defendant Institutional Lending 1, LLC, and W.B. Care Center LLC d/b/a West Broward Care Center.

## Defendant – Institutional Leasing 1, LLC

Institutional received a $2,500,000 judgment against Plaintiff Timothy Patrick Reardon, personally, and Plaintiffs nursing home management company, Q.I.S. Management, LLC in state court action:

Institutional Leasing 1, LLC vs. W.B. Care Center, LLC d/b/a WEST BROWARD CARE CENTER, Florida limited liability company, QIS MANAGEMENT, LLC, a Florida limited liability company, and TIMOTHY PATRICK REARDON, individually, and 'JOHN DOE CORP." and "JOHN DOE", names purposely fictitious and unknown.

Defendant also used $2,500,000 as "cash collateral" on two occasions when Plaintiff placed his nursing home in Chapter 11: in re: W.B. Care Center, LLC d/b/a WEST BROWARD CARE CENTER, Case No. 09-12957-BKC-JKO and also in 09-26196-BKC-JKO

Later, the $2,500,000 was Institutional's "credit bid" in a § 363 sale, to guarantee the starting bid would by $2,500,000 to purchase the last 4 years of a 5 year nursing home lease. Needless to say, other bidders did not even want to spend the money of "due diligence" so the auction was cancelled and "sold" back to Institutional, the landlord/lender.

Institutional Leasing 1, LLC never funded the $2,500,000 loan.

Institutional Leasing 1, LLC is owned by "co-conspirator not named" Abraham Shaulson.

### Defendant – Millennium Management, LLC

Defendant Millennium Management, LLC was hired by Plaintiff to do the "back office" support of a bookkeeping company, including monthly balance sheets, while also following all of the Federal guidelines for the production of Medicare and Medicaid Cost Reports.

Millennium Management, LLC never listed the $2,500,000 loan on any of the monthly Balance Sheets provided to W.B. Care Center LLC or to the State of Florida or the Federal Government.

Millennium Management LLC is also owned by "co-conspirator not named" Abraham Shaulson.

### Defendant – Moore Stephens Lovelace, P.A.

Moore Stephens Lovelace, P.A. is an accounting firm specializing in producing Medicare and Medicaid cost reports for over 450 of Florida's 650 skilled nursing facilities.

Moore Stephens delivered the Lease Agreement to the Agency for Health Care Administration with the $2,500,000 Note Guarantee.

Moore Stephens never listed the $2,500,000 loan in any Medicaid or Medicare Cost Report.

### CONCLUSION

Plaintiff respectfully requests an order directing the U.S. Marshal Service to Serve Subpoena to Produce Documents to Defendants:

(1) Institutional Leasing 1, LLC
(2) Millennium Management, LLC
(3) Moore Stephens Lovelace, P.A.

"Documents or electronically stored information of:

Cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement."

Respectfully submitted this 20th day of August,

Timothy Patrick Reardon, appearing pro se

226 N. E 1st Ave
Miami FL 33132

Exhibit A

Subpoena to Institutional Leasing 1, LLC

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Timothy Patrick Reardon | ) |
| *Plaintiff* | ) |
| v. | ) |
| Institutional Leasing 1, LLC | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.    12-20829 Lenard/O'Sullivan

(If the action is pending in another district, state where:

)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Institutional Leasing 1, LLC c/o Registered Agent Millennium Management, LLC
10800 Biscayne Blvd, Suite 600, Miami FL  33161

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of
Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from
Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center
as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Institutional Leasing 1's response to Plaintiff's Subpoena to Produce Documents" | Date and Time:  09/11/2012 0:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

|  *CLERK OF COURT*  | |
|---|---|
| OR | |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  _____
_____ , who issues or requests this subpoena, are:

Exhibit B

Subpoena to Millennium Management, LLC

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| Timothy Patrick Reardon | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   12-20829 Lenard/O'Sullivan |
| Millennium Management, LLC | ) | |
| | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Millennium Management, LLC c/o General Counsel, 10800 Biscayne Blvd, Suite 600
Miami, FL  33161

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Millennium Management's response to Plaintiff's Subpoena to Produce Documents" | Date and Time: 09/11/2012 0:00 am |
|---|---|

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _____

_CLERK OF COURT_

OR

_____          _____
_Signature of Clerk or Deputy Clerk_                _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_ _____
_____ , who issues or requests this subpoena, are:

Exhibit C

Subpoena to Moore Stephens Lovelace P.A.

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| Timothy Patrick Reardon | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   12-20829 Lenard/O'Sullivan |
| Moore Stephens Lovelace, P.A. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Moore Stephens Lovelace, P.A. c/o Registered Agent B&C Corporate Services of Central Florida,
      390 North Orange Avenue - Suite 1400, Orlando FL  32801

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: Documents or electronically stored information of cancelled check or proof of wire transfer of Two Million Five Hundred Thousand and 00/100 ($2,500,000) loan from Institutional Leasing 1, LLC to W.B. Care Center, LLC d/b/a West Broward Care Center as memorialized in attached Lease Agreement and Pledge and Security Agreement

| Place: File with Clerk of Court in above case under title "Defendant Moore Stephens response to Plaintiff's Subpoena to Produce Documents" | Date and Time: 09/11/2012 0:00 am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   _____

        *CLERK OF COURT*
                                OR

_____          _____
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

Exhibit D

Pledge and Security Agreement of  Timothy P. Reardon

to Institutional Leasing 1, LLC

Membership Interests in W.B. Care Center, LLC

With attached:

Note Guaranty
Guaranty of Lease
Security Agreement
Promissory Note
Assignment of 100% Membership Interests

# PLEDGE AND SECURITY AGREEMENT

of

## TIMOTHY P. REARDON

- to -

## INSTITUTIONAL LEASING 1, LLC

### MEMBERSHIP INTERESTS

IN

### W.B. CARE CENTER, LLC

**Siller Wilk LLP**
675 Third Avenue
9th Floor
New York, New York  10017-5704

242583v1

# PLEDGE AND SECURITY AGREEMENT

**AGREEMENT** (this "**Agreement**") made as of the 30th day of June, 2008 by **TIMOTHY PATRICK REARDON**, an individual with an address at 2627 South Bay Shore Drive, Suite 2506, Miami, Florida 33133 (with its successors, the "**Pledgor**") in favor of **INSTITUTIONAL LEASING 1, LLC**, a Florida limited liability company (the "**Secured Party**").

## BACKGROUND

**WHEREAS**, the Secured Party has on this date made a loan of **Two Million Five Hundred Thousand and 00/100 ($2,500,000) Dollars** (the "**Loan**") to Pledgor, as evidenced by both a Promissory Note given by Pledgor of this date to the order of the Secured Party calling for repayment of the principal sum evidenced by said note on or before the Maturity Date (as defined in the Note) together with the payments required under said note and at maturity of said principal sum (as said note may be hereinafter modified, amended, extended, renewed or substituted for, the "**Note**") and a Loan Agreement of this date between Pledgor and the Secured Party (the "**Loan Agreement**"); and

**WHEREAS**, Pledgor is the owner and holder of one hundred (100%) percent of the membership interest (the "**Interest**") in W.B. Care Center, LLC, a Florida limited liability company (the "**Lessee**"), which shall lease certain real property from Secured Party (collectively, the "**Property**") consisting of certain parcels of real property (the "**Land**"), as more particularly described in **Exhibit "A"** hereto, having a street address of 7751 West Broward Blvd, Plantation, Florida 33324, and the buildings, structures and improvements (the "**Improvements**") now or hereafter situated on, under or above the Land and all easements, entitlements and other rights appurtenant thereto. The Pledgor and the Lessee are each referred to as a "**Pledgor Party**," and collectively, the "**Pledgor Parties**"); and

**WHEREAS**, in order to induce the Secured Party to make the Loan, and to secure payment of the Note, Pledgor hereby assigns to the Secured Party, as security, and hereby grants a security interest in all of Pledgor's right, title and interest in the Interest, and all rights appurtenant thereto and interest therein, upon and subject to the terms and conditions hereafter in this Agreement set forth.

**NOW, THEREFORE**, in consideration of ten ($10.00) dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties hereto do hereby agree as follows:

1. **The Pledge**. In order to secure the punctual payment of the full amount of the Note when due (whether at stated maturity, by acceleration or otherwise) and all interest thereon and the full and timely performance of all other obligations of the Pledgor to the Secured Party now existing or hereafter arising under or in connection with the Loan, all as the same may hereafter be modified or amended (the "**Obligations**"), the Pledgor hereby pledges, hypothecates, mortgages, assigns, transfers and grants to the Secured Party a continuing security interest in, and general lien upon, all of the Pledgor's right, title and interest in the Interest, including, without limitation, all of Pledgor's right, title and interest in, to and under all (a) distributions of profits

Lessee, (c) distributions of cash flow by the Lessee, (d) property of the Lessee to which Pledgor now or in the future may be entitled, (e) proceeds of any liquidation upon the dissolution of the Lessee and winding up of any Lessee affairs, (f) general intangibles for money due or to become due (as defined in the Uniform Commercial Code of the State of New York) from the Lessee, (g) to the extent provided for herein, other rights of the Pledgor to receive any distributions or other payments of any kind whatsoever from or in respect of the Lessee or in any way derived from any Property, or from the ownership or operation thereof, whether any of the above distributions consist of money or property, and (h) all other rights of the Pledgor in the Lessee, including, without limitation, rights to reports, accounting, information, voting and rights to make decisions on behalf of the Lessee and the right to be named as a member on the books and records of the Lessee and in all proceeds of the foregoing (all of the foregoing referred to in clauses (a) through (h) above, collectively, are hereinafter referred to as the "**Collateral**") upon and subject to the terms and conditions hereafter in this Agreement set forth.

If, while this Agreement is in effect, the Pledgor shall become entitled to receive or shall receive any additional interest in the Lessee from any source whatsoever, or other options or rights, whether as an addition to, in substitution of, or in exchange for, any of the Collateral or otherwise, all of such additional interests shall automatically and immediately become subject to the security interest created by this Agreement and the Pledgor agrees to accept the same as Secured Party's agent and to hold the same in trust for the benefit of Secured Party and to assign the same forthwith to Secured Party in the exact form received, to be held by Secured Party subject to the terms of this Agreement as collateral for the Obligations. All sums of money and property so paid or distributed in respect of the Pledgor's interests in the Lessee, including but not limited to all cash distributions or dividends paid in respect of the such interests, that are received by the Pledgor shall be held by the Pledgor in trust, and applied first to the payment of current and accrued interest due pursuant to the Note.

2.    **Receipt of Documents**.  In order to confirm and perfect such security interest, Pledgor will (a) execute and deliver to Secured Party for filing one or more financing statements in connection with the Collateral in the form required to properly perfect Secured Party's security interest in the Collateral in all jurisdictions deemed appropriate by Secured Party to the full extent that such security interest in the Collateral may be perfected by such a filing (the UCCs), (b) with respect to the Pledged Equity that is represented by a partnership certificate, member certificate or stock certificate, or any other instrument, note, chattel paper or certificate qualifying as Collateral ("**Certificated Securities**"), deliver to Secured Party such Certificated Securities in Lessee duly endorsed or subscribed in blank, or accompanied by appropriate stock powers or other instruments of transfer, pledge or assignment, or enter into such other arrangement, as necessary to give control of any Collateral to Secured Party within the meaning of Section 8-106 of the UCC, (c) with respect to any pledged equity not represented by a Certificated Security, enter into such control agreements or other arrangements with Lender and with any Pledged Entity as necessary to give control of any Interests or Collateral to the Secured Party within the meaning of Section 8-106 of the UCC, and (d) promptly take all other actions required to perfect the security interest of the Secured Party in the Collateral under applicable law; the UCCs and the Certificated Securities shall hereinafter collectively be referred to as the "**Documents**").

3.    **Representations of the Pledgor and the Lessee**.  In order to induce the Secured Party to make the Loan and with the understanding that the Secured Party is acting in material

242583v1                                        2

reliance thereon, the Pledgor and the Lessee make the following representations and warranties to the Secured Party:

(a)     The Pledgor and the Lessee have, and have duly exercised, all requisite power and authority to enter into this Agreement, to pledge the Collateral to the Secured Party as provided in this Agreement, and to carry out the transactions contemplated by this Agreement.

(b)     The execution and delivery of this Agreement, and the performance of its terms, will not result in any violation of any provision of the Articles of Organization or the Limited Liability Company Agreement of the Lessee, or violate or constitute a default under the terms of any agreement, indenture, or other instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation, applicable to the Pledgor, its members and/or the Lessee or any of their respective property;

(c)     The Pledgor is the sole and lawful, legal and beneficial owner of all of the Collateral, free of any and all liens, claims, pledges, mortgages, hypothecations and security interests, except for the lien created hereby;

(d)     The security interest created hereby in the Collateral, and the proceeds thereof, as provided for in this Agreement, now constitutes and shall continue to constitute a valid, perfected and enforceable first lien and security interest therein subject to no prior interest, lien, charge or encumbrance, or agreement purporting to grant to any party other than the Secured Party a security interest in the assets of the Pledgor and the Lessee which include all or any part of the Collateral;

(e)     The Pledgor and the Lessee have not granted, nor shall the Pledgor or the Lessee grant, any other security interest in any or all of the Collateral and Pledgor and the Lessee have not sold, assigned, pledged, hypothecated, encumbered, transferred or otherwise disposed, and shall not sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose, of any or all of the Pledgor's or Lessee's right, title or interest in the Collateral without the prior express written consent of the Secured Party, which consent the Secured Party may withhold in its sole discretion.

(f)     The Pledgor and the Lessee have not, within the 12-month period ending on the date hereof: (1) made a general assignment for the benefit of creditors; (2) filed any voluntary petition in bankruptcy or suffered the filing of any involuntary petition in bankruptcy by its creditors; (3) suffered the appointment of a receiver to take possession of all or substantially all of its assets; or (4) suffered the attachment or other judicial seizure of all, or substantially all, of its assets; or (5) admitted in writing its inability to pay its debts as they come due.

(g)     Neither Pledgor nor the Lessee is insolvent nor will the Pledgor or the Lessee be rendered insolvent by consummating any of the transactions contemplated in this Agreement;

(h)     None of the information furnished by the Pledgor and/or the Lessee to the Secured Party with respect to the Collateral is false, incorrect, incomplete or misleading in any material respect.

(i)     There is no action or proceeding threatened or pending which in any way might affect the rights of the Secured Party under this Agreement, the Pledgor's and the Lessee's ability

to perform under this Agreement, or the validity or priority of the security interest created and granted by this Agreement.

(j)     The Pledgor and the Lessee are not in default under any agreement to which the Pledgor or the Lessee are a party.

(k)     The Pledgor, upon request by the Secured Party, but without cost or expense to the Secured Party, will execute, deliver, file and record such further agreements, instruments and documents as the Secured Party may require to impose, perfect and protect the security interest-lien created and granted by this Agreement and the Pledgor hereby authorizes the Secured Party to execute any such agreements, instruments and documents in the name of the Pledgor and/or the Lessee and to file and record the same.

4.     **Covenants of Pledgor and Lessee**.  The Pledgor and the Lessee jointly and severally covenant:

(a)     to pay or satisfy all of the Obligations;

(b)     to defend and hold the Secured Party harmless from and against all claims and demands by any person at any time claiming an interest adverse to Secured Party in the Collateral;

(c)     not to grant any other security interest in any or all of the Collateral and not to sell, assign, pledge, hypothecate, encumber, transfer or otherwise dispose of any or all of its right, title or interest in the Collateral without the prior express consent of the Secured Party;

(d)     to timely pay all of Pledgor's and the Lessee's debts and obligations;

(e)     to cause the Lessee to not take any actions set forth in Schedule A without the consent of the Secured Party; and

(f)     to cause the Lessee to give the Secured Party ten (10) business days advance written notice of the taking of any of the actions set forth on Schedule B;

(g)     to cause the Lessee to give notice to the Secured Party of the events described in Schedule C within ten (10) business days following the occurrence of such event.

(h)     to not directly or indirectly transfer, convey or exchange any of its ownership interest the Lessee.

(i)     to not amend the Limited Liability Company Agreement of the Lessee.

5.     **Insurance**.

(a)     The Pledgor will, at Pledgor's expense, maintain or cause to be maintained such other insurance with respect to the Collateral and the personal property secured in such amounts and against such insurable hazards as the Secured Party may determine in its reasonable discretion.  All insurance maintained by the Pledgor shall name the Secured Party as insured as its respective interests may appear.

242583v1                                             4

(b)    The Pledgor will deliver, or cause to be delivered, to the Secured Party, promptly upon request, (i) the original or true copies of all policies evidencing all insurance required to be maintained under subsection (a) or certificates of insurance and a letter from an insurance broker or agent satisfactory to the Secured Party to the effect that the insurance policies maintained by any Pledgor Party comply with the terms of this Agreement, and (ii) evidence as to the payment of all premiums due thereon. The Pledgor will also deliver to the Secured Party, promptly upon request, an affidavit of the Pledgor setting forth the particulars as to all such insurance policies and certifying that the same comply with the requirements of this paragraph, that all premiums due thereon have been paid and that the same are in full force and effect. The Pledgor will also deliver to the Secured Party, not later than thirty (30) days prior to the expiration of any policy, a binder or certificate of the insurer evidencing the replacement thereof and not later than thirty (30) days prior to the expiration of such policy an original copy (or true copy) of the new policy. In the event the Pledgor shall fail to effect or maintain or cause to be maintained any insurance required to be effected or maintained pursuant to the provisions of this paragraph: (i) the Pledgor will indemnify the Secured Party against damage, loss or liability resulting from all risks for which such insurance should have been effected or maintained; and (ii) the Secured Party shall have the right, but not the obligation, to obtain any such insurance and any amount expended by the Secured Party in connection therewith shall be deemed indebtedness secured by this Agreement and shall be repaid by the Pledgor, on demand, together with interest thereon from the date of expenditure at the Default Rate.

6.    **Events of Default.**

(a)    In the case of the occurrence of any of the following events, for any reason whatsoever and whether such occurrence be voluntary or involuntary (each herein sometimes called an "Event of Default"): (i) a default as defined in Schedule D occurs, (ii) the Collateral or any part thereof is encumbered by any additional lien; (iii) subject to the terms of this Agreement, if the Pledgor permits the Collateral or any part thereof, or the Property (including, but not limited to, the development rights appurtenant to the Property, if any) or any interest therein to be sold, transferred or conveyed to any other person or entity, except as otherwise specifically permitted herein, or in the Loan Agreement, (v) subject to the terms of this Agreement, the sale, conveyance, transfer, pledge or encumbrance of any interest of the Pledgor in the Lessee. Then and in any connection with any such Event of Default, and at any time thereafter, the Secured Party shall have the right from time to time, upon ten (10) business days' written notice by ordinary mail to the Pledgor as provided for herein to designate the time and place of any private sale (or public sale if same shall be required by applicable statute which cannot be waived) at its option to sell, re-sell, assign, transfer and deliver any of the Collateral, in such order and at such price and on such terms, as the Secured Party, in its sole discretion shall determine, for cash, on credit or for future delivery, in the County and State where the Collateral is situated. Upon such sale, the Secured Party, unless prohibited by a provision of any applicable statute which cannot be waived, may purchase the Collateral being sold, or assign, transfer and deliver the same to any other purchaser or purchasers thereof, and the Secured Party or such purchaser or purchasers (as the case may be) shall hold the same free from and discharged of all trusts claims, right of redemption, stay or appraisal and equities of the Pledgor except for surplus money proceedings. The Secured Party shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of such sale of the Collateral may have been given. The Secured Party may adjourn any public sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice,

be made at the time and place to which the same was so adjourned. In case of the sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Secured Party until the sale price is paid by the purchase or purchasers thereof, but the Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may be sold again upon like notice. As an alternative to exercising the power of sale herein conferred upon it, the Secured Party may proceed by a suit or suits at law or in equity to foreclose the Collateral and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(b)     The Secured Party shall have such other rights with respect to the Collateral as shall be afforded to secured parties by the Uniform Commercial Code.

(c)     The Pledgor hereby waives any right to require that the Secured Party proceed against any real or personal property or any guaranty given as security for the Note, whether or not existing or hereafter given, before exercising its rights and remedies with respect to the Collateral.

(d)     No remedy herein conferred upon or reserved to the Secured Party is intended to be exclusive of any other remedy, and such remedies shall be cumulative and shall be in addition to every other remedy given hereunder.

(e)     The Pledgor agrees that, in the event that the Pledgor or the Lessee shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any voluntary petition under Title 11 of the U.S. Code, as amended ("**Bankruptcy Code**"), (ii) be the subject of any order for relief issued under the Bankruptcy Code, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (v) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, the Secured Party shall thereupon be entitled and the Pledgor and the Lessee irrevocably consent to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to the Secured Party as provided for herein, in the Note, the Documents and all other documents delivered in connection herewith and as otherwise provided by law, and the Pledgor and the Lessee hereby irrevocably waive any right to object to such relief and will not contest any motion by the Secured Party seeking relief from the automatic stay.

(f)     The Secured Party, in any action to enforce, foreclose or protect the security interest created and granted hereby, shall be entitled, without notice and without regard to the adequacy of any security held by the Secured Party to the appointment of a receiver and the Pledgor and the Lessee shall immediately after demand is made turnover all records relating to the Property.

7.   **Proceeds of Sale.**  The proceeds received from said public or private sale shall be applied in the following order:

(a)   to pay all costs and expenses of collection and of the public or private sale (including, without limitation, reasonable attorneys' fees, advertising costs, brokerage commissions, late charges and stock transfer stamps); and

(b)   to pay to the Secured Party all sums due the Secured Party pursuant to the Note, and this Agreement including, but not limited to late charges, default interest, advances, costs and fees etc.

Any surplus realized after said deductions shall be turned over to the Pledgor.

8.   **Appointment.**  The Pledgor Parties hereby irrevocably constitute and appoint the Secured Party, its successors and assigns, and any agent or designee thereof, as their true and lawful attorney-in-fact with power of substitution and full irrevocable power and authority, coupled with an interest and for a valuable consideration, upon the occurrence and during the continuance of an Event of Default, in the place and stead of, and in the name of, the Pledgor Parties, or in its own name, to take any and all action and to execute any and all agreements, certificates, documents and instruments which may be necessary or desirable, in its sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, receive and give acquittances and receipts for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to file any claim or to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect any and all moneys due with respect to the Collateral whenever payable or any part thereof and to enforce any other right in respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; to accept or reject any plan of reorganization, readjustment or compromise in its discretion, whether in any such proceedings, by agreement of compromise or otherwise; and generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though the Secured Party was the absolute owner thereof for all purposes, and to do, at the Secured Party's option and at the expense of the Pledgor, at any time, or from time to time, all acts and things which the Secured Party deems necessary or desirable to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as the Pledgor might do.  This power of attorney, being coupled with an interest and being granted for a valuable consideration, is irrevocable until the date the Obligations are paid in full.  The powers conferred on the Secured Party hereunder are solely to protect its interests in the other Collateral and shall not impose any duty upon it to

242583v1

7

exercise any such powers, nor shall the Secured Party be responsible for or be deemed to have assumed any of the Pledgor Parties' liabilities or obligations with respect to the Collateral. The Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Secured Party nor any of its trustees, agents or designees shall be responsible to any Pledgor Party for any act or failure to act, or for any error of judgment or mistake of fact or law, except for its own willful default hereunder. The Pledgor Parties agree to indemnify, defend and hold harmless the Secured Party from and against all claims and demand by any person claiming an interest in any of the Collateral other than claims resulting solely from the willful default of the Secured Party.

9.    **Further Assurances.**

(a)    The Pledgor shall, at any time on request of the Secured Party, sign financing statements and other instruments, in forms acceptable to the Secured Party, and do such further acts and things, as it may reasonably request or as are reasonably necessary in the Secured Party's opinion to establish and maintain a valid first lien and security interest in the Collateral in accordance with the terms of the Note and this Agreement or to effectuate the purposes of this Agreement. Upon the Pledgor's failure to do so, the Secured Party is authorized as attorney-in-fact of the Pledgor to sign any such instrument. The Pledgor agrees to pay all filing fees and to reimburse the Secured Party for all costs and expenses of any kind incurred in any way in connection with such financing statements or other instruments. The Pledgor's refusal or failure to comply with the Secured Party's request in accordance with the provision of this Article shall constitute a default hereunder.

(b)    The Pledgor shall pay, when due, all charges, costs and expenses of any kind related to the Collateral and shall keep the Collateral free and clear of all liens.

10.    **No Waiver.** The Secured Party shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder or under the Note and no waiver whatever shall be valid unless in writing, signed by the Secured Party, and the only to the extent therein set forth. This Agreement may not be changed, modified or discharged in whole or in part unless set forth in a writing signed on behalf of the Secured Party by one of its duly authorized officers. A waiver by the Secured Party of any default, right or remedy hereunder on any one occasion shall not be construed as a waiver of any other default or a bar to any right or remedy the Secured Party would otherwise have on any future occasion. All rights and remedies of the Secured Party hereunder, or any agreement or instrument executed in connection herewith, or under the terms of the Collateral, shall be cumulative and be exercised singly or concurrently, and such rights shall be in addition to any other rights and powers which the Secured Party may now or hereafter have as a Secured Party under the New York Uniform Commercial Code or under any other applicable law.

11.    **Reimbursement of Secured Party's Expenses.** In the case of an Event of Default hereunder, and in the case of each sale, or of any other proceeding to collect any of the Obligations by enforcement of the Secured Party's lien and security interest in the Collateral, the Secured Party shall be reimbursed for all costs and expenses of every kind reasonably incurred in connection therewith, including reasonable attorney's fees, plus interest thereon at the "Default Rate" (as defined in the Note) (but not in excess of the highest rate permitted by law).

242583v1

8

12.     **Irrevocability of Pledge.**  The security interest herein granted is irrevocable and shall continue so long as any of the Obligations remain unpaid.  Upon payment in full of all of the Obligations, the Secured Party shall transfer its then interest in the Collateral to the Pledgor without recourse, representation or warranty whatsoever and deliver to the Pledgor all of the Documents and other instruments held by the Secured Party which evidence or constitute the Collateral, together with a UCC-3 termination statement with respect to any financial statements previously filed with respect to the Collateral.

13.     **Notices.**  Any notice to either party to this Agreement shall be deemed effective only if sent by a recognized overnight courier after three (3) days, registered or certified mail, return receipt requested after five (5) days, to the following address, or at such other address which either party shall hereafter notify the other party in the same manner:

To Secured Party:       **INSTITUTIONAL LEASING 1, LLC**
                        P.O. Box 402401
                        Miami Beach, Florida 33140

with copy to:           **SILLER WILK LLP**
                        675 Third Avenue, 9th Floor
                        New York, New York 10017-5704
                        Attention:  Aaron C. Kinderlehrer, Esq.

To Pledgor:             Mr. Timothy P. Reardon
                        2627 South Bay Shore Drive
                        Suite 2506
                        Miami, Florida 33133

The Pledgor will promptly deliver to the Secured Party all notices and other documents, and will promptly give the Secured Party notice of any notices and documents, received by the Pledgor and/or the Lessee with respect to any of the Collateral.

14.     **Reliance.**  The Pledgor acknowledges that the Loan would not have been made to the Lessee if the Collateral had not been pledged to the Secured Party pursuant to this Agreement, and that the Secured Party is making the Loan to the Lessee in reliance upon this Agreement.

15.     **No Oral Modification.**  Neither this Agreement, nor any of the documents delivered pursuant hereto may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

16.     **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without the application of any conflict of law principles.  The Pledgor Parties agree that they shall not raise any defense or make any claim in any action or proceeding brought under this Agreement, the Note or any other documents executed and delivered in connection with any of the foregoing that this clause is invalid or that the law of any other jurisdiction should apply.

242583v1

9

17.     __Jurisdiction__. With respect to any claim or cause of action in connection with the execution or performance of, or arising under, this Agreement, the Collateral and/or the Documents, the Pledgor Parties (a) irrevocably submit to the nonexclusive personal jurisdiction of the courts of the State of Florida; (b) irrevocably waive any objection which it may have to the laying on of venue of any suit, action or proceeding arising out of or relating to this Agreement or said documents brought in any such court; (c) irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; (d) irrevocably waive the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over it; (e) irrevocably waive any right to a trial by jury with respect to any issue arising with respect to such claim, suit action or proceeding.

18.     __Severability__. If any provision of this Agreement or the application thereof to any person or circumstances shall for any reason or to any extent be invalid and unenforceable, the remaining provisions of this Agreement and the application of those provisions to other persons or circumstances or the same persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

19.     __Binding Effect and Assignment__.  This Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Pledgor and the legal representatives, successors and assigns of Pledgor, and (iii) shall inure to the benefit of Secured Party and the heirs, executors, administrators, legal representatives, successors and assigns of Secured Party. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Note and it's rights under this Agreement to any other party. Pledgor's rights and obligations hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

20.     __Miscellaneous__.

(a)     Whenever, in this Agreement, either of the parties hereto is referred to, such references shall be deemed to include the successors and assigns of such party.

(b)     All covenants, agreements and representations herein made by the Pledgor and/or the Lessee shall inure to the benefit of the successors and assigns of the Secured Party and any holder of the Note. The liability of the Pledgor and the Lessee hereunder shall be joint and several.

(c)     The recitals contained in this Agreement and each of the Exhibits referred to herein and attached hereto are incorporated herein by this reference.

(d)     Any date specified in this Agreement which falls on a Saturday, Sunday or legal holiday shall automatically be extended until the first regular business day after such date.

(e)     All capitalized terms used in this Agreement that are defined in any of the paragraphs hereof, will have the meanings ascribed to them in such paragraphs unless the context otherwise requires.

242583v1

(f)     A reference in this Agreement to any one gender, masculine, feminine or neuter, includes the other two, and the singular includes the plural and vice versa, unless the context otherwise requires.

(g)     The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and not to the particular provisions in which the term is used.  Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

(h)     The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

(i)     This Agreement may be executed in counterparts which, when taken together, shall constitute one and the same original.

21.     **Costs and Expenses.**  The Pledgor will pay to the Secured Party all costs and expenses reasonably incurred and sums paid by the Secured Party (including without limitation reasonable attorneys' fees, insurance premiums and sales commissions) in connection with the custody, care and collection, for or any actual or attempted disposition of any of the Collateral, the collection of any proceeds of insurance with respect to the Collateral or otherwise in connection with this Agreement.

22.     **Waiver of Defenses.**  In any litigation or legal proceeding arising out of or relating to, this Agreement or any of the Obligations or the Collateral, in which the Secured Party and the Pledgor shall be adverse parties, the Pledgor waives the right to interpose any defense, set-off or counterclaim of any kind not directly arising herefrom or therefrom, as the case may be, and also waive the right to a trial by jury.

23.     **Waiver of Presentment, Etc.**  The Pledgor hereby waives presentment, notice of dishonor and protest with respect to all instruments included in or evidencing the Obligations or the Collateral and, except as specified herein, any and all other notices and demands whatsoever, whether or not relating to such instruments.

*[Signature Page to Follow]*

242583v1

11

**IN WITNESS WHEREOF,** this Pledge and Security Agreement has been executed as of the day and year first written above.

_____
Timothy Reardon

**W.B. CARE CENTER, LLC**
a Florida limited liability company

By: _____
Name:
Title:

**INSTITUTIONAL LEASING 1, LLC**
a Florida limited liability company

By: _____
Name: Abraham Shaulson
Title: Manager

242583v1

STATE OF *Florida* )
                                )ss.:
COUNTY OF *Palm Beach* )

On the 17th day of *July* , 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TANDEBIE T. FRATER
MY COMMISSION # DD577943
EXPIRES: July 25, 2010
(407) 398-0153  Florida Notary Service.com

STATE OF *Florida* )
                                )ss.:
COUNTY OF *Palm Beach* )

On the 17th day of *July* , 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

TANDEBIE T. FRATER
MY COMMISSION # DD577943
EXPIRES: July 25, 2010
(407) 398-0153  Florida Notary Service.com

STATE OF  )
                      )ss.:
COUNTY OF  )

On the 17 day of *July* , 2008 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

_____
Notary Public

**EXHIBIT A**
**The Property**

[See Attached Property Description]

## SCHEDULE A

The Pledgor shall not take any of the following actions or permit the Lessee to take any of the following actions unless approved or authorized by the Secured Party:

    (i)    Cause the Lessee or the Pledgor to file for Bankruptcy or make any assignment of the assets of the Lessee or the Pledgor in trust for creditors or on the assignee's promise to pay the debts of the Lessee or the Pledgor.

    (ii)    Any sale or other disposition (directly or indirectly) of all or a substantial portion of the Lessee's or the Pledgor's assets or merger or consolidation of the Lessee with or into any other person or convert into another form of entity;

    (iii)    Consenting to or acquiescing in any judgment against the Lessee or the Pledgor;

    (iv)    Redeeming all or any portion of the Interest of a member in the Lessee.

    (v)    Determining whether to make in-kind distributions to partners or members, and if so determined, determine which assets are to be distributed to each partner or member.

    (vi)    Admit any new members to the Lessee.

    (vii)    Grant a security interest in any part of Lessee's property, incurring indebtedness for borrowed money and refinancing or increasing existing indebtedness, whether secured or unsecured, for borrowed money unless such borrowing or refinancing, or increasing of existing debt results in the payment in full of all amounts due to Secured Party.

## SCHEDULE B

Notwithstanding anything to the contrary in this Agreement, the Pledgor shall give the Secured Party advance written notice (including copies of the relevant documents) of at least ten (10) business days of the following actions, decisions or events:

      (i)      Commencing any litigation where the amount at issue exceeds $25,000;

      (ii)     The Pledgor or any of its affiliates guaranteeing any indebtedness of the Lessee or the Pledgor.

## SCHEDULE C

I. An Event of Default will exist upon the occurrence of any of the following events, as reasonably determined by Secured Party:

(i) The Pledgor or the Lessee fail to comply with the terms of this Agreement, misappropriate any funds, commit any other fraudulent act or commit any other grossly negligent acts with respect to the Lessee;

(ii) Payment of any of the amounts due under the Loan is not timely made in accordance with the Loan;

(iii) The occurrence of any voluntary or involuntary bankruptcy filing with respect to the Lessee or the Pledgor; provided that the filing of an involuntary bankruptcy will not constitute an event of default if the case is dismissed within ninety (90) days of its filing.

(iv) The Lessee, the Pledgor or any of their affiliates takes any action described in Schedule A without first obtaining the consent of the Secured Party.

(v) The Lessee or the Pledgor fails in a material way to comply with their obligations under Schedule B.

(vi) Any representation, warranty, covenant or written statement made in this Agreement or any other instrument executed in connection therewith shall prove to have been false or misleading when made, or shall be materially breached.

II. The Secured Party shall give notice to the Pledgor if it becomes aware of any Event of Default; provided that the failure to give notice will in no way excuse such Event of Default or prevent the Secured Party from exercising any of its remedies under this Agreement.

III. Notwithstanding the other provisions of this Schedule C, the Lessee and the Pledgor shall not be deemed to be in default under Sections I (ii) or (viii) if the Lessee or the Pledgor cure any monetary default within ten (10) days after notice from the Secured Party, (ii) the Lessee or the Pledgor cure any non-monetary curable default within thirty (30) days after notice from the Secured Party, or if such Event of Default is not capable of being cured within such thirty (30) day period, for such reasonable time as necessary so long as the Lessee or Pledgor proceed with due diligence to cure such Event of Default, or (iii) such Event of Default is noncurable, but such Event of Default does not have an adverse effect on the Lessee in an amount exceeding $50,000; provided however, the Pledgor and the Lessee shall not have the right to cure or claim lack of material adverse effect if the same Event of Default has occurred twice and the Secured Party has given notice thereof during any twelve (12) month period. On monetary defaults for non-Secured Party matters, the Pledgor shall pay any late fees, interest or any other penalties related to the default.

## NOTE GUARANTY

This Guaranty, dated as of the 30th day of June, 2008 made by TIMOTHY PATRICK REARDON, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Guarantor") in favor of INSTITUTIONAL LEASING 1 LLC having an address at P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord").

WHEREAS, simultaneously herewith Landlord has entered into an Agreement of Lease (the "Lease"), dated as of the date hereof, with W.B. Care Center, a Florida limited liability company having an office at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Tenant") for the building known as West Broward Care Center, Broward Florida ("Premises", as more particularly described in the Lease), which Lease is hereby incorporated in this Guaranty by reference and

WHEREAS, in addition in connection with such Lease, Tenant, as Maker, signed a $2,500,000 Promissory Note, made payable to Landlord, as Payee, (the "Note"); and

WHEREAS, Guarantor owns a 100% portion of the membership interests of Tenant and Guarantor will derive substantial benefit from the Lease; and

WHEREAS, Guarantor acknowledges that Landlord would not enter into the Lease unless Guarantor enters into this Guaranty and this Guaranty accompanies the execution and delivery of such Note and Lease by Tenant.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease by Landlord, for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by Guarantor, Guarantor does hereby covenant and agree with Landlord as follows:

1.      Unless otherwise specifically noted, all capitalized terms used in this Guaranty shall have the same meaning as are ascribed to such terms in the Note.

2.      Guarantor hereby absolutely, unconditionally and irrevocably guaranties, as principal and not as indemnitor, to Landlord, in accordance with and pursuant to this Guaranty, payment and timely performance of all obligations, now or hereafter existing, of Tenant under the Note.

3.      (A)      Guarantor acknowledges that its liability hereunder is primary and that Landlord may, at Landlord's option, join Guarantor in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Note and/or Lease or any term, covenant or condition thereof, and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant.

235675v2

(B) Guarantor acknowledges that this Guaranty is an absolute and unconditional guaranty of payment and performance and not merely of collection.

4. (A) All payments due hereunder shall be made in lawful money of the United States of America in immediately available funds free and clear of, and without deduction or withholding for or on account of, any taxes, levies, fees, imposts, duties, expenses, commissions, withholdings, assessments or other charges, or any penalties, fines, additions to tax or interest thereon (collectively, "Taxes") to the extent that any such Taxes would reduce the amount Landlord would otherwise have received had Tenant made such payment. If any Taxes shall be required by law to be deducted or withheld from any payment hereunder and as a result thereof the amount Landlord would otherwise have received had Tenant made such payment is reduced, Guarantor shall increase the amount paid so that Landlord receives, after deduction or withholding on account of taxes, the full amount of the payment provided for in this Guaranty.

(B) If Landlord shall be obligated by any bankruptcy, insolvency or other legal proceedings to repay to Guarantor or to Tenant, or to any trustee, receiver or other representative of any of them, any amounts previously paid by Guarantor pursuant to this Guaranty, this Guaranty shall be deemed reinstated to the extent of that repayment made by Landlord. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if, in good faith and on the advice of counsel, Landlord believes that such obligation exists.

5. This Guaranty shall be a continuing guarantee and the liability of Guarantor hereunder shall in no way be affected, modified, diminished, impaired or terminated by reason of any of the following, whether or not notice thereof is given to or consent is obtained from Guarantor: (i) any consent, approval, waiver or other action, inaction or omission under or concerning the Note, (ii) any dealings or transactions or matter or thing occurring between Landlord and Tenant, (iii) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or its successors or assigns, (iv) any change in relationship between Guarantor and Tenant, (v) the default or failure of Guarantor to perform any of its obligations set forth in this Guaranty, (vi) any action which Landlord may take or fail to take against Tenant by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord under the Note, or otherwise and (vii) any other circumstance or condition that may result in a discharge, limitation or reduction of liability of a surety or guarantor.

6. (A) Guarantor hereby waives notice of the acceptance of this Guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might otherwise be entitled.

[00235675v1]

2

235675v2

(B)    Guarantor hereby waives trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Guaranty or of any of its provisions, directly or indirectly, or any and all negotiations in connection therewith.

7.    Guarantor's obligations hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, attention or compromise and shall not be subject to, and Guarantor hereby irrevocably waives, any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of Guarantor's obligations hereunder or otherwise.

8.    Guarantor hereby irrevocably:

(A)    submits to the jurisdiction of the state courts of the State of Florida, for the purposes of each and every suit, action or other proceeding arising out of or based upon this Guaranty or the subject matter hereof brought by Landlord, it being expressly understood and agreed that this consent to jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by such law, shall be necessary in order to confer jurisdiction upon Guarantor in any such court; and

(B)    waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding brought in any such court, any claim that Guarantor is not subject personally to the jurisdiction of the above-named courts, that Guarantor's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court, and further agrees to waive, to the fullest extent permitted under applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which Landlord or its successors or assigns are entitled pursuant to the final judgment of any court having jurisdiction.

9.    Guarantor hereby consents to service of process by certified or registered mail at address for Guarantor as set forth in Paragraph 14 hereof, or in any other manner permitted by law.  Guarantor agrees that service in the foregoing manner shall be deemed, in every respect, effective service of process upon Guarantor and be taken and held to be valid personal service upon, and personal delivery to, Guarantor. Guarantor agrees that Guarantor's submission to jurisdiction and consent to service of process by mail is made for the express benefit of Landlord.

10.    Final judgment against Guarantor in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions:

[00235675v1]

235675v2

(A)   by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Guarantor therein described; or

(B)   in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Landlord may at its option bring suit, or institute other judicial proceedings against Guarantor or any of the Guarantor's assets in any state or federal court of the United States or of any country or place where either Guarantor or such assets may be found.

11.   Guarantor represents and warrants to Landlord that:

(A)   Guarantor has full power, authority and legal right to cause this Guaranty to be signed and delivered, and to perform and observe the provisions of this Guaranty, including, without limitation, the payment of all moneys hereunder.

(B)   This Guaranty constitutes the legal, valid and binding obligation of Guarantor, and is enforceable in accordance with its terms.

(C)   Guarantor, as of the date hereof, is not in violation of any decree, ruling, judgment, order or injunction applicable to it nor any law, ordinance, rule or regulation of whatever nature, nor are there any actions, proceedings or investigations pending or threatened against or affecting Guarantor (or any basis therefor known to Guarantor) before or by any court, arbitrator, administrative agency or other governmental authority or entity, any of which, if adversely decided, would materially or adversely affect its ability to carry out any of the terms, covenants and conditions of this Guaranty.

(D)   No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by Guarantor of this Guaranty or for the payment of any sums hereunder.

(E)   Neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any order, writ, injunction or decree of any court or governmental authority, or of any agreement or instrument to which Guarantor is a party or by which it is bound, or constitutes or will constitute a default thereunder.

12.   Nothing herein contained is intended or shall be construed to give to Guarantor any right of subrogation under the Note or any right to participate in any way therein or in Landlord's right, title and interest in the Note. Notwithstanding any payments made under this Guaranty, all rights of subrogation and participation are expressly waived and released by Guarantor.

[00235675v1]

4

235675v2

13.    If Landlord shall employ counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay on demand all of Landlord's costs in connection therewith, whether or not suit be brought including, without limitation, reasonable attorneys' fees and disbursements.

14.    All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") desired or required to be given under this Guaranty shall be in writing, and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if sent by registered or certified mail, return receipt requested, prepaid, addressed as follows:

> If to Guarantor, to him at the
> address first set forth above
>
> If to Landlord, to it at its address
> first set forth above:
>
> with a copy to:
>
> Siller Wilk LLP
> 675 Third Avenue
> New York, New York  10017
> Attention:  Aaron C. Kinderlehrer, Esq.

All Notices shall be deemed given or served on the third (3rd) day after the date on which such Notice has been sent.  Any party to this Guaranty may change the address to which Notices shall be delivered to it and its representatives by notice in accordance with this Paragraph 14.

15.    (A)    The provisions of this Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective successors and assigns.  All references in this Guaranty to Landlord and Tenant shall be deemed to mean Landlord's and Tenant's respective permitted successors and assigns.

(B)    No delay on the part of Landlord in exercising any right, power or privilege under this Guaranty, nor any failure to exercise the same, shall operate as a waiver of, or otherwise affect, any right, power or privilege of Landlord under this Guaranty, nor shall any single or partial exercise thereof preclude the further exercise of, or the exercise of any other, right, power or privilege of Landlord under this Guaranty.

(C)    Neither any waiver or modification of any provision of this Guaranty, nor any termination of this Guaranty, shall be effective unless in writing and signed by the party against which the waiver, modification or termination is sought to be

5

enforced, nor shall any waiver be applicable except in the specific instance for which it is given.

(D)     The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Guaranty.

(E)     All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one remedy, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

(F)     If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

16.     Joint and Several Liability:

If there is more than one guarantor of the Note, each such guarantor, including, but not limited to, Guarantor hereunder shall be jointly and severally liable for the full and timely performance of all obligations, new or hereafter existing, of Tenant under the Note.  Further, each such guarantor, including, but not limited to, Guarantor hereunder agrees that Landlord need not seek payment from any other person or source other than the undersigned Guarantor.

[00235675v1]

235675v2

6

IN WITNESS WHEREOF, Guarantor have signed this Guaranty as of the date first above written.

TIMOTHY PATRICK REARDON

STATE OF _____ )
                   ) ss.:
COUNTY OF _____ )

On the 5 day of July in the year 2008 before me, the undersigned, personally appeared TIMOTHY PATRICK REARDON, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



JACK HEINEY
MY COMMISSION #DD375158
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

Notary Public

7

## GUARANTY OF LEASE

This Guaranty of Lease, dated as of the 30th day of June, 2008 made by TIMOTHY PATRICK REARDON, having an address at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Guarantor") in favor of INSTITUTIONAL LEASING 1 LLC having an address at P.O.B. 402401 Miami Beach, Florida 33140 ("Landlord").

WHEREAS, simultaneously herewith, Landlord has entered into an Agreement of Lease (the "Lease"), dated as of the date hereof, with W.B. Care Center, a Florida limited liability company having an office at 2627 South Bayshore Drive, Suite 2506, Miami, Florida, 33133 ("Tenant") for the building known as West Broward Care Center, Broward Florida ("Premises", as more particularly described in the Lease), which Lease is hereby incorporated in this Guaranty by reference; and

WHEREAS, Guarantor owns a 100% portion of the membership interests of Tenant and Guarantor will derive substantial benefit from the Lease; and

WHEREAS, Guarantor acknowledges that Landlord would not enter into the Lease unless Guarantor enters into this Guaranty and this Guaranty accompanies the execution and delivery of such Lease by Tenant.

NOW, THEREFORE, in consideration of the execution and delivery of the Lease by Landlord, for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by Guarantor, Guarantor does hereby covenant and agree with Landlord as follows:

1. Unless otherwise specifically noted, all capitalized terms used in this Guaranty shall have the same meaning as are ascribed to such terms in the Lease.

2. Guarantor hereby absolutely, unconditionally and irrevocably guaranties, as principal and not as indemnitor, to Landlord, in accordance with and pursuant to this Guaranty, the full and timely performance of all obligations, now or hereafter existing, of Tenant under the Lease.

3. (A) Guarantor acknowledges that its liability hereunder is primary and that Landlord may, at Landlord's option, join Guarantor in any action or proceeding commenced by Landlord against Tenant in connection with or based upon the Lease or any term, covenant or condition thereof, and recovery may be had against Guarantor in such action or proceeding or in any independent action or proceeding against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant.

(B) Guarantor acknowledges that this Guaranty is an absolute and unconditional guaranty of payment and performance and not merely of collection.

1

234122v3

4.    (A)    All payments due hereunder shall be made in lawful money of the United States of America in immediately available funds free and clear of, and without deduction or withholding for or on account of, any taxes, levies, fees, imposts, duties, expenses, commissions, withholdings, assessments or other charges, or any penalties, fines, additions to tax or interest thereon (collectively, "Taxes") to the extent that any such Taxes would reduce the amount Landlord would otherwise have received had Tenant made such payment. If any Taxes shall be required by law to be deducted or withheld from any payment hereunder and as a result thereof the amount Landlord would otherwise have received had Tenant made such payment is reduced, Guarantor shall increase the amount paid so that Landlord receives, after deduction or withholding on account of taxes, the full amount of the payment provided for in this Guaranty.

(B)    If Landlord shall be obligated by any bankruptcy, insolvency or other legal proceedings to repay to Guarantor or to Tenant, or to any trustee, receiver or other representative of any of them, any amounts previously paid by Guarantor pursuant to this Guaranty, this Guaranty shall be deemed reinstated to the extent of that repayment made by Landlord. Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments if, in good faith and on the advice of counsel, Landlord believes that such obligation exists.

5.    (A)    This Guaranty shall be a continuing guarantee and the liability of Guarantor hereunder shall in no way be affected, modified, diminished, impaired or terminated by reason of any of the following, whether or not notice thereof is given to or consent is obtained from Guarantor: (i) any subletting of all or any portion of the Premises or any assignment or other transfer of Tenant's interest in the Lease, (ii) any consent, approval, waiver or other action, inaction or omission under or concerning the Lease, (iii) any modifications, renewals, extensions or amendments of the Lease, (iv) any dealings or transactions or matter or thing occurring between Landlord and Tenant, (v) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Tenant or its successors or assigns, (vi) the release or discharge of Tenant from the performance or observance of any of the terms, covenants or conditions contained in the Lease pursuant to the terms thereof, by operation of law, by reason of any of the events described in subsection (v) of this Paragraph 5 hereof, or otherwise, (vii) any change in relationship between Guarantor and Tenant, (viii) the default or failure of Guarantor to perform any of its obligations set forth in this Guaranty, (ix) any action which Landlord may take or fail to take against Tenant by reason of any waiver of, or failure to enforce, any of the rights or remedies reserved to Landlord in the Lease, or otherwise, (x) any failure or refusal of Landlord to re-let the Premises or any part or parts thereof in the event that Landlord shall obtain possession of the Premises after Tenant's insolvency or default, (xi) any failure to collect rent thereof under any such re-letting, (xii) any alterations, repairs, replacements and/or decorations in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of re-letting the Premises, and (xiii) any other circumstance or condition that may result in a discharge, limitation or reduction of liability of a surety or guarantor.

2

(B)     Any suit or proceedings brought against Guarantor to collect the amount of any deficiency referred to in Section 8.2 of the Lease for any month or months shall not prejudice in any way the rights of Landlord to collect any such deficiency for any subsequent month or months in any similar suit or proceeding.

6.     (A)     Guarantor hereby waives notice of the acceptance of this Guaranty and presentment and demand for payment, notice of non-payment, notice of dishonor, protest, notice of protest, non-performance, non-observance and any other notice or demand to which Guarantor might otherwise be entitled.

(B)     Guarantor hereby waives trial by jury of any and all issues arising in any action or proceeding between the parties, upon, under or in connection with this Guaranty or of any of its provisions, directly or indirectly, or any and all negotiations in connection therewith.

7.     Guarantor's obligations hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including, without limitation, any claim of waiver, release, surrender, attention or compromise and shall not be subject to, and Guarantor hereby irrevocably waives, any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of Guarantor's obligations hereunder or otherwise.

8.     Guarantor hereby irrevocably:

(A)     submits to the jurisdiction of the state courts of the State of Florida, for the purposes of each and every suit, action or other proceeding arising out of or based upon this Guaranty or the subject matter hereof brought by Landlord, it being expressly understood and agreed that this consent to jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Guaranty or as otherwise permitted by such law, shall be necessary in order to confer jurisdiction upon Guarantor in any such court; and

(B)     waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any suit, action or proceeding brought in any such court, any claim that Guarantor is not subject personally to the jurisdiction of the above-named courts, that Guarantor's property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Guaranty or the subject matter hereof may not be enforced in or by such court, and further agrees to waive, to the fullest extent permitted under applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which Landlord or its successors or assigns are entitled pursuant to the final judgment of any court having jurisdiction.

9.     Guarantor hereby consents to service of process by certified or registered mail at address for Guarantor as set forth in Paragraph 14 hereof, or in any

3

234122v3

other manner permitted by law. Guarantor agrees that service in the foregoing manner shall be deemed, in every respect, effective service of process upon Guarantor and be taken and held to be valid personal service upon, and personal delivery to, Guarantor. Guarantor agrees that Guarantor's submission to jurisdiction and consent to service of process by mail is made for the express benefit of Landlord.

10. Final judgment against Guarantor in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions:

(A) by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Guarantor therein described; or

(B) in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Landlord may at its option bring suit, or institute other judicial proceedings against Guarantor or any of the Guarantor's assets in any state or federal court of the United States or of any country or place where either Guarantor or such assets may be found.

11. Guarantor represents and warrants to Landlord that:

(A) Guarantor has full power, authority and legal right to cause this Guaranty to be signed and delivered, and to perform and observe the provisions of this Guaranty, including, without limitation, the payment of all moneys hereunder.

(B) This Guaranty constitutes the legal, valid and binding obligation of Guarantor, and is enforceable in accordance with its terms.

(C) Guarantor, as of the date hereof, is not in violation of any decree, ruling, judgment, order or injunction applicable to it nor any law, ordinance, rule or regulation of whatever nature, nor are there any actions, proceedings or investigations pending or threatened against or affecting Guarantor (or any basis therefor known to Guarantor) before or by any court, arbitrator, administrative agency or other governmental authority or entity, any of which, if adversely decided, would materially or adversely affect its ability to carry out any of the terms, covenants and conditions of this Guaranty.

(D) No authorization, approval, consent or permission (governmental or otherwise) of any court, agency, commission or other authority or entity is required for the due execution, delivery, performance or observance by Guarantor of this Guaranty or for the payment of any sums hereunder.

(E) Neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, conflict or will conflict with or result in a breach of any of the terms, conditions or provisions of any order, writ, injunction or decree of any court or

4

234122v3

governmental authority, or of any agreement or instrument to which Guarantor is a party or by which it is bound, or constitutes or will constitute a default thereunder.

12. Nothing herein contained is intended or shall be construed to give to Guarantor any right of subrogation under the Lease or any right to participate in any way therein or in Landlord's right, title and interest in the Lease. Notwithstanding any payments made under this Guaranty, all rights of subrogation and participation are expressly waived and released by Guarantor.

13. If Landlord shall employ counsel to enforce Guarantor's obligations under this Guaranty or any part thereof, Guarantor agrees to pay on demand all of Landlord's costs in connection therewith, whether or not suit be brought including, without limitation, reasonable attorneys' fees and disbursements.

14. All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") desired or required to be given under this Guaranty shall be in writing, and, any law or statute to the contrary notwithstanding, shall be effective for any purpose if sent by registered or certified mail, return receipt requested, prepaid, addressed as follows:

If to Guarantor, to him at the
address first set forth above

If to Landlord, to it at its address
first set forth above:

with a copy to:

Siller Wilk LLP
675 Third Avenue
New York, New York 10017
Attention: Aaron C. Kinderlehrer, Esq.

All Notices shall be deemed given or served on the third (3rd) day after the date on which such Notice has been sent. Any party to this Guaranty may change the address to which Notices shall be delivered to it and its representatives by notice in accordance with this Paragraph 14.

15. (A) The provisions of this Guaranty shall be binding upon and shall inure to the benefit of Landlord and Guarantor and their respective successors and assigns. All references in this Guaranty to Landlord and Tenant shall be deemed to mean Landlord's and Tenant's respective permitted successors and assigns.

(B) No delay on the part of Landlord in exercising any right, power or privilege under this Guaranty, nor any failure to exercise the same, shall operate as a waiver of, or otherwise affect, any right, power or privilege of Landlord under this

5

234122v3

Guaranty, nor shall any single or partial exercise thereof preclude the further exercise of, or the exercise of any other, right, power or privilege of Landlord under this Guaranty.

    (C)  Neither any waiver or modification of any provision of this Guaranty, nor any termination of this Guaranty, shall be effective unless in writing and signed by the party against which the waiver, modification or termination is sought to be enforced, nor shall any waiver be applicable except in the specific instance for which it is given.

    (D)  The validity and enforcement of this Guaranty shall be governed by and construed in accordance with the internal laws of the State of Florida without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Guaranty.

    (E)  All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative remedies and it is agreed that no one remedy, whether exercised by Landlord or not, shall be deemed to be in exclusion of any other remedy available to Landlord and shall not limit or prejudice any other legal or equitable remedy which Landlord may have.

    (F)  If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty or the application of such provision to persons or circumstances other than those as to which it is held void, unenforceable or invalid, shall not be affected thereby and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

16.  Joint and Several Liability:

    If there is more than one guarantor of the Lease, each such guarantor, including, but not limited to, Guarantor hereunder shall be jointly and severally liable for the full and timely performance of all obligations, new or hereafter existing, of Tenant under the Lease. Further, each such guarantor, including, but not limited to, Guarantor hereunder agrees that Landlord need not seek payment from any other person or source other than the undersigned Guarantor.

234122v3

IN WITNESS WHEREOF, Guarantor have signed this Guaranty as of the date first above written.

_____

TIMOTHY PATRICK REARDON

STATE OF _____          )
                          ss.:
COUNTY OF _____         )

On the _15_ day of _July_ in the year 2008 before me, the undersigned, personally appeared TIMOTHY PATRICK REARDON, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

JACK HENEY
MY COMMISSION #DD375156
EXPIRES: NOV 28, 2008
Bonded through 1st State Insurance

_____
Notary Public

7

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (the "Security Agreement") is made as of the 30th day of June, 2008, by **W.B. CARE CENTER, LLC**, a Florida limited liability company ("Debtor") and **INSTITUTIONAL LEASING 1, LLC**, a Florida limited liability company (the "Secured Party").

**WHEREAS**, the Secured Party has on this date made a loan of **two million five hundred thousand dollars and 00/100 ($2,500,000) Dollars** (the "**Loan**") to Debtor, as evidenced by both a Promissory Note given by Debtor of this date to the order of the Secured Party calling for repayment of the principal sum evidenced by said note on or before the Maturity Date (as defined in the Note) together with the payments required under said note and at maturity of said principal sum (as said note may be hereinafter modified, amended, extended, renewed or substituted for, the "**Note**"); and

**WHEREAS**, in order to induce the Secured Party to make the Loan, and to secure payment of the Note, Debtor hereby assigns to the Secured Party, as security, and hereby grants a security interest in all of Debtor's right, title and interest in the Collateral, and all rights appurtenant thereto and interest therein, upon and subject to the terms and conditions hereafter in this Agreement set forth.

**NOW, THEREFORE**, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Security Interest.

(a)     In order to secure the prompt and unconditional performance and indefeasible payment of the Obligations (as defined in Section 1(b) below), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby grants to Secured Party a first, prior and continuing security interest in, to and under all of the Collateral as described in Exhibit A hereto (the "Collateral").

(b)     "Obligations" shall mean the unpaid principal and interest on the Note and all other obligations and liabilities of Debtor to Secured Party, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter incurred, which may arise under, out of, or in connection with, the Note or otherwise.

(c)     The continuing security interest in the Collateral granted in this Security Agreement shall remain in full force and effect until the indefeasible payment in full of the Obligations.

2.      Covenants With Respect To The Collateral. Debtor hereby covenants and agrees with Secured Party that Debtor will, (a) at Debtor's sole cost and expense, defend the Collateral against all claims and demands of all persons at any time claiming any interest therein; (b) pay all taxes, assessments and governmental charges upon the

Collateral except to the extent that such taxes, assessments and charges shall be contested in good faith by Debtor; (c) immediately notify Secured Party of any event causing a substantial loss or diminution in the value of all or any material part of the Collateral and the amount or an estimate of the amount of such loss or diminution; (d) maintain adequate insurance at all times with respect to the Collateral, for such risks as are customary in Debtor's industry for the respective items included in the Collateral, and shall provide for a minimum of ten (10) days prior written notice to Secured Party of cancellation, and Debtor shall furnish Secured Party with certificates or other evidence satisfactory to Secured Party of compliance with the foregoing insurance provisions upon request therefor; (e) not sell or offer to sell or otherwise assign, transfer or dispose of the Collateral or any interest therein, other than in the ordinary course of business, without the prior written consent of Secured Party; (f) keep the Collateral free from any adverse lien, claim, security interest or encumbrance and in good order and repair, reasonable wear and tear excepted, and will not waste or destroy the Collateral or any part thereof; and (g) not use the Collateral in violation of any statute or ordinance the violation of which could materially and adversely affect Debtor's business.

3.    <u>Records Relating to Collateral</u>.  Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives and agents appointed by Secured Party to inspect any of the Collateral and the books and records of or relating to the Collateral at any time during normal business hours and upon reasonable notice, to make and take away photocopies, photographs and printouts thereof and to write down and record any such information.

4.    <u>Event of Default; Rights and Remedies</u>.

(a)    An "Event of Default" shall exist hereunder: (1) (x) if Debtor shall fail to make any payments in accordance with the provision of the Note within ten (10) days from the date of such demand, provided however, that Secured Party shall not make any such demands until the expiration of the Forbearance Period or (y) if Debtor shall fail to keep, observe or perform any provision of the Security Documents, the Note, the Forbearance Agreement or any other instrument or agreement between Debtor and Secured Party relating to the Obligations; or (2) if bankruptcy or insolvency proceedings shall be instituted by or against Debtor; or (3) if Debtor shall dissolve, terminate, cease to do business, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets; or (4) the Collateral shall be attached, levied upon, seized in any legal proceedings, or held by virtue of any lien or distress; or (5) if Debtor shall make any assignment for the benefit of creditors; or (6) if Secured Party with reasonable cause determines that its interest in the Collateral is in jeopardy.

(b)    . If an Event of Default shall have occurred and be continuing, then and in any such event, and at any time thereafter, the Secured Party shall have the right from time to time, upon ten (10) business days' written notice by ordinary mail to Debtor as provided for herein, to designate the time and place of any private sale (or public sale if the same shall be required by applicable statute which cannot be waived) at her option to sell, re-sell, assign, transfer and deliver any of the Collateral, in such order and at such price and on such terms, as the Secured Party, in her sole discretion shall determine, for

cash, on credit or for future delivery, and upon such other terms as Secured Party may deem commercially reasonable. Upon such sale, Secured Party, unless prohibited by a provision of any applicable statute which cannot be waived, may purchase the Collateral being sold, or assign, transfer and deliver the same to any other purchaser or purchasers thereof, and Secured Party or such purchaser or purchasers (as the case may be) shall hold the same free from and discharged of all trusts claims, right of redemption, stay or appraisal and equities of Debtor except for surplus money proceedings. Secured Party shall not be obligated to make any sale of Collateral if she shall determine not to do so, regardless of the fact that notice of such sale of the Collateral may have been given. Secured Party may adjourn any public sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case of the sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the sale price is paid by the purchase or purchasers thereof, but Secured Party shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold, and, in case of any such failure, such Collateral may be sold again upon like notice. As an alternative to exercising the power of sale herein conferred upon her, Secured Party may proceed by a suit or suits at law or in equity to foreclose the Collateral and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(c)     Secured Party shall have such other rights with respect to the Collateral as shall be afforded to secured parties by the Uniform Commercial Code as in effect in the State of Florida at such time ("UGC").

(d)     No remedy herein conferred upon or reserved to Secured Party is intended to be exclusive of any other remedy, and such remedies shall be cumulative and shall be in addition to every other remedy given hereunder.

5.     <u>Proceeds of Sale</u>.     The proceeds received from said public or private sale shall be applied in the following order:

(a)     to pay all costs and expenses of collection and of the public or private sale (including, without limitation, reasonable attorneys' fees, advertising costs, brokerage commissions and late charges);

(b)     to pay to Secured Party all sums due Secured Party pursuant to the Note, this Security Agreement and the Forbearance Agreement including, but not limited to outstanding principal of the Note, accrued and unpaid interest on the Note, late charges, default interest, advances, costs and fees, etc.; and

(c)     any surplus realized after said deductions shall be turned over to Debtor.

6.     <u>Other Recourse</u>.

(a)     Debtor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral or other security for the Obligations, or to

242634v1                                        3

have any third party joined with Debtor in any suit arising out of the Obligations, or pursue any other remedy available to Secured Party. Debtor further waives any and all notice of acceptance of this Security Agreement and of the creation, modification, rearrangement, renewal or extension of the Note. Until all of the Obligations shall have been paid in full, Debtor shall have no right of subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party.

(b)     Nothing contained in this Security Agreement shall be construed as requiring Secured Party to take any action at any time. All of Secured Party's rights and remedies, whether provided under law, this Security Agreement or otherwise shall be cumulative and none is exclusive. Such rights and remedies may be enforced alternatively, successively, or concurrently.

7.     Financing Statement Filings. To the extent reasonably necessary in order to maintain Secured Party's perfected security interest in the Collateral, Debtor hereby authorizes Secured Party to file, without the signature of Debtor, one or more financing or continuation statements, and amendments thereto, relating to the Collateral. Debtor further agrees that a photographic or other reproduction of this Security Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction that Secured Party may deem appropriate.

8.     Further Assurances. Debtor hereby agrees to execute and deliver such further instruments and documents as may be reasonably requested by Secured Party in order to carry out fully the intent and accomplish the purposes of this Security Agreement. Debtor agrees to take any action which Secured Party may reasonably request in order to obtain and enjoy the full rights and benefits granted to Secured Party by this Agreement.

9.     Appointment. Debtor hereby irrevocably constitutes and appoints Secured Party, it's successors and assigns, and any agent or designee thereof, as its true and lawful attorney-in-fact with power of substitution and full irrevocable power and authority, coupled with an interest and for a valuable consideration, upon the occurrence and during the continuance of an Event of Default, in the place and stead of, and in the name of, Debtor, or in its own name, to take any and all action and to execute any and all agreements, certificates, documents and instruments which may be necessary or desirable, in it's sole discretion, to realize upon the Collateral, including, without limiting the generality of the foregoing, to ask, demand, collect, receive and give acquittances and receipts for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of with respect to the Collateral; to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to the Collateral; to direct any party liable for any payment with respect to the Collateral to make payment of any and all moneys due and to become due thereunder directly to Secured Party or as Secured Party shall direct; to sign and endorse any assignments, verifications and notices in connection with accounts and other documents relating to the Collateral; to file any claim or to commence and

242634v1                                        4

prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect any and all moneys due with respect to the Collateral whenever payable or any part thereof and to enforce any other right in respect to the Collateral; to collect and enforce the payment of any amounts due with respect to the Collateral by suit, proof of debt or claim or otherwise in any proceeding under the Federal Bankruptcy Code, or in any dissolution, insolvency, liquidation or other proceeding involving an adjustment of the indebtedness or interests in any obligor upon the Collateral or application of any assets of such obligor to the payment in liquidation thereof, or otherwise; to accept or reject any plan of reorganization, readjustment or compromise in her discretion, whether in any such proceedings, by agreement of compromise or otherwise; and generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral as fully and completely as though Secured Party was the absolute owner thereof for all purposes, and to do, at Secured Party's option and at the expense of Debtor, at any time, or from time to time, all acts and things which Secured Party deems necessary or desirable to protect, preserve or realize upon the Collateral and Secured Party's security interest therein, in order to effect the intent of this Agreement, all as fully and effectively as Debtor might do. This power of attorney, being coupled with an interest and being granted for a valuable consideration, is irrevocable until the date the Note is paid in full. The powers conferred on Secured Party hereunder are solely to protect her interests in the Collateral and shall not impose any duty upon her to exercise any such powers, nor shall Secured Party be responsible for or be deemed to have assumed any of Debtor's liabilities or obligations with respect to the Collateral. Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither Secured Party nor any of it's trustees, agents or designees shall be responsible to Debtor for any act or failure to act, or for any error of judgment or mistake of fact or law, except for it's own willful default hereunder.

10.  Miscellaneous.

(a)  Entire Agreement.  This Agreement and the Note contain the entire agreement of Secured Party and Debtor with respect to the Collateral. If the parties hereto are parties to any prior agreement, either written or oral, relating to the Collateral, the terms of this Agreement shall amend and supersede the terms of such prior agreement, but all security agreements, financing statements, guaranties, other contracts and notices for the benefit of Secured Party shall continue in full force and effect to secure the Note unless Secured Party specifically releases her rights thereunder by separate release.

(b)  Amendment.  No modification, consent or amendment of any provision of this Security Agreement shall be valid or effective unless the same is in writing and signed by Debtor and Secured Party.

(c)  Actions by Secured Party.  The lien, security interest and other rights of Secured Party hereunder shall not be impaired by (i) any renewal, extension, increase or modification with respect to the Note, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Collateral or any portion thereof, (iii) any release or indulgence granted to any

endorser, guarantor or surety of the Note, or any conversion of any part of the Note into an equity interest in securities issued by Debtor. The taking of additional security by Secured Party shall not release or impair the lien, security interest or other security rights of Secured Party hereunder or affect the obligations of Debtor hereunder.

(d)     Waiver by Secured Party.  Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default. Secured Party may remedy any default without waiving the Event of Default remedied. Neither the failure by Secured Party to exercise, nor the delay by Secured Party in exercising, any right or remedy upon any Event of Default shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right or remedy at a later date. No single or partial exercise by Secured Party of any right or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right or remedy hereunder, under any statute, or at law or equity, may be exercised at any time. No waiver of any provision hereof or consent to any departure by Debtor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to or demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.

(e)     Costs and Expenses.  Debtor will upon demand pay to Secured Party the amount of any and all costs and expenses (including without limitation, attorneys' fees and expenses), which Secured Party may incur in connection with (i) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party under the Note, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

(f)     Governing Law.     This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without the application of any conflict or choice of law of law principles.

(g)     Jurisdiction.     With respect to any claim or cause of action in connection with the execution or performance of, or arising under this Security Agreement, Debtor (a) irrevocably submits to the nonexclusive personal jurisdiction of the courts of the State of Florida; (b) irrevocably waives any objection which it may have to the laying on of venue of any suit, action or proceeding arising out of or relating to this Security Agreement brought in any such court; (c) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum; (d) irrevocably waives the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over it; and (e) IRREVOCABLY WAIVES ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING WITH RESPECT TO SUCH CLAIM, SUIT, ACTION OR PROCEEDING.

(h)   Severability.   If any provision of this Security Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Agreement, and the effect thereof shall be confined to the provision held to be illegal, invalid or unenforceable.

(i)   No Obligation.   Nothing contained herein shall be construed as an obligation on the part of Secured Party to extend or continue to extend credit or loans to Debtor.

(j)   Binding Effect and Assignment.   This Security Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Debtor and the legal representatives, successors and assigns of Debtor, and (iii) shall inure to the benefit of Secured Party and the heirs, executors, administrators, legal representatives, successors and assigns of Secured Party. Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Note and it's rights under this Security Agreement to any other party. Debtor's rights and obligations hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

(k)   Termination.   Upon payment in full of the Note, this Security Agreement and the security interests created hereby shall terminate. Upon termination of this Agreement and with Debtor's written request, Secured Party will, at Debtor's sole cost and expense, return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

(l)   Cumulative Rights.   All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

(m)   Gender and Number.   Within this Security Agreement, words of any gender shall be held and construed to include the other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context requires otherwise.

(n)   Descriptive Headings.   The headings in this Security Agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

(o)   Counterparts.   This Security Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same agreement.

242634v1                                   7

IN WITNESS WHEREOF, this Security Agreement has been executed as of the day and year first written above.

DEBTOR:

W.B. CARE CENTER, LLC

By:

Name:

Title:

SECURED PARTY:

INSTITUTIONAL LEASING 1, LLC

By:

Name: Abraham Shaulson

Title: Manager

242634v1

8

## PROMISSORY NOTE

**$2,500,000**
                                           Miami, Florida
                                           June 30, 2008

         FOR VALUE RECEIVED, the undersigned, W.B. Care Center LLC, a Florida limited liability company with offices c/o 2627 South Bayshore Drive, Suite 2506, Miami, Florida 33133 (the "Maker"), hereby promises to pay to INSTITUTIONAL LEASING 1 LLC, a Florida limited liability company, having an address at P.O.B. 402401, Miami Beach, Florida 33140, its successors, assigns or designees (collectively, the "Payee") the principal sum of TWO MILLION FIVE HUNDRED THOUSAND AND 00/100 ($2,500,000) DOLLARS, payable as follows: the principal sum of $2,500,000 and 00/100 ($2,500,000), with interest at the Interest Rate (as hereinafter defined) from the date of this Note, shall be paid on or before the fifth (5th) anniversary of the date hereof (the "Maturity Date"). All payments shall be applied first to accrued and unpaid interest, then to principal.

         1.      The "Interest Rate" as used here shall mean a variable interest rate per annum equal to the Lender's Base Rate, as hereinafter defined, plus six (6 %) percent, but in no event will the interest rate be less than 10.5% per annum (the "Floor Rate") on the unpaid balance from time to time outstanding until the entire principal balance of the indebtedness evidenced by this Note and all interest and other amounts from time to time payable under this Note shall have been paid in full. The term "Lender's Base Rate" as referred to in this Note is the interest rate published in the Eastern Edition of **THE WALL STREET JOURNAL** in the "Money Rates" table as the "Prime Rate" in effect from time to time computed daily and payable monthly on the basis of a three hundred and sixty (360) day year and actual days elapsed for JP Morgan/Chase Bank. If the said Prime Rate is published as a range, with a high and a low interest rate, the Lender's Base Rate shall be the highest rate on corporate loans posted by at least 75% of the USA's 30 largest banks known as The Wall Street Journal Prime Rate and is published in **THE WALL STREET JOURNAL**. The rate of interest under this note will change as of the effective date of each change in such Prime Rate. If **THE WALL STREET JOURNAL** shall cease to publish the Prime Rate in the Money Rates table of its Eastern Edition, the Lender shall choose an interest rate that in the sole and absolute discretion of Lender most closely approximates said Prime Rate and Lender may notify Borrower in writing of such designation, which rate shall be Lender's Base Rate from and after the date on which **THE WALL STREET JOURNAL** shall have ceased to so publish the Prime Rate. Lender's Base Rate may not be the lowest or most favorable rate charged by Lender.

         2.      **REPAYMENT.** The entire outstanding principal balance of this Promissory Note, together with all unpaid and accrued interest and all other amounts due and owing pursuant to the terms of this Promissory Note shall be due and payable without notice or demand on the Maturity Date. The annual Interest Rate for this Promissory Note is computed on a 360/365 basis; that is, by applying the ratio of the

1

235660v2

annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.

All payments of principal and interest shall be made in lawful money of the United States that shall be legal tender in payment of all debts at the time of payment. Any check, draft or money order remitted in settlement of this note, may be handled for collection in accordance with the practice of the collecting bank or banks and shall not be deemed payment until the money is actually received by the holder of this note.

3. **DEFAULT.** Upon the occurrence of any Event of Default (as hereinafter defined), the entire outstanding balance of this Promissory Note shall, at the option of the holder, become immediately due and payable without notice or demand, and in any event, interest shall immediately accrue at a "default rate" which means the rate of interest which is Eighteen (18%) percent per annum, but in no event to exceed the maximum rate allowed by law.

4. The occurrence of any of the following events shall be deemed an Event of Default hereunder:

(a) Maker shall default in making payment of the principal, interest or any other amount due and payable under this Promissory Note when due, provided however that Payee shall be required to send Maker one ten (10) day notice to cure during any 12 month period for any default in payment before the same shall be deemed an Event of Default;

(b) (i) Maker commences any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency or the relief of debtors, seeking to adjudicate it a bankrupt or insolvent, or seeking an arrangement, adjustment, composition or other relief with respect to it or its debts, or (B) seeking the appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or making a general assignment for the benefit of creditors; or (ii) there is commenced against Maker any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order or judgment for relief or any such adjudication or appointment, or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iii) Maker takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (i) and,(ii) above; or

(c) A default or an Event of Default by Maker under the Lease (as hereinafter defined) as set forth in Paragraph 8 hereof.

Upon the occurrence of (i) any Event of Default hereunder under clause (a), Payee may declare the unpaid principal amount of this Promissory Note and accrued unpaid interest to be due and payable by giving written notice of such declaration to Maker, and upon the giving of such notice, such principal amount and interest shall become

235660v2

immediately due and payable without any further notice or demand upon the Maker, (ii) any Event of Default under clause (b) above, the outstanding principal amount of this Promissory Note and accrued unpaid interest shall become immediately due and payable hereunder without any notice or demand upon the Maker, and (iii) any Event of Default hereunder, and continuing thereafter (including after the entry of judgment on this Promissory Note), interest on the unpaid principal balance of this Promissory Note shall accrue at the highest per annum interest rate permitted by law (the "Default Rate") until this Promissory Note is paid in full.

5. Any notice required or permitted to be given hereunder shall be deemed to have been duly given when delivered, if sent by national overnight courier (such as Federal Express, or similar), or three (3) days after being sent by United States registered or certified mail, return receipt requested, with postage prepaid, addressed to Maker at the address set forth above. Any notice required or permitted to be given hereunder by Payee maybe given by an attorney on behalf of Payee.

6. Maker hereof expressly waives the right to trial by jury.

7. Maker hereby waives presentment for payment, demand, notice of nonpayment, protest of any dishonor, notice of protest and protest of this Promissory Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Promissory Note. In addition, Maker hereby also expressly waives the right to (i) interpose counterclaims or (ii) assert any and all defenses, counterclaims, set-off and reductions for any reason whatsoever against any other parties identified as Plaintiffs in the action referred to in the Stipulation of Settlement hereafter defined, except as set forth therein.

8. This Promissory Note is the Note referred to in that certain Lease of even date herewith between Maker, as Tenant, and Payee, as Landlord (the "Lease"). A default or an Event of Default under the Lease shall also be deemed an Event of Default under this Promissory Note.

9. In the event that (i) the indebtedness evidenced by this Promissory Note, or any part thereof, is collected in any proceeding at law, or (ii) this Promissory Note is submitted to attorneys for collection after the failure of Maker to make payment of any principal or interest when due and payable, Maker shall pay all reasonable costs of collecting this Promissory Note, including, without limitation, reasonable attorney's fees and expenses and court costs, if any.

10. **DELAY IN ENFORCEMENT**. The liability of Maker and any subsequent endorser, guarantor or other accommodation maker under this Promissory Note is unconditional and shall not be affected by an extension of time, renewal, waiver or any other modification whatsoever, granted or consented to by the holder. Any failure by the holder to exercise any right it may have under this Promissory Note is not a waiver of the holder's right to exercise the same or any other right at any other time.

3

235660v2